1

2             UNITED STATES DISTRICT COURT

3               DISTRICT OF NEW JERSEY

4    OTSUKA PHARMACEUTICAL, CO., LTD.,)Consolidated
                                      )Civil Action No.
5                Plaintiff,           )3:07-cv-0100
                                      )(MLC)(LHG)
6         v.                          )
                                      )Honorable Judge
7    SANDOZ, INC.,                    )Mary L. Cooper
     TEVA PHARMACEUTICALS USA, INC.,  )
8    TEVA PHARMACEUTICAL INDUSTRIES,  )
     LTD., BARR LABORATORIES, INC.,   )
9    BARR PHARMACEUTICALS, INC.,      )
     APOTEX, INC., APOTEX CORP., SUN  )
10   PHARMACEUTICAL INDUSTRIES, LTD., )
     SYNTHON BV, SYNTHON              )
11   PHARMACEUTICALS, INC., and       )
     SYNTHON LABORATORIES, INC.,      )
12                                    )
                     Defendants.      )
13   -------------------------------)

14

15

16

17                  Trial Proceedings

18                 Trenton, New Jersey

19               Thursday, August 5, 2010

20

21

22

23

24   Reported by:
     JOMANNA DeROSA, CSR
25   JOB NO. 32431

1

2

3          August 5, 2010

4          9:30 a.m.

5

6

7          Trial, held at the United States

8 District Court, District of New Jersey,

9 402 East State Street, Trenton, New Jersey,

10 before Jomanna DeRosa, a Certified Shorthand

11 Reporter and Notary Public of the States of

12 New York, New Jersey, California and

13 Arizona.

14

15

16

17

18

19

20

21

22

23

24

25

1

2   A P P E A R A N C E S:

3

4        FINNEGAN, HENDERSON, FARABOW,

5        GARRETT & DUNNER LLP

6        Attorneys for Plaintiff

7              901 New York Avenue, NW

8              Washington, D.C. 20001

9        BY:   PAUL W. BROWNING Ph.D.

10             JAMES B. MONROE ESQ.

11             MICHAEL J. FLIBBERT ESQ.

12

13

14        FITZPATRICK, CELLA, HARPER & SCINTO

15        Attorneys for Plaintiff

16             1290 Avenue of the Americas

17             New York, New York 10104

18        BY:   JOHN D. MURNANE ESQ.

19

20

21

22

23

24

25

1

2    A P P E A R A N C E S (Continued):

3

4         KENYON & KENYON LLP

5         Attorneys for Defendant Teva

6              One Broadway

7              New York, New York 10004

8         BY:   MARIA LUISA PALMESE ESQ.

9              ELIZABETH HOLLAND ESQ.

10

11

12        FLASTER GREENBERG, P.C.

13        Attorneys for Plaintiff

14             1810 Chapel Avenue West

15             Cherry Hill, New Jersey 08002

16        BY:   JEFFREY A. COHEN ESQ.

17

18

19        HUSCH BLACKWELL SANDERS LLP

20        Attorneys for Defendant Apotex

21             120 South Riverside Plaza, Suite 2200

22             Chicago, Illinois 60606

23        BY:   DANIEL R. CHERRY ESQ.

24             STEVEN E. FELDMAN ESQ.

25             JAMES P. WHITE ESQ.

1

2      A P P E A R A N C E S (Continued):

3

4           LITE DEPALMA GREENBERG, LLC

5           Attorneys for Defendant Teva

6                Two Gateway Center, 12th Floor

7                Newark, New Jersey 07102

8           BY:   MAYRA V. TARANTINO ESQ.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          PROCEEDINGS

2          JUDGE COOPER:  Good morning,

3     everyone.  This morning, of course, we start

4     with opening statements.  Everyone may be

5     seated except counsel, who will be stating

6     their appearances.

7          MR. MONROE:  Good morning, Your

8     Honor.  James Monroe from Finnegan on behalf

9     of Otsuka.

10         MR. FLIBBERT:  Good morning, Your

11    Honor.  Mike Flibbert from Finnegan, also for

12    Otsuka.

13         MR. BROWNING:  Good morning, Your

14    Honor.  Paul Browning from Finnegan, also on

15    behalf of Otsuka.

16         MR. MURNANE:  Good morning, Your

17    Honor.  John Murnane from Fitzpatrick, Cella,

18    Harper & Scinto, also for Otsuka.

19         JUDGE COOPER:  Thank you.

20         MS. HOLLAND:  Good morning, Your

21    Honor.  Elizabeth Holland of Kenyon & Kenyon

22    for the Teva and Barr defendants.

23         MS. PALMESE:  Good morning, Your

24    Honor.  Maria Palmese from Kenyon & Kenyon for

25    Teva/Barr.

1                     PROCEEDINGS

2              MR. CHERRY:  Good morning, Your

3      Honor.  Dan Cherry from Husch Blackwell for

4      Apotex.

5              MR. FELDMAN:  Good morning, Your

6      Honor.  Steven Feldman from Husch Blackwell

7      for Apotex.

8              MR. WHITE:  Good morning, Your

9      Honor.  James White, Husch Blackwell, for

10     Apotex.

11             MR. COHEN:  Good morning, Your

12     Honor.  Jeffrey Cohen from Flaster Greenberg

13     for Apotex.

14             MS. TARANTINO:  Good morning, Your

15     Honor.  Mayra Tarantino from Lite DePalma

16     Greenberg, also on behalf of Teva and Barr.

17             JUDGE COOPER:  All right.  Be

18     seated.  Thank you.

19             Are there any preliminaries before

20     we begin the opening statements?

21             MS. HOLLAND:  No, Your Honor.

22             MR. CHERRY:  No, Your Honor.

23             JUDGE COOPER:  Okay.  Fine.  Who

24     would like to go first?

25             MS. HOLLAND:  I will, Your Honor.

1         HOLLAND - OPENING STATEMENT

2    Thank you.

3             JUDGE COOPER:  And we will listen

4    to this opening statement in its entirety.

5    Then we'll take a brief recess before we do

6    the next one.

7             MS. HOLLAND:  Before I begin, Your

8    Honor, I'm going to be speaking on behalf of

9    Teva and Barr, and Mr. Cherry is going to be

10   speaking on behalf of Apotex, and we're going

11   to split up the time, the hour that we have.

12            JUDGE COOPER:  Sure.  That's fine.

13            MS. HOLLAND:  Before I begin, with

14   your permission I would just like to introduce

15   the rest of the members of our trial team who

16   you haven't met yet, but they've put a lot of

17   hard work into the case.

18            We have Pete Giunta, Tom Lavery,

19   Michael Chang, Ajita Shukla.

20            I'd also like to introduce Lauren

21   Rabinovic, who is in-house counsel at Teva.

22   And Darren Buchbinder, who is going to be

23   helping us with the visuals.

24            JUDGE COOPER:  Thank you.

25            MS. HOLLAND:  As you know, Your

1          HOLLAND - OPENING STATEMENT

2      Honor, there are three claims that Otsuka is

3      asserting against the defendants in this case.

4                Can we have the first slide?

5                These are the three claims, Your

6      Honor, in summary form.  Claim 12 of the

7      '528 patent covers the compound aripiprazole

8      itself.

9                And Claim 17 covers a

10     pharmaceutical composition for treating

11     schizophrenia that's containing aripiprazole

12     as the active ingredient.

13               And finally, Claim 23 is a method

14     of treating schizophrenia in a patient by,

15     again, administering the compound

16     aripiprazole.  And aripiprazole is the active

17     ingredient in Abilify.

18               Now, the '528 patent-in-suit was

19     not the first time that Otsuka obtained patent

20     protection for aripiprazole.  Otsuka's earlier

21     '416 patent also covered aripiprazole, and

22     also barred others from making, using or

23     selling aripiprazole.

24               Can we have the next slide.

25               As you can see here, Your Honor,

HOLLAND - OPENING STATEMENT

1  
2   Otsuka obtained the '416 patent in March 1988,
3   and through that patent got a full patent
4   term's worth of protection for aripiprazole up
5   until March 2005.
6          When Otsuka obtained the
7   '528 patent in 1991, it got for itself almost
8   an additional full decade of patent protection
9   for aripiprazole.
10         Now, Otsuka has affirmatively used
11  the '416 patent as a weapon to keep others off
12  the market for aripiprazole.  As we see in
13  this slide 3, Your Honor, Otsuka certified to
14  the FDA when it submitted its new drug
15  application that the '416 patent covers its
16  aripiprazole products.
17         Similarly, Otsuka's package insert
18  for its Abilify product listed the '416 patent
19  as covering the aripiprazole product and
20  Abilify and essentially telling the public
21  that it was prepared and ready, willing and
22  able to assert the '416 patent against anybody
23  who tried to come on the market with an
24  aripiprazole product.
25         But the '416 patent was not limited

1      HOLLAND - OPENING STATEMENT

2      to aripiprazole.  It claimed an entire class

3      of chemical compounds that are known as

4      carbostyril derivatives.  That's a term we're

5      going to be exploring more throughout the

6      course of this case.

7              This is a statement that Otsuka

8      made in the pretrial order.  And as you can

9      see, Otsuka acknowledges that the '416 patent

10     took billions of different chemical

11     structures, different carbostyril derivatives,

12     out of the hands of the public.

13             If Otsuka hadn't roped off this

14     entire class of compounds for itself, Your

15     Honor, others could have been researching

16     carbostyril derivatives and could have been

17     looking at them as antischizophrenic drugs.

18     Instead, everybody other than Otsuka was

19     prohibited from doing so.

20             As Mr. Cherry will explain during

21     his presentation, the fact that Otsuka got a

22     monopoly on all these carbostyril derivatives

23     in the '416 patent, and other patents that

24     Otsuka has on carbostyril derivatives, that

25     makes the question of secondary considerations

HOLLAND - OPENING STATEMENT

of nonobviousness completely irrelevant in this case.

Now, Your Honor asked at the hearing on the in limine motions, how is it possible to obtain a patent that covers billions of compounds, as Otsuka did in the '416 patent?

Well, the way to do that, Your Honor, is to convince the patent office that the utility that you claim for the compounds or, you know, the way they can be used, that you can take the information you have and generalize that to all the compounds that you're claiming.

So let's see what Otsuka said about the usefulness of these carbostyril derivatives of the '416 patent.

This is an excerpt from the '416 patent, column 3. And as you can see, among other things, the compounds of the present invention are useful as antischizophrenic agents. This is what Otsuka told the public as a use of the carbostyril derivatives of the '416 patent.

HOLLAND - OPENING STATEMENT

1
2          Now, in the case of the
3    '416 patent, the patent office looked at
4    Otsuka's data and said there simply wasn't
5    enough there to let them get these very broad
6    claims on all these compounds.
7          So what did Otsuka do?  In order to
8    prove to the patent office that the compounds
9    of the claims really did have the
10   antischizophrenic activity that Otsuka said
11   they did, they submitted a declaration from
12   Dr. Nakagawa, who is one of the inventors on
13   the '416 patent.
14          And the Nakagawa declaration
15   contains data from a test called the Mouse
16   Jumping Test, which you will be hearing a lot
17   about in this case.  The Mouse Jumping Test is
18   a standard test that's used to determine
19   antischizophrenic activity.
20          Can we see slide 7, please.
21          Now, what Otsuka argues to the
22   Court in this case is that somebody looking to
23   develop an antischizophrenic drug would simply
24   pay no attention to Mouse Jumping data.  It
25   would be irrelevant to them.

Page 14

HOLLAND - OPENING STATEMENT

1

2          But let's see what Otsuka told the

3   patent office when it was trying to get claims

4   to carbostyril derivatives based on Mouse

5   Jumping data.

6          This was a statement that Otsuka

7   made during prosecution of another one of its

8   compounds on carbostyril derivatives, the

9   '932 patent.  And what Otsuka clearly told the

10  patent office was that Mouse Jumping data

11  demonstrates antischizophrenic activity, and

12  that it provides reasonable assurance that

13  claim compounds will have antischizophrenic

14  activity.

15         And Your Honor, that's just one

16  example, as you'll see in this case, of Otsuka

17  taking positions in the current litigation

18  that are inconsistent with things they've said

19  to the patent office in the past.

20         Not only is the Mouse Jumping Test

21  a standard test that's used in the industry

22  for determining antischizophrenic activity,

23  it's a test that Otsuka actually used to

24  determine antischizophrenic activity.

25         Can we see the next slide.

1        HOLLAND - OPENING STATEMENT

2            This is an excerpt from the

3    deposition testimony of Dr. Banno, another

4    inventor on the '416 patent.  And as he says

5    quite clearly, that the Mouse Jumping Test was

6    an important test that Otsuka used for

7    determining antischizophrenic activity.

8            Now, let's get back to the Nakagawa

9    declaration.  As we saw a minute ago, the

10   '416 patent claims billions of compounds.  So

11   how did Otsuka decide which compounds it was

12   going to put in the Nakagawa declaration when

13   it wanted to prove to the patent office that

14   the claim's compounds had antischizophrenic

15   activity?

16           Can we see slide 9.

17           This is Table 8 from the Nakagawa

18   declaration, and this is the table that

19   contains the Mouse Jumping data we've been

20   talking about.

21           As you can see, of the billions of

22   compounds of the '416 patent, Otsuka narrowed

23   down the compounds to nine, and chose these

24   nine to demonstrate to the patent office that

25   the compounds have antischizophrenic activity.

1           HOLLAND - OPENING STATEMENT

2       And one of these nine compounds, which is

3       circled here, is the compound we've been

4       calling the unsubstituted butoxy, and it's

5       Claim 13 of the '416 patent.

6                   Can we see the next slide.

7                   So what did Dr. Nakagawa, on behalf

8       of Otsuka, tell the patent office about these

9       nine compounds, including the unsubstituted

10      butoxy?

11                  Well, Otsuka told the patent office

12      that they performed excellently in the Mouse

13      Jumping Test, meaning these are compounds that

14      have excellent antischizophrenic activity.

15                  Now, let's fast-forward to the

16      prosecution of the '528 patent, which is the

17      patent-in-suit in this case.

18                  As you know, the '528 patent went

19      through an initial examination and issued in

20      1991.  In 2005 Otsuka put the patent into a

21      patent office procedure called a

22      reexamination, and it told the patent office

23      that the '416 patent, which we've just been

24      discussing, presented a substantial new

25      question of patentability, which is the

1        HOLLAND - OPENING STATEMENT

2     standard that's used in the patent office for

3     determining whether a reexamination is

4     appropriate.

5              After Otsuka put the '528 patent

6     into reexamination, the examiner immediately

7     zeroed in on the unsubstituted butoxy and

8     said, Look, the unsubstituted butoxy makes

9     aripiprazole obvious.

10             And the examiner rejected the

11    claims in the reexamination to -- well, before

12    I get to the science, Your Honor, the examiner

13    also rejected the claims over another compound

14    called the 2,3-dichloropropoxy, which is

15    another compound you may have seen in the

16    trial brief.

17             In order to understand the

18    examiner's rejection, I want to delve into the

19    chemistry a little bit, so let's go to

20    slide 11.

21             This is the chemical structure of

22    aripiprazole.  This is basically the way

23    chemists communicate with each other about

24    compounds.  It's a pictorial representation of

25    the way the atoms in the compound are linked

1      HOLLAND - OPENING STATEMENT

2      together.

3              The lines that you see represent

4      chemical bonds, and the points are the

5      different atoms in the aripiprazole molecule.

6      So whenever you see a point, Your Honor, that

7      is an atom.  The lines are bonds.  And to

8      chemists, when there's no particular atom at a

9      particular point, it's understood to be

10     carbon.  So to a chemist, when a chemist sees

11     this structure, the chemist understands

12     exactly what aripiprazole looks like in

13     three-dimensional space.

14              Now, it may look -- the structure

15     may look a little complicated right now, but I

16     think if we look at it and break it down in

17     the way that a chemist would look at it, into

18     its component parts, it will be a little

19     easier to understand.

20              So let's go to the next slide.

21              This shows you the general

22     structure of the carbostyril derivatives we're

23     going to be looking at in this litigation.

24     And as you'll see, Your Honor, they follow the

25     same general pattern.  You'll see a

1      HOLLAND - OPENING STATEMENT

2      carbostyril core, which is kind of the heart

3      of the molecule.

4              And, you know, as I mentioned

5      earlier, they're called carbostyril

6      derivatives because they have this carbostyril

7      core, and there's something hanging off of the

8      carbostyril core, and that's going to

9      generally be true in all the compounds we look

10     at.

11              Next to the carbostyril core we

12     have what's called the side chain, and the

13     side chain of aripiprazole has three

14     components to it.  You could think of it kind

15     of like a bracelet, Your Honor, with a charm

16     hanging off of it.  That would be the core

17     with the side chain.

18              The side chain is made up of three

19     parts:  A linker in orange here, a piperazine

20     group in gray, and a phenyl group in green.

21     So this is the aripiprazole molecule broken

22     down into its component parts.  And as I said,

23     all the carbostyril derivatives we look at are

24     going to have those same component parts.

25              Now, let's compare the structure of

1          HOLLAND - OPENING STATEMENT

2      aripiprazole to the structure of the

3      unsubstituted butoxy.  So we have the

4      aripiprazole structure on top.  We have the

5      unsubstituted butoxy structure on the bottom.

6      Again, unsubstituted butoxy is Claim 13 of the

7      '416 patent.

8                As you can see, Your Honor,

9      aripiprazole and the unsubstituted butoxy have

10     an identical carbostyril core.  They have an

11     identical linker.  They have an identical

12     piperazine group.  The place that they differ,

13     Your Honor, is only in the phenyl group.

14                As you can see, aripiprazole has

15     two chlorine atoms, represented by the "Cl" at

16     the top.  And as the name would imply, the

17     unsubstituted butoxy is unsubstituted.  It has

18     no substitutions on the phenyl group.

19                The chlorines on aripiprazole are

20     what we call the 2 and the 3 positions.

21     Dr. Press a little later on this morning is

22     going to explain in more detail the numbering

23     system that's used to number these compounds.

24     But for our purposes now, we should just

25     remember that the chlorines on aripiprazole

1       HOLLAND - OPENING STATEMENT

2       are at the 2 and 3 positions.

3              The next slide.

4              This compares aripiprazole to the

5       other compounds I mentioned earlier, which the

6       examiner said made aripiprazole obvious.  This

7       is called the 2,3-dichloropropoxy.  And as you

8       can see again, Your Honor, the same pattern.

9       They each have the carbostyril core identical.

10             In the case of the linker, this is

11      the one difference between aripiprazole and

12      the 2,3-dichloropropoxy, is in the length of

13      the linker.  If you look at aripiprazole, the

14      linker has four carbons, four points on the

15      linker.  Because it has four carbons, it's

16      called a butoxy linker.

17             If you look at the linker on the

18      2,3-dichloropropoxy, it has three carbons.

19      Three carbon linkers are known as propoxy

20      linkers.  And in the case of aripiprazole and

21      the 2,3-dichloropropoxy, that is the single

22      difference between the compounds.  It's the

23      length of the linker, butoxy versus propoxy.

24             Next.

25             Again, we see identical piperazine

1        HOLLAND - OPENING STATEMENT

2    group between aripiprazole and the

3    2,3-dichloropropoxy and identical phenyl

4    group.  They each have the chlorines at the 2

5    and 3 position.

6            Since the structure of aripiprazole

7    is nearly identical to the structures of both

8    the unsubstituted butoxy and the

9    2,3-dichloropropoxy, aripiprazole is what is

10    known as prima facia obvious.

11            Can we see slide 15, please.

12            This is a quote from the Federal

13    Circuit's decision in In re Lalu:

14            "As you can see, compounds of

15    similar structure are prima facia obvious.

16    Why is that?  Because a chemist expects that

17    compounds that have similar structure will

18    have similar properties."

19            So getting back to the examiner's

20    rejection of aripiprazole, the examiner found

21    that aripiprazole is very similar in structure

22    to the unsubstituted butoxy, very similar in

23    structure to the 2,3-dichloropropoxy.  The

24    similarity in structure makes you expect that

25    aripiprazole will have similar properties, and

1        HOLLAND - OPENING STATEMENT
2    that's what the examiner found.
3            Now, given all this, the structural
4    similarity, the data from the Nakagawa
5    declaration showing that the unsubstituted
6    butoxy had antischizophrenic activity, how did
7    Otsuka convince the patent office to allow the
8    claims to aripiprazole?
9            Well, simple, Your Honor.  It just
10   never told the patent office about the
11   Nakagawa declaration.  It never told the
12   patent office that there was data on the
13   unsubstituted butoxy showing antischizophrenic
14   activity.  More than that, it actually
15   affirmatively represented to the patent office
16   that the data didn't exist.
17           Can we see the next slide.
18           This is an excerpt from a
19   submission that Otsuka made during the
20   '528 patent reexamination.  As you can see,
21   Otsuka told the patent office:
22           "There is no evidence that the
23   unsubstituted butoxy has antischizophrenic
24   activity."
25           Next slide.  Another statement that

Page 24

1        HOLLAND - OPENING STATEMENT

2    Otsuka made during the '528 reexamination,

3    same idea:

4            "There is no prior art evidence

5    that the unsubstituted butoxy has

6    antischizophrenic activity."

7            So what did Otsuka accomplish by

8    hiding all the data from the Nakagawa

9    declaration and the unsubstituted butoxy from

10   the examiner?

11           It permitted Otsuka to argue that

12   it would be unexpected that compounds with the

13   butoxy linkers, the four carbon linkers like

14   aripiprazole, would have superior

15   antischizophrenic properties to the propoxy

16   compounds, the three carbon linked compounds.

17           Can we see the next slide.

18           And we can see that Otsuka got the

19   result it wanted because the examiner, in the

20   reasons for confirming the patent after

21   reexamination of the '528 patent, found that

22   it would be unexpected that the compounds with

23   the butoxy linker -- and I apologize for the

24   typos from the patent office, Your Honor --

25   but what the amendment says is that it would

HOLLAND - OPENING STATEMENT

1  be unexpected that compounds with the butoxy

2  linker would be superior to compounds with the

3  propoxy linker.

4          And the reason Otsuka was able to

5  have the examiner come out with that result is

6  because they didn't let her do her job

7  properly.  They didn't give her all the

8  information she needed.  She needed to know

9  about the Nakagawa declaration.  She needed to

10  know about Otsuka's data on the unsubstituted

11  butoxy having antischizophrenic activity.  She

12  needed to know that it would not be unexpected

13  to have activity in those compounds.  It would

14  be expected, based on the Nakagawa declaration

15  data.

16          We submit, Your Honor, that when

17  all the prior art is considered, not just what

18  Otsuka cherry-picked to show the patent

19  office, that the Court will find that the

20  examiner was correct.  These compounds --

21  aripiprazole is obvious over the unsubstituted

22  butoxy compound, and aripiprazole is nothing

23  more than an obvious modification of that

24  compound.

1     HOLLAND - OPENING STATEMENT

2           With that background, I'd like to

3     focus in on the double patenting defense.

4           Can we see slide 19.

5           This is just an overview of double

6     patenting, Your Honor.  As you know, it

7     applies only in a situation like what we have

8     here, where the same entity, Otsuka, owns both

9     patents, an earlier patent and a later patent.

10          And the test for double patenting

11    is whether the claim in the later patent, in

12    this case the claims of aripiprazole, are

13    obvious variants of the claims of the earlier

14    patent, in this case the '416 patent.

15          Now, Otsuka contends in this case

16    that the double patenting analysis is what it

17    calls "subsumed by the obviousness" analysis.

18    But that's simply wrong, Your Honor.  The

19    Federal Circuit has made clear that

20    obviousness and double patenting are two

21    separate distinct defenses, and they have

22    different elements.

23          Can we see the next slide.

24          These are some of the key defenses

25    between double patenting and obviousness.

Page 27

HOLLAND - OPENING STATEMENT

1
2          First of all, double patenting does
3     not require identification of a lead compound.
4     The case law tells you where to start with a
5     double patenting analysis.  You must start
6     with the claims of the earlier patent.
7          In addition, double patenting
8     analysis does not require evidence of
9     motivation to combine or modify the prior art.
10     It also does not require inquiry into
11     secondary considerations.
12          So as required by the case law, the
13     double patenting analysis in this case has to
14     start with the claims of the earlier patent.
15          As we've seen, the unsubstituted
16     butoxy is Claim 13 of the '416 patent, and
17     that's where we start our double patenting
18     analysis.
19          The only question for the Court on
20     the double patenting defense is whether
21     aripiprazole is an obvious variance of the
22     unsubstituted butoxy.
23          And the Nakagawa declaration, which
24     I've talked about a little bit so far,
25     provides a person of ordinary skill with

HOLLAND - OPENING STATEMENT

1  unequivocal test data that teaches that person

2  to put chlorines at the 2 and 3 position of

3  the unsubstituted butoxy to make aripiprazole.

4  And that's the only difference between the two

5  compounds.

6         Can we see slide 21.

7         Previously, Your Honor, I showed

8  you a slide that had Table 8 from the Nakagawa

9  declaration.  You saw there were nine

10  compounds listed.

11         What I do on this slide is just

12  compare two of those compounds to show you

13  what information the Nakagawa declaration

14  provides to the person of ordinary skill in

15  the art.

16         Just to explain the format first,

17  on the left-hand side are the compound numbers

18  that Nakagawa gave in his declaration.  What

19  we've added in here are the structures of the

20  compounds, their names, and the column on the

21  right.  The ED50, again, comes from the

22  Nakagawa declaration.

23         First, to explain what ED50 is.

24  ED50 is the result you get from the Mouse

HOLLAND - OPENING STATEMENT

1    Jumping Test.  ED50 is the effective dose that

2    gives you a 50 percent result.

3            So in a test like the Mouse Jumping

4    Test, the lower the ED50 value, the better the

5    compound does in the test because what it

6    means is you need less of it to get the

7    reaction that you want.

8            So in this case, the Nakagawa

9    declaration permits the person of ordinary

10   skill in the art to compare how a propoxy

11   compound and a butoxy compound do in the Mouse

12   Jumping Test.

13           What we see here is the same

14   pattern of two carbostyril derivatives we've

15   seen earlier, the carbostyril core, the

16   linker, piperazine and phenyl.

17           In this case, the unsubstituted

18   propoxy compound, as you might expect, has a

19   propoxy linker, three carbons, unsubstituted

20   on the phenyl ring.

21           If you look at the unsubstituted

22   butoxy, which we've seen before, four carbons

23   on the linker, unsubstituted on the phenyl

24   ring.  So this gives you a direct comparison

HOLLAND - OPENING STATEMENT

1  between the propoxy compound and the butoxy
2  compound.
3
4          And what you see, Your Honor, is
5  that the unsubstituted butoxy has a lower
6  score in the Mouse Jumping Test, meaning it is
7  a more potent compound.  You need to give less
8  of it in order to get the result that you
9  want.
10          Next slide.
11          So the first piece of information
12  we have from Nakagawa is I want to go with the
13  butoxy, not a propoxy.  I get a more potent
14  compound.
15          Let's see what else the Nakagawa
16  declaration teaches us.  Here we see the
17  propoxy series of compounds.  These all have
18  the propoxy linker.  The first one is the
19  unsubstituted that we saw in the previous
20  slide.
21          The next three compounds differ
22  from the unsubstituted propoxy in a single
23  way.  Compound 16 has a chlorine at the
24  4 position, compound 39 has the chlorine at
25  the 3 position, and compound 43 has a chlorine

1            HOLLAND - OPENING STATEMENT

2        at the 2 position.

3                    This permits the person of ordinary

4        skill in the art to see what happens when you

5        put a chlorine on a phenyl ring.  How does

6        that affect the potency of the compound?

7                    So if you look at compound 16, Your

8        Honor, there's a chlorine at the 4 position.

9        What does that do to the potency?  As you can

10       see, ED50 goes up, less potent compound.  You

11       have to give more of it.

12                   So the person of ordinary skill in

13       the art says to themselves, I don't want to

14       put a chlorine at the 4 position.

15                   But if you look at compounds 39 and

16       43, which have the chlorines at the 2 and

17       3 positions, what happens?  The ED50 goes

18       down, more potent compounds.

19                   So the person of ordinary skill in

20       the art says, I want to put chlorine at the

21       2 position and I want to put chlorine at the

22       3 position because that's going to give me a

23       more potent compound.

24                   When you look at those two pieces

25       of information together, I want to go with

1          HOLLAND - OPENING STATEMENT

2     butoxy, not propoxy, and I want to put

3     chlorines at the 2 and 3 position.  You get

4     the compound aripiprazole, the butoxy linker

5     with the chlorines at the 2 and 3 position.

6          So Nakagawa does, Your Honor,

7     provide a roadmap for the person of ordinary

8     skill in the art to get to aripiprazole.

9          Since the double patenting analysis

10    doesn't get into secondary considerations,

11    that's basically the end of the story on

12    double patenting.  Even if Otsuka did have

13    evidence of unexpected results, which it

14    doesn't, that evidence wouldn't be relevant to

15    double patenting.

16          And the fact that aripiprazole is

17    an obvious variance of the unsubstituted

18    butoxy, that ends the inquiry on double

19    patenting, and the Court should find that

20    aripiprazole, the three claims at issue in

21    this case, are invalid for double patenting.

22          Before I turn the podium over to

23    Mr. Cherry, who is going to spend more time

24    discussing the obviousness defense, as opposed

25    to double patenting, I just want to make a few

HOLLAND - OPENING STATEMENT

2  comments on obviousness.

3          With obviousness, the caseload

4  doesn't give you the starting point.  But in

5  this case, Your Honor, you get to the same

6  place anyway.  You get to the unsubstituted

7  butoxy as the starting point.

8          As Dr. Press is going to explain,

9  if you were a person of ordinary skill in the

10  art in 1988 and you were looking to work in

11  the field of antischizophrenic drug

12  development, you would go to the literature

13  and you would find that there were a handful

14  of classes of compounds that had been in the

15  clinic and shown to be useful as

16  antischizophrenic agents.  One of this class

17  of compounds was carbostyril derivatives, as

18  we've seen.

19          In fact, Otsuka had a compound

20  called OPC-4392 -- and that's just simply an

21  internal Otsuka designation for the

22  compound -- that had been in the clinic, and

23  results of Phase II studies had been

24  published.

25          And I'm not going to speak too much

CHERRY - OPENING STATEMENT

1    more about that.  Mr. Cherry is going to talk

2    about OPC-4392 in his remarks.

3         But the point of bringing it in

4    here, Your Honor, is that the person would

5    look at the art, see carbostyril derivatives,

6    see promise there for antischizophrenic

7    agents, would go back to the literature, would

8    find the '416 patent, would then find the

9    Nakagawa declaration, and would understand

10   that if you take the unsubstituted butoxy, you

11   put the two chlorines on it, you get

12   aripiprazole, which you would expect to be a

13   more potent antischizophrenic agent.

14        With that, I will turn the podium

15   over to Mr. Cherry.

16        JUDGE COOPER:  Thank you very much.

17        MR. CHERRY:  Good morning, Your

18   Honor.  I'm Dan Cherry for Apotex.  With your

19   permission, I'd ask my partner, Mr. Feldman,

20   to introduce our trial team.

21        JUDGE COOPER:  Oh, sure.

22        MR. FELDMAN:  Thank you, Your

23   Honor.  I believe you met a few of them

24   yesterday.  We have Hartwell Morse, Erik Flom,

1        CHERRY - OPENING STATEMENT

2    Sam Brown, Sherry Rollo, and Dr. Mike Bloom.

3    There's also Betty Hinchen, who's our

4    paralegal.  I don't think I missed anyone.

5    Thank you.

6              MR. CHERRY:  Your Honor,

7    Ms. Holland has discussed obviousness in view

8    of the unsubstituted butoxy, and I'm going to

9    discuss a couple of other prior art

10   carbostyril compounds that she alluded to.

11             And the first one I'll start with

12   is the 2,3-dichloropropoxy.  And you recall

13   that she mentioned that this is just like

14   aripiprazole, except only for the fact that it

15   has a three-link linker as opposed to a

16   four-link linker.

17             In the terminology the three-link

18   linker is called a propoxy, and the four links

19   in the aripiprazole was called a butoxy.

20             Now, this compound is important

21   because, as Ms. Holland has pointed out, it

22   was one of the compounds that the patent

23   office used to reject aripiprazole during

24   reexamination.

25             And in fact, this was the

1          CHERRY - OPENING STATEMENT

2     compound -- this 2,3-dichloropropoxy was the

3     one that was addressed in Dr. Hirose's

4     declaration because what happened was that

5     after various arguments were made by Otsuka to

6     try and change the patent office's mind, they

7     got a final rejection and then submitted this

8     declaration by Dr. Hirose.

9               And what Dr. Hirose did was compare

10    the 2,3-dichloro with aripiprazole, and then

11    Otsuka asserted that there were unexpected

12    results.

13              Now, in fact, let's look at the

14    reasons for allowance, and we'll see, as

15    Ms. Holland pointed out, the patent office

16    bought that argument.  And this notion that

17    going from a propoxy to a butoxy gives

18    unexpected results was the reason for

19    patentability of the aripiprazole.  In fact,

20    such results were to be expected.  They were

21    not unexpected.  Not unexpected.

22              For example, if we turn to the

23    Nakagawa declaration again, there are these

24    two compounds.  One was an unsubstituted

25    propoxy.  The other was an unsubstituted

CHERRY - OPENING STATEMENT

1    butoxy.  So here they differ only in the

2    length of the linker, and we see that the

3    butoxy is nearly twice as potent.

4            So the notion that you get an

5    unexpected improvement from going from the

6    propoxy to the butoxy is refuted by the

7    Nakagawa declaration, which was submitted by

8    Otsuka itself in the earlier '416 patent.

9            And Dr. Oshiro, who is a

10   co-inventor on the '528 patent-in-suit, is

11   also a co-inventor on the '416.

12           So we submit that the patent office

13   was right to reject it based on the

14   2,3-dichloro.  They were just led astray by

15   this assertion of unexpected improvement,

16   which does not have a basis in fact.

17           So here we have two starting

18   places.  You start with either one and end up

19   at aripiprazole.  And the law of obviousness

20   permits you to have multiple starting places.

21           There's a third one now we'd like

22   to talk about, which is OPC-4392.  This is

23   OPC-4392.  It looks a lot like all the

24   carbostyrils you've seen so far.  The next

CHERRY - OPENING STATEMENT

slide shows that it has the same basic groups.

Now, I'm going to talk in a minute about some of the particular parts of this molecule, but first I would like to review what the prior art knew about how OPC-4392 was active in humans.

Because OPC-4392 is unique among these prior art carbostyrils because it went through both Phase I and Phase II studies in humans.  And the fact that it's in humans would be particularly noted by the person skilled in the art because it's in humans that you actually find out for sure what the compound does.

Because, you see, you can do animal tests and other tests, but you don't actually know until you get it in humans because so far as we know, mice don't have schizophrenia; and even if they do, we can't ask them how they feel about it.

So let me show you some excerpts from an article by Dr. Murasaki, and he's reporting here in summary form about what happened with 4392 in humans.  He starts out

CHERRY - OPENING STATEMENT

1   by pointing out that this compound is a new

2   antipsychotic drug.

3           He then goes on to point out that

4   in the Phase I trials there was a lowering of

5   blood prolactin values.  Now, this would be --

6   this would catch the eye if you're a skilled

7   person because prolactinemia was a problem in

8   the typical antipsychotics in the prior art.

9   So now we have a compound that avoids that

10  problem.

11          The next slide shows some of the

12  information that was obtained in Phase II

13  trials.  One is that 4392 is not strong in the

14  antipsychotic action.  This refers to what is

15  sometimes referred to as the positive symptoms

16  of schizophrenia.

17          And this word "not strong" is a

18  bone of contention in this case.  Otsuka takes

19  the view that not strong means nothing, zero,

20  zip.  It doesn't do anything.  But that's not

21  what this word not strong says.  If it was

22  inactive, inactive, that's what it would say.

23  Instead it says it's not strong, which means

24  there's some activity, just not as much as

1      CHERRY - OPENING STATEMENT

2      you'd want.

3              Dr. Murasaki goes on to point out

4      that there are improvements in the negative

5      symptoms of schizophrenia.  This would catch

6      the eye of a person skilled in the art because

7      those prior art typical antipsychotics did not

8      help negative symptoms.  So this would be of

9      great interest to the skilled person.

10             He goes on to point out that it's

11     anticipated that this drug could be used in

12     the chronic stages of schizophrenia.

13             So he's not suggesting that 4392 be

14     thrown in the trash can, which is Otsuka's

15     position.  He's saying, Go ahead.  Let's try

16     and develop this drug.

17             The next slide mentions some more

18     about side effects.  It says that the

19     extrapyramidal disturbances are extremely

20     weak.  That means a low liability for EPS.

21             In another abstract a different

22     doctor, Dr. Grivaldo (phonetic), says that EPS

23     was not observed in these patients.  This

24     would catch the eye of a person skilled in the

25     art because EPS was a big drawback in the

1          CHERRY - OPENING STATEMENT
2     typical antipsychotics.
3               Dr. Murasaki also mentions that
4     there was some nausea, but that it could be
5     overcome by a gradual increase.  This is a
6     matter of titrating the dosage, which is a
7     typical way of dealing with these issues which
8     often come up with all kinds of drugs.
9               So the takeaway on OPC-4392 from
10    these teachings in the prior art -- all is
11    available to this person of ordinary skill in
12    the art before Otsuka's invention date -- is
13    that OPC-4392 made it through Phase I into
14    Phase II.
15              Phase I tests for whether healthy
16    people are adversely affected by the drug.
17    They did well enough in that to go into
18    Phase II.  Phase II is where you give it to
19    people with the medical condition you're
20    trying to treat; in this case, schizophrenia.
21              There we find a good side effect
22    profile, that it treated negative symptoms.
23    Its only problem:  That it was not strong with
24    regard to positive symptoms.  Not strong.
25    That's not inactive, Your Honor.  There's some

1      CHERRY - OPENING STATEMENT

2      activity.

3           The medicinal chemists looking at

4      this information would see OPC-4392 as an

5      opportunity for improvement, if you will.

6      Perhaps it's not bright enough on positive

7      symptoms.  Perhaps it's only a little pink,

8      and you want to make it redder.  Okay.  And

9      that's what the medicinal chemists would see

10     as an opportunity here.

11          Otsuka's position is instead that

12     4392 and all the other carbostyrils would be

13     rejected as possible antischizophrenic drugs.

14     That's just not consistent with the facts I

15     just showed you.

16          But if you were to assume that were

17     true that 4392 and all the other carbostyrils

18     would be thrown away, then the '528 patent is

19     invalid under Section 101 and Section 112.

20     101 is the requirement for utility.  112 is

21     the requirement for disclosing how to use, and

22     they go hand in hand.

23          There is nothing in the '528 patent

24     that would change the mind of a skeptical

25     person who already came to reading the

CHERRY - OPENING STATEMENT

'528 patent as believing the carbostyrils would not work to treat schizophrenia.

They have a couple of animal tests there, one of which has nothing to do with activity. So you've got one animal test that they have that they claim shows some potential for activity. It would not be enough to overcome a skeptical person's view that was based on a belief that tests in humans showed the carbostyrils were no good.

So Otsuka's position that the tests on 4392 would cause carbostyrils to be rejected actually ends up invalidating their patent.

Now, our position is that the person skilled in the art would expect carbostyrils to treat schizophrenia. That's what the prior art teaches, particularly when you've got this proof of concept, if you will, in the human testing done on 4392.

So what would your skilled medicinal chemist, with the help of whoever else he needed, what would he do with 4392? He would see this as an opportunity for a new

1    CHERRY - OPENING STATEMENT

2    antischizophrenic drug.  The only thing he

3    would need to do is to improve its potency in

4    positive symptoms.  And the prior art suggests

5    how to do that, Your Honor.

6              Next slide, please.

7              As Ms. Holland has already

8    explained, going from a propoxy to a butoxy

9    linker is suggested in the prior art.  One

10   thing is this change in the linker length is

11   the simplest change.  It's the first thing

12   that a medicinal chemist would think of.  It's

13   called molegation (phonetic).  The prior art

14   references the Ing article (phonetic) from

15   '64.  It refers to, you know, doing the next

16   link as the simplest thing.  You immediately

17   think of this.

18             And the Nakagawa declaration

19   indicates that going to a butoxy would be an

20   improvement.  So this is one thing that the

21   skilled chemist would think of doing.

22             Another one is to use chlorine as a

23   substituent.  Chlorine is very common in

24   antipsychotics.  And again, Nakagawa's Mouse

25   Jumping Tests indicate that putting chlorine

1        CHERRY - OPENING STATEMENT

2    on improves potency.

3           Now, there is another piece of

4    prior art that I would like to add to the mix,

5    Your Honor, and this one is the Wise poster.

6    It's the work of Parke-Davis on coumarins.

7    And you've already heard something about the

8    Wise poster and you read about it in the

9    brief.  And what they're doing is working on a

10   compound called coumarins.

11          Can I have the next slide, please.

12          Coumarins are very similar to

13   carbostyrils.  As you can see, the three

14   groups on the left are all the same.  What I

15   have here is a typical coumarin and a typical

16   carbostyril.  It's only in the group on the

17   right where you have the coumarin and

18   carbostyril groups.

19          If you look closely, you'll find

20   that they're identical, except only for one

21   thing:  The coumarin has an oxygen, that's the

22   right O, where the carbostyril has a nitrogen

23   and a hydrogen.  That's the only difference.

24   In fact, these are very close analogs to each

25   other because electrically, the oxygen and the

Page 46

CHERRY - OPENING STATEMENT

1    nitrogen and hydrogen are very close and they

2    occupy about the same amount of space.

3            Another reason why the person

4    skilled in the art would be attracted to

5    Parke-Davis' work on coumarins as reported in

6    the Wise poster is what Wise was doing was

7    working on developing an antischizophrenic

8    drug.  So we have closely analogous compounds,

9    the same target medical condition.

10           In addition, when you go to the

11   Wise poster, you find that he did a number of

12   tests, and some of these same tests are the

13   same tests, the published prior art reveals,

14   were done by Otsuka, you know, when they were

15   testing 4392, because way before they put 4392

16   into humans, they had to do animal tests and

17   other tests on it, and some of those same

18   tests are tests that are done by Parke-Davis

19   in their treatment of coumarins in the Wise

20   poster.

21           Next slide, please.

22           When you read the data -- the most

23   important thing in the Wise poster is the

24   data -- you'll find that Wise also did tests

CHERRY - OPENING STATEMENT

1  which compare a propoxy to a butoxy linker.

2  These two tests -- they're different than

3  Mouse Jumping Tests, so these are two

4  additional tests.  In two out of those two

5  tests the butoxy does better than a propoxy.

6  So here we have a very strong reinforcement of

7  this move of going from a propoxy to a butoxy.

8      In addition, if you look down at

9  the bottom, you'll see that Wise also compared

10  chlorine versus methyl.  Now, this was at the

11  3 position, not the 4 position.  And at the

12  3 position he found in three out of three

13  tests, three different tests than the Mouse

14  Jumping, that the chlorine did better.  So

15  here we have strong teachings to stretch the

16  linker and put chlorine on instead of methyl.

17      Now, before I leave Wise, Otsuka is

18  going to tell you that Wise says don't put

19  chlorine on.  And they may take some sentences

20  in the Wise poster out of context, and the

21  experts will try to explain to you what these

22  sentences mean.

23      But more important than the

24  commentary by Wise is the actual data, and

1    CHERRY - OPENING STATEMENT

2    it's the data that a person skilled in the art

3    would believe the most.  And the data is there

4    demonstrating the desirability of stretching

5    the propoxy to a butoxy and putting chlorine

6    on.

7            So based on the teachings that I

8    just reviewed, the person skilled in the art

9    would turn to the OPC-4392 molecule and make

10   some changes to improve its potency.  Small

11   changes to stay close to what did well in

12   humans, but make small changes with the notion

13   that we're going to improve its potency.

14           So what would this person do?

15           Next slide, please.

16           First thing I want to talk about is

17   a single or double bond.  Over on the left,

18   that's in the carbostyril group, OPC-4392 has

19   a double bond.  That would be two lines.  All

20   the test compounds in Nakagawa have single

21   bonds.  That would be only one line there.  To

22   chemists, if you put the broken line up there,

23   it means it could be either one.

24           Now, the skilled person would go

25   forward with a program where you would make a

CHERRY - OPENING STATEMENT

group of compounds, and the group of compounds

would include both single and double-bonded

compounds.

This, in fact, is suggested by the

prior art '416 patent where when it comes to

discussing carbostyrils, it discusses them in

pairs, both the single and the double-bonded

version.  There's like 250 pairs or something

like that in the -- in the '416 patent.

And we suggest that the person

skilled in the art would follow a similar

program.

Next slide, please.

Now, the skilled person would

stretch the linker.  We would get that

four-link linker and get a butoxy.

So what else would that skilled

person do?  That skilled person would add

chlorine.

Next slide, please.

And would do it in a program to

see -- the first compound would be just to

stretch the linker.  The next one would be to

add chlorine at one position, leave methyl at

CHERRY - OPENING STATEMENT

1  the other.  The next one is vice-versa.  And

2  the fourth one is to put chlorines at both

3  positions.  All right.

4          And this would be because a skilled

5  person going forward wouldn't make one at a

6  time, but would make a small group to see how

7  these teachings in the prior art actually

8  worked out.

9          So here we have four, but they're

10  both single and double bonds.

11          Next slide, please.

12          In fact, there would be eight

13  compounds that the skilled person would do.

14  The ones on the left are the single-bonded

15  ones.  The ones on the right are the

16  double-bonded ones.  And you can see on the

17  bottom are the single-boned and the

18  double-bonded versions of the butoxy with two

19  chlorines.

20          The skilled person would actually

21  expect the most potency to come out of these

22  compounds because he would be taking full

23  advantage of the teachings in the prior art to

24  put on chlorine and to use the butoxy.

1       CHERRY - OPENING STATEMENT

2               Next slide, please.

3               One of these is aripiprazole.  So

4       it is our contention, Your Honor, that

5       aripiprazole is an obvious thing to do, that

6       all eight of these are obvious.

7               And under the law we're not

8       required to prove that aripiprazole was the

9       obvious choice but only an obvious choice

10      because it's kind of common sense, Your Honor.

11      If it's obvious --

12              JUDGE COOPER:  I'm looking at the

13      carbostyril unit that you call aripiprazole,

14      and it's identical to the one on the other

15      side because you've added a double bond in

16      your left-hand column.

17              MR. CHERRY:  Oh, my goodness.

18      Thank you, Your Honor.

19              JUDGE COOPER:  It's a typo.

20              MR. CHERRY:  It's a typo.  It sure

21      is.  Now, the ones on the left are all

22      supposed to be single bonded.  I'm

23      embarrassed, Your Honor, but good catch.

24      Thank you.

25              So as I was saying, they would all

1      CHERRY - OPENING STATEMENT

2    be obvious, and that's all that the law

3    requires us to prove.

4           On pages -- I think it's 26 and 27

5    of our brief, we cite particularly the Fulton

6    and Merck cases in this regard.  Merck is

7    particularly interesting because there the

8    federal circuit makes the comment that, well,

9    there are 1200 obvious compounds, and the fact

10   that there are 1200 doesn't make any one of

11   them less obvious.

12          Now, Otsuka will also suggest,

13   "Well, the prior art suggests making other

14   changes."  Well, you could do those as well.

15   There are reasons why you wouldn't want to go

16   and do those, but let's assume you did those.

17   You would just increase the number of

18   compounds you did, but it would be nowhere

19   near the 1200 compounds.

20          For example, in the Merck case, for

21   example, they talk about changing the position

22   where you attach the linker to the carbostyril

23   group, and they want to move it over like

24   this, which is a little bit like taking your

25   left arm and putting it where your right leg

1      CHERRY - OPENING STATEMENT

2    is.  You could do that if you wanted, but if

3    you did that, that would just add another

4    eight compounds.  You'd have 16 compounds and

5    they'd all be obvious, Your Honor.

6          So it's our contention that

7    aripiprazole is obvious in view of 4392, in

8    view of the unsubstituted butoxy, in view of

9    the 2,3-dichloro.

10          Now, in response Otsuka is going to

11    come up and talk about the so-called secondary

12    considerations.  And as Ms. Holland pointed

13    out, those are not a consideration.  Those are

14    not at issue in the double patenting, as we

15    point out on pages 11 to 13 of our trial

16    brief, particularly the Geneva and the Procter

17    & Gamble cases.  But in obviousness Graham

18    tells us to look at the secondary

19    considerations.

20          But in this case, Your Honor,

21    Otsuka's prior art blocking patents take the

22    legs out from under their secondary

23    considerations because what one has to do is

24    think about:  What inference is one supposed

25    to draw from the secondary considerations like

1      CHERRY - OPENING STATEMENT

2    commercial success?

3              The relevancy of commercial

4    success, for example, to nonobviousness is

5    basically, well, if you could have made money

6    that way, everyone else would have done it.

7              But in this case everyone else was

8    blocked out by Otsuka's very active patent

9    position, the '416 patent we've talked about,

10   but they had others and other carbostyrils.

11   They had staked out the carbostyril field for

12   themselves, and that would have discouraged

13   others from doing it.

14             So one can't draw the necessary

15   inference to support the relevancy of

16   commercial success and the other secondary

17   considerations, Your Honor.

18             Obviousness in a sense asks the

19   question, well, why didn't everyone else do

20   it?  And the answer in this case is everyone

21   else didn't do it because Otsuka scared them

22   off with their blocking patents.

23             Now, it's interesting to look at

24   the fact that others in the field were coming

25   up with other atypicals at about the same

1           CHERRY - OPENING STATEMENT

2     time:  Risperidone, for example, olanzapine

3     and some others.  This indicates that the

4     level of skill in the art was very high.

5     Whatever technical problems were involved in

6     pushing forward with an atypical antipsychotic

7     could be handled by others in the field.

8               Now, to be sure, risperidone and

9     olanzapine and so on are not carbostyrils, but

10    the reason they didn't go forward with the

11    carbostyrils was because of Otsuka's blocking

12    patent position.

13              It's also important to keep in mind

14    that a lot of Otsuka's own prior work in

15    carbostyrils is prior art that counts against

16    patentability.

17              So, for example, Otsuka may have

18    gotten prizes for developing this drug.  All

19    that prior work, including work up to 4392,

20    counts towards getting prizes, but it counts

21    against patentability under Section 103.  So

22    they're just not comparable things, to look at

23    prizes Otsuka got and the legal issue that you

24    face in deciding the obviousness at issue.

25              So we submit that aripiprazole is

1      CHERRY - OPENING STATEMENT

2    obvious in view of any one of these three

3    starting points we talked about.  And the fact

4    that you get to aripiprazole starting with any

5    one of them is a very strong case of

6    obviousness that would overcome any relevant

7    secondary considerations, assuming there were

8    any.

9         Let me just say a couple of words

10   about inequitable conduct, Your Honor.  It's

11   our position that the '528 patent is

12   unenforceable because Otsuka had information

13   that they did not give the patent office and

14   they should have.

15         They had the Nakagawa declaration.

16   They also knew about the Wise poster.  We have

17   an internal memo, the Haruki memo, that

18   indicates their knowledge of these -- of this

19   coumarin work by Parke-Davis.  They should

20   have given that to the patent office.

21         Dr. Oshiro had his finger on all

22   this because he was a co-inventor both of the

23   '416 patent, where the Nakagawa declaration

24   was submitted, as well as a co-inventor in the

25   '528.  He was a recipient of this internal

1        CHERRY - OPENING STATEMENT

2    Haruki memo.

3              Otsuka really can't argue that the

4    left hand didn't know what it was doing from

5    the right.

6              In addition, there are problems

7    with the Hirose declaration, Dr. Hirose's

8    declaration.  He said that they followed a

9    certain protocol.  They didn't follow that

10   protocol, Your Honor.  That goes right to the

11   relevance of this data that they used to

12   convince the examiner of the so-called

13   unexpected results.

14             And if the patent office had known

15   that he didn't follow the protocol that he

16   said he would, they would not have relied on

17   that declaration, Your Honor.

18             So we submit that these acts by

19   Otsuka constitute the kind of unclean hands

20   that render the '528 patent unenforceable.

21             So in summary, it's the defendants'

22   position that these claims for aripiprazole

23   are invalid for double patenting, that they're

24   invalid for obviousness under Section 103, and

25   unenforceable for inequitable conduct.  Thank

1          CHERRY - OPENING STATEMENT

2     you, Your Honor.

3               JUDGE COOPER:  Very good.  Thank

4     you.

5               Let's take 15 minutes.

6               (Recess taken.)

7               JUDGE COOPER:  So Mr. Monroe,

8     you're up.  Everybody else may be seated.

9               MR. MONROE:  Thank you, Your Honor.

10    Before I begin, I would like to also introduce

11    some of the other members of our team.  You

12    met some yesterday, and today I have John

13    Brenner of the Pepper firm, Denise Main from

14    Finnegan, Abby Micason from Fitzpatrick.  Noel

15    Baird is our graphics assistant.  And then our

16    litigation support team, Melissa Hartwell,

17    Courtney Publico, Katie Allen, Ning Chen, and

18    Millicent Hartwell.

19              JUDGE COOPER:  Fine.  Thank you.

20              MR. MONROE:  Your Honor, the issues

21    in this case are not as simple as the

22    defendants have presented them.  And their

23    depiction of what occurred at Otsuka is

24    incorrect.

25              This case involves a very

1       MONROE - OPENING STATEMENT

2       complicated area of science and one of the

3       most challenges areas of science,

4       antipsychotic drug discovery.  And this area

5       of science is littered with failures,

6       including by Otsuka.

7                   This case also involves a very

8       hardworking and brilliant scientist,

9       Dr. Oshiro, who you will hear from during the

10      course of this trial.  And you will hear about

11      his discovery of aripiprazole and all of the

12      effort it took to develop this successful

13      compound.

14                  Aripiprazole was discovered in the

15      1980s, and after extensive testing and

16      regulatory scrutiny, was approved for a drug

17      finally in 2002 and has been marketed since

18      then in the U.S. as the drug Abilify.

19                  Aripiprazole has a unique

20      combination of properties that make it stand

21      out from the other antipsychotics that are on

22      the market, and this unique combination of

23      properties is what has led to such commercial

24      success and wide usage of this compound.  And

25      this compound actually has been used around

MONROE - OPENING STATEMENT

1     the world and has treated millions of

2     patients.

3              And counsel mentioned awards.  It

4     is true.  Aripiprazole has received numerous

5     awards, and the awards are directed to the

6     compound itself and how unexpected and how

7     great that award has been for treating

8     schizophrenia.

9              One of those awards is the Prix

10    Galien Award, which was awarded in 2006, and

11    that is one of the most prestigious awards

12    that one can win in the world in the

13    pharmaceutical industry.

14             Part of the reason it met such

15    critical acclaim is it is the first

16    carbostyril derivative to be approved as an

17    FDA drug.

18             And can you show slide 1, please.

19             And counsel touched on that topic

20    and showed you a diagram of aripiprazole.  And

21    I'm showing the same here.  It's a little

22    different than theirs, but also pointing you

23    to the left-hand side, which is the

24    carbostyril portion, which has been modified,

MONROE - OPENING STATEMENT

1   and then the additional information, which

2   present counsel noted, can be modified.

3         It's these various modifications

4   that one can make that result in properties --

5   the compounds having different properties.

6   And it's why one can't necessarily expect

7   what's going to happen.  You actually have to

8   test the compound, as counsel noted, to find

9   out if it really will have a particular

10  property.

11        This compound also is

12  pharmacologically unique as compared to the

13  prior art compounds because it was the first

14  to really treat what are known as positive

15  symptoms, negative symptoms and also cognitive

16  symptoms.

17        Primarily, the most important thing

18  about aripiprazole is that it treats the

19  positive symptoms and negative symptoms, but

20  without the EPS side effects which they

21  discussed and we will discuss during trial,

22  Your Honor.

23        This compound represents years of

24  research and, as noted, was punctuated by

MONROE - OPENING STATEMENT

1   failure.  And Otsuka, again, was not alone in

2   such failures, and the entire industry

3   experienced such failures.

4        You will hear from Otsuka's experts

5   how complicated antipsychotic discovery is and

6   how difficult of a task it is to come up with

7   a compound which will actually meet the needs

8   of the patients.

9        In fact, reflecting the fact that

10  this is such a difficult area of science,

11  there was an entire period from 1975 to 1990

12  when there were no new antipsychotics because

13  it was just too difficult and too hard to come

14  up with a compound that would be effective.

15       It's somewhat ironic that the

16  defendants are focusing on a lot of the art

17  and a lot of the articles that recognize these

18  failures in an effort to say it would have

19  been obvious to make aripiprazole, when it's

20  actually the opposite that is true.

21       And it's outlined in Otsuka's

22  pretrial submission.  The only claims at

23  issue, and as the defendants have noted, are

24  the three claims of the patent.

1      MONROE - OPENING STATEMENT

2              If you could go to slide 2, please.

3      No, slide 3.

4              This looks a little different than

5      what defendants showed.  Claim 12 actually

6      recites the formula, the chemical formula.

7      Defendants put in a shorthand aripiprazole,

8      but actually, it's a more complicated

9      description in Claim 12.

10             And then Claim 17 deals with

11     pharmaceutical formulations for using

12     aripiprazole.  And Claim 23 covers methods of

13     treating schizophrenia using aripiprazole.

14             Defendants have admitted that their

15     products they seek to market will infringe all

16     three of these claims.  And they freely

17     admitted that -- or at least one of them has

18     admitted that that is their business model, is

19     to copy successful blockbuster drugs in hopes

20     to reap the financial benefit from those

21     drugs.  And they often then make validity

22     attacks or enforceability attacks in an effort

23     to roll the dice and see if they're lucky.

24             And often those arguments made for

25     invalidity and inequitable conduct are very

1          MONROE - OPENING STATEMENT

2      simplistic and don't actually acknowledge or

3      address the complexity of the science that's

4      really at issue.  And that's what we have

5      here, Your Honor.

6              Therefore, before discussing the

7      merits of their arguments, I would like to put

8      in context what we're talking about and

9      address some of the terms that the Court is

10     going to hear to provide a better explanation

11     for what was actually happening at the time

12     Otsuka discovered aripiprazole.

13              As I mentioned, despite extensive

14     research, the cause of schizophrenia remains

15     unknown.  What is known is that it's a

16     severely debilitating illness, and it

17     completely disrupts a person's ability to have

18     normal day-to-day activities.  And it's

19     considered one of the worst mental illnesses

20     that you can have, and often leads to

21     hospitalization or leads to patients who are

22     suffering from this illness to engage in very

23     destructive, self-destructive behavior that

24     leads, again, to other illnesses, such as

25     cancer or heart disease.

MONROE - OPENING STATEMENT

1
2          And one of the worst parts about
3    schizophrenia is it shows itself most of the
4    time early in one's life, in late teens, early
5    adulthood, and it's chronic.  It does not go
6    away.  You have it for the rest of your life.
7    And there's also a higher incidence of suicide
8    in schizophrenics because of how debilitating
9    this illness is.
10          Doctors first attempted
11   unsuccessfully to deal with this disease in
12   the 1930s and the 1940s by using very
13   primitive methods.  And we outline those in
14   our brief:  Lobotomy, electroshock therapy.
15          And then they ultimately just ended
16   up warehousing patients.  And that was a
17   pejorative term that was used to describe what
18   they had to do because they had no other way
19   to treat these patients but put them somewhere
20   in these overcrowded hospitals.  And they did
21   that because it was hopeless what they could
22   do with the patients.
23          Then there was a ray of hope in the
24   1950s, and you will hear during trial from
25   some of the experts about this, of a drug

1       MONROE - OPENING STATEMENT

2    called chlorpromazine.  And everyone was very

3    excited, thought this was going to be a good

4    drug.

5            It was a very fortuitous discovery,

6    which is typical in science, where this drug

7    was discovered as having an effect in

8    schizophrenia patients when they were actually

9    testing the drug for a different purpose.

10           While it was not a cure for

11   schizophrenia, it did allow a lot of patients

12   to get out of the hospital and start to have

13   normal lives again.

14           And then following that discovery

15   in the '50s, there was also the discovery of

16   another very important compound that you will

17   hear about called haloperidol.  It was a more

18   potent antipsychotic then chlorpromazine and

19   it was widely used.

20           And I'd like to explain some

21   terminology for the Court.  Those compounds

22   were known as first-generation antipsychotics

23   or also typical antipsychotics.  And there's

24   often confusion as to the terms that are being

25   used.  I would like to just clarify.

1          MONROE - OPENING STATEMENT

2                  First-generation antipsychotics are

3      often -- that term is used interchangeably

4      with "typical," and second generation is used

5      interchangeably with "atypical."  There was a

6      dividing line between what a typical

7      antipsychotic was and what an atypical

8      antipsychotic was.

9                  A typical antipsychotic was one

10     that would treat the psychotic symptoms of

11     schizophrenia, but it would come with a lot of

12     side effects, including a particularly bad one

13     which was referred to by counsel as

14     extrapyramidal symptoms.  For shorthand,

15     because it's a hard word to pronounce, people

16     say EPS.

17                 EPS is a really bad set of symptoms

18     that are reversible, and, therefore, patients

19     tend to stop taking their medication because

20     they would rather be psychotic than have some

21     of these symptoms, such as involuntary facial

22     movements or mask-like expressions,

23     salivation, things like that.  Patients would

24     rather just be psychotic.

25                 So that caused a big problem for

1      MONROE - OPENING STATEMENT

2      physicians trying to treat patients with this

3      set of first generation or typical drugs.

4              Therefore, scientists tried to find

5      something better.  And ultimately they thought

6      they found something better, and that is the

7      drug you'll hear about called clozapine.

8              And that was another ray of hope.

9      That drug did not cause these EPS symptoms

10     and, in fact, is often referred to as the

11     first of the second generation of atypical

12     antipsychotics.

13             The problem with clozapine was they

14     quickly discovered some serious problems and

15     they had to take it out of clinical trials.

16     It was so severe they had to take it out of

17     clinical trials.  And that was what really led

18     to this era of research of people trying to

19     find new antipsychotics.

20             But from 1976 to 1990 there were no

21     new antipsychotics approved because of the

22     difficulty associated with developing one.

23             And then in 1990, the FDA did

24     approve clozapine.  Despite its disastrous

25     side effects, it was approved because of the

MONROE - OPENING STATEMENT

1        great need for something that would be

2        effective for at least patients who were

3        severely debilitated.

4                And a few years later, around 1993,

5        the FDA approved another drug called

6        risperidone, which you'll hear a lot about,

7        which is chemically, structurally a little bit

8        different from clozapine, but its

9        pharmacological properties are very similar.

10       And so those two drugs became the drugs of use

11       for quite a long time.

12               Going back to slide 1, at this

13       point I would like to note something about the

14       structure of the compound.  This is a

15       two-dimensional representation of this

16       molecule.  Molecules obviously are

17       three-dimensional, and even their

18       three-dimensional orientation can affect the

19       properties of a compound.

20               And so you have to be very

21       careful -- and this will come up during our

22       expert's testimony regarding some of

23       defendants' assertions -- to make pretty

24       pictures that show a comparison of one

MONROE - OPENING STATEMENT

1   compound to another, and squash everything up

2   to look like it's the same, when, in fact, if

3   you add a linker, it lengthens it and also can

4   change its orientation.  And, therefore, it's

5   not as simple as just looking at a picture and

6   say, Do these two things look alike?

7           But even if that were the case,

8   just adding one minor modification to a

9   compound can drastically change its

10  properties, and that's actually what happened

11  in this case, Your Honor.

12          Going back again, I would like to

13  note that with respect to the EPS symptoms,

14  they also can create something called tardive

15  dyskinesia, which I mentioned -- or I did not

16  mention, but I mentioned a severe -- a

17  condition, and that condition is not

18  reversible.

19          And so even for patients who were

20  staying on these first-generation drugs, they

21  would, as I say, get off the drug not only to

22  avoid bad side effects, but also in particular

23  this side effect which was so debilitating.

24          And that's why, again, in the '60s

MONROE - OPENING STATEMENT

1    people got very excited when they thought

2    there was going to be this new drug,

3    clozapine, and then later they got excited

4    with risperidone.

5         One item I would like to discuss

6    regarding the technology that was referenced

7    in passing by counsel is the concept of what

8    really happens in the brain.

9         There are things called receptors

10   in the brain, and they are on the surface of a

11   cell.  And there are things called

12   neurotransmitters which come in and interact

13   with those receptors, and that interaction can

14   cause various changes in the physiological

15   motion or reaction in the patient.

16        And they can come in two forms, and

17   you'll hear these terms, which is why I want

18   to mention them.  There are agonists and

19   antagonists.  Agonists help to stimulate the

20   response that's at issue, and antagonists will

21   block or reduce the physiological response at

22   issue.

23        The problem is that there are

24   literally hundreds of receptors and

1       MONROE - OPENING STATEMENT

2       neurotransmitters, and nobody really knows

3       exactly how they all interact, what

4       combination of receptors and neurotransmitters

5       will bring about the illness.

6               As a result, no one really knows

7       what type of molecule that you can create and

8       introduce into the body, what kind of molecule

9       will interact in what way with which receptors

10      to get whatever result you're looking for.  So

11      it's really a trial-and-error sort of process

12      to find out what will really work.  And our

13      experts will provide a lot of information to

14      the Court on that issue.

15              Now, during the dry period that

16      we've talked about, Otsuka was trying to

17      develop an antipsychotic, and Otsuka tested

18      hundreds of compounds in an effort to find a

19      potential antipsychotic.

20              One of those compounds which was

21      referenced earlier is called OPC-4392.  And

22      that compound did look promising at first.  It

23      went through two different clinical trials.

24      And as noted, it had some success in the first

25      trial, but what was left out is also there

MONROE - OPENING STATEMENT

1    were some severe neurological issues that

2    caused concern.

3           But they went ahead and put the

4    product into the Phase II trials in

5    schizophrenia patients.  Again, just like

6    clozapine, even if there may be a problem, you

7    may still want to move forward with the drug

8    because there's such a great need for a drug.

9           Unfortunately, in those trials in

10    patients, they found that 4392 did not treat

11    the positive symptoms.  And there will be a

12    lot of quibbling about that, but the facts are

13    it did not.

14           And that is why Otsuka -- and the

15    facts will show they dropped that project and

16    did not move forward with 4392.  They did not

17    try to modify the compound in the real

18    simplistic, obvious way that has been

19    presented to the Court.

20           Rather, they started an entirely

21    new project.  They assigned Dr. Oshiro, who I

22    mentioned, a medicinal chemist, to start a new

23    phase of the project.  And he started over

24    with a blank sheet of paper essentially.

1        MONROE - OPENING STATEMENT

2              He went back and looked at a stock

3    of compounds that Otsuka had developed, you

4    know, a library of compounds sitting on the

5    shelves, and said, Let's rescreen those

6    compounds and see if we can find any that have

7    an effect in a different test than had been

8    done previously.

9              Dr. Oshiro said, I want you to

10   screen these compounds in what is called the

11   anti-apomorphine stereotomy test.

12             I won't try to describe that right

13   now, but you'll hear about it from the

14   experts.  That is a test which is indicative

15   of potential efficacy for treating psychotic

16   symptoms, positive symptoms.

17             So Dr. Oshiro started over to

18   rescreen a bunch of compounds to see if they

19   would have efficacy in that test.  And he

20   found some compounds that looked potentially

21   promising which are referred to as seed

22   compounds.  And that's another term of art

23   that you will hear in this trial.  Those were

24   OPC-4310 and OPC-4470.  The numbers were just

25   allotted as they had been synthesized.

MONROE - OPENING STATEMENT

1

2          And he then took those seed

3    compounds and -- well, let me explain what

4    that means, Your Honor.  Seed compound means

5    the compound has at least some of the activity

6    that you're interested in, but not enough to

7    really move forward on research directed to

8    clinical trials.  You just have an inkling of

9    hope that maybe you're going to get somewhere

10   with it.

11         And he identified those two

12   compounds as having efficacy in the tests he

13   identified as being the best one for his

14   research, and those two compounds were his

15   seed compounds.

16         He then made modifications to those

17   compounds to see if he could get even stronger

18   efficacy.  And after a lot of effort and

19   research, he came up with a compound that

20   you'll hear about called 14542.  That compound

21   had really great results in the

22   anti-apomorphine stereotomy test.  And that's

23   when Dr. Oshiro decided he had a lead

24   compound.

25         We'll have some issues sometimes in

MONROE - OPENING STATEMENT

1    Japanese.  Lead and seed, when they get

2    translated, say the same, but we'll deal with

3    that.

4           He came up with a lead compound

5    that he thought was very promising and could

6    go forward into further research for further

7    clinical development, but then wanted to do

8    more tests.  So he conducted more

9    modifications and changes to those compounds

10   and came up with OPC-14597, which is

11   aripiprazole.

12          So sometimes in the testimony

13   you'll hear witnesses say 14597 because that's

14   how their minds work.  They use the numbers by

15   which they designated them internally.

16          What you'll also learn is that this

17   research was filled with twists and turns, and

18   it was not just an easy task to ultimately

19   come to aripiprazole.

20          I would now like to touch briefly

21   on the '528 patent itself and its prosecution,

22   given some of the comments made by counsel.

23          Otsuka first sought patent

24   protection by filing a Japanese application in

1       MONROE - OPENING STATEMENT

2    Japan in 1988, and then a year later filed an

3    application in the U.S., claiming priority

4    back to that Japanese application.

5            Otsuka's U.S. application includes

6    a discussion of the prior art relevant to the

7    subject matter of the patent, and that

8    discussion included a listing of other patents

9    directed to carbostyril compounds.

10           And that shows that Otsuka was

11   attempting to be as forthright as possible and

12   provide the examiner with all of the

13   information that they had regarding

14   carbostyril compounds.

15           And the references that they

16   disclosed to the patent office in that

17   discussion in the patent actually reference

18   the particular lead compounds the defendants

19   are focusing on now in this case.

20           They included the unsubstituted

21   butoxy compound.  They included OPC-4392.

22   Then they included the 2,3-dichloropropoxy

23   compound.

24           Moreover, Otsuka's application was

25   thoroughly examined by an examiner who was

MONROE - OPENING STATEMENT

1  familiar not only with this technology, but

2  also other applications that the defendants

3  are pointing to.

4            And the examiner conducted a

5  careful search and considered the

6  patentability of the claims in view of one of

7  the patents the defendants have identified,

8  and concluded that the claims are patentable

9  over the prior art.

10           Furthermore, as they noted, the

11  patent went into reexamination.  And during

12  reexamination, the patent office considered

13  the very same compounds and issues that the

14  defendants are addressing here in this trial.

15           And ultimately, a tribunal of three

16  experienced patent examiners affirmed the

17  patentability of the claims at issue in this

18  case and, in fact, approved additional new

19  claims that were added during the

20  reexamination, Claim 23 being one of those

21  claims.

22           At this point I would like to note

23  what we perceive to be a glaring error in

24  defendants' arguments.  They've noted in the

MONROE - OPENING STATEMENT

1    trial brief and here today that the examiner

2    repeatedly rejected the claims in view of what

3    they call the German '105 patent.  That did

4    not happen.

5         The German '105 patent was brought

6    to the examiner's attention by Otsuka, but the

7    patent office never rejected the claims in

8    view of that patent.  And we hope that they

9    will correct that mischaracterization.

10         I would now like to touch on the

11   invalidity allegations.  As the Court is

12   aware, the claims are presumed valid as a

13   matter of law, and the defendants' burden is

14   to prove invalidity by clear and convincing

15   evidence, notwithstanding Apotex's separate

16   argument of asking the Court to change that

17   burden.

18         Under either of the burdens, but

19   definitely clear and convincing, they cannot

20   establish that the claims are invalid.

21         First, they admit that the prior

22   art does not include aripiprazole.  So their

23   prior art allegations are not under 35 USC 102

24   in the sense of the prior art anticipating the

MONROE - OPENING STATEMENT

1    claims at issue.

2             Rather, they have that secondary

3    attack of arguing that the claims would have

4    been obvious to one skilled in the art by

5    combining various bits of information.

6             In doing so, the defendants engaged

7    in what is known in patent law as a classic

8    hindsight analysis.  Essentially they start

9    with aripiprazole, and they go look for things

10   that look structurally similar in Otsuka's

11   other patent literature, and then say, Start

12   with that, and then we'll make changes to that

13   to get to aripiprazole.  That's improper.

14            And interestingly, they really

15   can't decide which lead compound they want to

16   use or what path to take.  Prior to getting

17   close to trial the defendants were taking

18   divergent positions, but they now seem to have

19   reconciled their different paths.

20            Throughout discovery, Teva and Barr

21   focused on the unsubstituted butoxy compound

22   and said that would be a lead compound in the

23   prior art.  And that one would be motivated,

24   we allege, through hindsight to arrive at

1      MONROE - OPENING STATEMENT

2      aripiprazole.

3              The unsubstituted butoxy compound

4      is one of several hundred compounds referenced

5      in the '416 patent which was considered by the

6      patent office.

7              And what counters their position is

8      in that patent there is a claim which

9      specifically identifies that that particular

10     compound within the scope of all those

11     compounds is an antihistamine.

12             And no one skilled in the art back

13     during that time period looking to do

14     antipsychotic drug research would have started

15     with an antihistamine compound that had been

16     specifically identified as an antihistamine

17     compound.

18             In contrast to Teva, Apotex does

19     not start with an antihistamine.  Apotex

20     instead starts with Otsuka's failed compound,

21     4392.  And they argue again that through

22     hindsight, you can modify it to come up with

23     aripiprazole.

24             I apologize, Your Honor.

25             And what they're suggesting is

1          MONROE - OPENING STATEMENT

2     completely contrary to scientific theory and

3     actually contrary to what Otsuka actually did.

4     They did not start with 4392, and they knew

5     the most about carbostyril compounds.

6     Instead, they went back and started over.

7               But finally, the defendants, now at

8     trial and in their trial brief, they've really

9     identified for the first time this other sort

10    of lead compound, this 2,3-dichloropropoxy

11    compound.  Previously that compound was

12    relegated to what they called their bracket

13    theory.

14              Their argument was that you would

15    take the unsubstituted butoxy compound and the

16    2,3-dichloropropoxy compound, and that created

17    some sort of bracket that encompassed

18    aripiprazole and would have led someone to get

19    to aripiprazole.

20              That bracket theory makes no sense

21    because there's nothing to connect those two

22    compounds or to suggest that one should take

23    something from one and something from the

24    other to come up with aripiprazole.

25              And now at trial, defendants are

MONROE - OPENING STATEMENT

1    really focusing more on just -- they're

2    forgetting the bracket theory to some degree

3    and focusing more on 2,3-dichloropropoxy as a

4    lead compound.

5         The only common theme in the

6    defendants' lead compound theories, even if

7    they don't want to call them lead compound

8    theories, is hindsight.  And as we discussed,

9    that's improper.

10        And that's what we'll establish at

11   trial, that that's contrary to what actually

12   happened and what one skilled in the art would

13   have done, faced with the realities of

14   research during that time period.

15        In particular, Otsuka will present

16   a plethora of evidence that will show what one

17   skilled in the art faced with the realities in

18   the '70s and 1980s and 1988, what they would

19   have done.

20        And as noted, Otsuka will point out

21   that one skilled in the art would not have

22   started with a carbostyril compound of any

23   type.  Rather, they would have been directed

24   to other types of compounds, such as modifying

MONROE - OPENING STATEMENT

1   clozapine or modifying risperidone.

2           And in fact, this is not just

3   Otsuka's argument for this case.  This is

4   actually what happened if you go back in

5   history and look at what happened.

6           And just as kind of a -- if I could

7   go to -- I guess it's going to be slide 4.

8   Yes.

9           Your Honor, this slide simply

10  highlights what compounds have been approved

11  since 1990 following the dry period of

12  research and how they are somewhat related.

13  Color coding has been used to kind of show you

14  how they have similar structures.

15          Clozapine was approved in 1990, and

16  then later you'll see olanzapine, quetiapine

17  and asenapine.  I'm going to mispronounce

18  that, Your Honor.  Those three were

19  essentially derivatives of clozapine where the

20  skilled artisan looked at clozapine and tried

21  to find a way to modify it to get improved

22  results.

23          And all of those compounds also

24  obtained patents, Your Honor, because they

MONROE - OPENING STATEMENT

1      showed that through modifications of what came

2      before, which was the breakthrough drug, they

3      were able to find an approved pharmaceutical.

4              Similarly, risperidone was approved

5      in 1993.  And you can see several progeny of

6      risperidone who also have obtained patent

7      protection because it was established that

8      those, what some would say are minor

9      modifications, actually created different

10     physiological and pharmacological effects.

11             And then you see aripiprazole, Your

12     Honor.  So far after 20-plus years, there is

13     no follow-on yet.  Right now it's just

14     aripiprazole.

15             And it's important to note that you

16     have basically the breakthrough drug like

17     clozapine, which gives others; risperidone,

18     which gives others; and now aripiprazole is

19     that similar sort of pioneering breakthrough

20     invention.  And that's what the '528 patent

21     covers is this breakthrough invention.

22             But even if you accept one of the

23     defendants' lead compound theories, their

24     torturous arguments about how you would modify

1
2  the compound to get to aripiprazole are
3  completely baseless, and our experts will
4  address that.
5          One thing I would like to point out
6  when you're listening to their theories is the
7  type of theory they're presenting.  It's
8  normal in patent cases and in an obviousness
9  case for you to hear, Take this piece -- this
10  patent or article and combine its teachings
11  with another patent or article, on the
12  assumption that one skilled in the art would
13  make that association and combine their
14  teachings.  That's your typical obviousness
15  scenario.
16          When you do that, again, you have
17  to be careful and not engage in hindsight.
18  And a telltale sign that you're doing that is
19  when you sort of pick and choose things and
20  willy-nilly combine them and say, Look, there
21  was the path to this claimed compound.
22          There's no better way to describe
23  what defendants are doing there in this case
24  than what I just said.
25          However, they're even going one

1           MONROE - OPENING STATEMENT

2      step further.  They're saying, Take a patent

3      and take its teachings and combine it with

4      some information -- which we disagree with

5      their interpretation -- but they say, Combine

6      that patent with information in a declaration

7      that is buried in the voluminous prosecution

8      history of an entirely different patent.

9                For example, they say, Take the

10     German '105 patent and combine that

11     information with something contained in the

12     Nakagawa declaration that's buried in the

13     prosecution history of the '416 patent.

14                Our position is that the Nakagawa

15     declaration is not prior art.  But even if it

16     were prior art, defendants cannot establish it

17     would have been obvious for one skilled in the

18     art to have tried to go about combining these

19     pieces of information to arrive at

20     aripiprazole.

21                And in fact, I would like to put in

22     context what we're dealing with from a time

23     period.  We've all become a little spoiled

24     with the Internet and electronic media.

25                What we're dealing with in this

MONROE - OPENING STATEMENT

1

2  case is back in 1988.  This was before people

3  could hop on the Internet and look up a patent

4  and look up a prosecution history or use word

5  searching or use electronic indices.

6          If you wanted the prosecution

7  history of a patent, assuming you even thought

8  you wanted one, you would have to go to the

9  patent office and either physically review it

10  page by page, or you would have to pay someone

11  to go copy it for you, or you would have to

12  order one from the patent office, which could

13  take quite a long time.  But you actually had

14  to physically review every page and look for

15  whatever it was you were looking for.

16          The reality is scientists don't do

17  that.  They weren't doing that.  One skilled

18  in the art would not have done that.

19          And, therefore, we believe there is

20  no reason to believe that one skilled in the

21  art would have combined the teachings of a

22  patent with the teaching of the declaration in

23  the Nakagawa -- the Nakagawa declaration in

24  the '416 patent.

25          I think their arguments become even

MONROE - OPENING STATEMENT

1   more fantastical when you look at what the --

2   their next step.  They kind of flash by it

3   fast.

4            But what they say is you take the

5   German '105 patent.  You go to the declaration

6   buried in the prosecution history of the

7   '416 patent.  And then to interpret that data,

8   you need to go to the voluminous prosecution

9   history of another different patent, the

10  '932 patent.

11           Those are their, you know, attorney

12  argument admissions they want to claim with

13  respect to the data in an entirely different

14  patent.  To make that sort of combination

15  would be a first, to say the least.

16           But even assuming you were to do

17  that, our position, and the experts will

18  establish, that the defendants' interpretation

19  of the data in the Nakagawa declaration is

20  entirely wrong.  In fact, they repeatedly say

21  that the declaration was used to establish

22  efficacy for treating schizophrenia.

23           No, it was not.  Schizophrenia was

24  not mentioned in the declaration.  There was

MONROE - OPENING STATEMENT

1   no representation that that's what that data

2   was being presented for.

3           And the defendants are simply

4   saying that must have been what the data was

5   for because if you go to this other patent

6   that had different tests in it, you would make

7   that association.  And Your Honor, we contend

8   that's beyond the pale.

9           And then on top of that, defendants

10  are arguing that one of skill in the art is

11  not just a person; it's a team of scientists.

12  And this is contrary to controlling law.  But

13  their position is that it's a team of

14  scientists that we need to focus on when we're

15  deciding the validity issues.

16          But then you have to play that out.

17  What they're saying is a team of scientists

18  would have looked at the patent and gone to a

19  prosecution history to get a declaration and

20  then interpret it in light of another

21  prosecution history.  And we believe that's to

22  the extreme, Your Honor.

23          Otsuka will also present at trial

24  evidence rebutting the defendants' fallback

MONROE - OPENING STATEMENT

1

2    position that relies upon the so-called Wise

3    poster.  Defendants themselves note that the

4    Wise poster, even if it had been known and

5    even if it was prior art, it related to

6    coumarins.  And they say, Oh, well, it's just

7    very -- you know, it's the same thing.  You

8    know, oxygen, nitrogen, it's all the same.

9              That's not how this works, Your

10   Honor.  There are carbostyril compounds, and

11   as noted, one of the patents covered billions

12   of compounds; and then there are coumarins.

13   These are very different things.

14             And what the defendants want to

15   suggest is that there is a chemistry cookbook,

16   and everything looks alike, and you just

17   switch this, switch that, and voila, you get

18   aripiprazole.

19             And to suggest that you would look

20   at why as directed to coumarins to modify the

21   '416 patent or 4392 or the unsubstituted

22   butoxy is completely baseless.

23             And not to beat a dead horse, but I

24   would like to go back to what Otsuka actually

25   did.  There is no other pharmaceutical company

MONROE - OPENING STATEMENT

1  at that time period who was focusing on

2  carbostyril compounds except for Otsuka.  And

3  indeed, the entire industry was focused on

4  these other compounds, as I noted.

5          In addition, no other company was

6  focusing on research directed to developing a

7  compound known as a partial dopamine agonist.

8  And I again won't get into the specifics of

9  that right now, but in sum, that's something

10  where you affect one side of the synapse and

11  you affect the other side of the synapse also

12  in a different way.  And so you have this

13  compound that affects two sides of a synapse.

14  And that will be explained during trial.  And

15  Otsuka was the one who was focusing on that

16  issue and no one else.

17          And the twists and turns I

18  mentioned are that you'll see that Otsuka

19  actually had roadblocks even within

20  Dr. Oshiro's own research, where he thought he

21  had something and to go a different direction.

22          And that will come out during trial

23  and show and establish that it's not so simple

24  and obvious as defendants have said.  If it

1          MONROE - OPENING STATEMENT

2     were that simple, then Otsuka, who knew the

3     most about carbostyril compounds, they would

4     have just made aripiprazole like that, out of

5     the gate.  They would not have had to engage

6     in all this research.  If it had been that

7     simple, they would have just made that

8     compound and moved on.

9               In addition, if it were that simple

10    to make all these, you know, little minor

11    chemical modifications and get an effective

12    product, the market would be flooded with

13    effective antipsychotics.  And the facts show

14    that it's not, and the reason is because it's

15    not that simple.

16              Finally, as counsel noted, Otsuka

17    is relying upon secondary considerations, and

18    we do believe they are very relevant in this

19    case.

20              In fact, the history of

21    schizophrenia research that I noted to you

22    previously is littered with failures, littered

23    with efforts and efforts and efforts to

24    develop a drug.

25              And that satisfied the long-felt

1          MONROE - OPENING STATEMENT

2      and unmet need prong of the secondary

3      considerations for nonobviousness, which are

4      otherwise known as objective indicia of

5      nonobviousness.  You'll hear both terms used.

6              In addition, we will focus you on

7      again what a layperson might think are minor

8      changes in a compound are actually significant

9      changes that give you unexpected results.

10             Contrary to defendants' position,

11     this record establishes that aripiprazole

12     truly was unexpected compared to what came

13     before it.

14             Similarly, we will focus the Court

15     on the widespread use of the product and its

16     commercial success.  And that's an issue that

17     is in the trial brief.

18             And as noted, aripiprazole in 2009

19     was the sixth largest pharmaceutical in the

20     U.S. and since 2002 has sold over $12- or

21     $13 billion.  I know that's a -- 12 and 13 is

22     a big -- billion is a big number.  But the

23     point is it's been hugely successful, and that

24     is evidence of nonobviousness of the compound.

25             I would like you to keep in mind in

1      MONROE - OPENING STATEMENT

2    evaluating the defendants' arguments and the

3    evidence they present what they're really

4    asking the Court to do.  They're asking the

5    Court to throw out several standards that are

6    well accepted from the federal circuit and the

7    Supreme Court as to how one analyzes

8    obviousness under 103.

9              As noted, Apotex wants the Court to

10   throw out the clear and convincing standard

11   for proof.

12             Also, both defendants want you to

13   throw out the accepted definition of what one

14   skilled in the art is, and they want the Court

15   to adopt this team of scientists approach.

16             They ask the Court to disregard the

17   Janssen case which Otsuka relies upon from

18   this court which identified what a skilled

19   artist would be, consistent with Otsuka's

20   definition.  And their only basis for saying

21   the Court should disregard it is that in their

22   beliefs, it's not realistic or it's not real

23   life.

24             And finally, as hinted to, the

25   defendants are asking the Court to apply an

1          MONROE - OPENING STATEMENT

2      obviousness analysis which is completely

3      contrary to precedent.  And they've attempted

4      to argue that KSR somehow supports their

5      position, and that's the Supreme Court

6      decision where the Supreme Court did chime in

7      on some of the case law of the federal

8      circuit.

9              What they don't point out is that

10     KSR did not abolish the concept of unexpected

11     results in the concept of a 103 analysis.  And

12     in fact, the federal circuit has continued to

13     apply that principle in its own case law after

14     KSR, and in particular, a couple of cases that

15     defendants have pointed to as saying they

16     preceded KSR.

17             The defendants failed to note that

18     post-KSR the federal circuit did deny a

19     petition for rehearing in view of KSR in the

20     one case, and the Supreme Court denied a

21     petition in the other case they cite, all

22     post-KSR.

23             So KSR is important to consider,

24     but it did not change the basic principles

25     when you deal with unexpected results in a 103

1          MONROE - OPENING STATEMENT

2     case.

3              And again, the last item, they're

4     asking the Court to disregard secondary

5     considerations, both in an obviousness

6     analysis, and then they go to their fallback

7     position which I'm just about to discuss about

8     double patenting.

9              And I think it's clear why they

10    want to go to double patenting.  They want to

11    go to double patenting so they can avoid all

12    of the requirements that must be met in order

13    for something to be invalid for obviousness

14    under 103.

15             They want to say, You don't have to

16    deal with the lead compound issue.  Just go to

17    that claim in the '416 patent and find it's

18    obviousness under double patenting.  They want

19    to say, You don't have to look for motivation

20    in the same sense that you do in 103.  You

21    don't have to look at secondary

22    considerations.

23             In essence, they're retreating from

24    their 103 position for those elements they

25    know they can't establish and asking the Court

1          MONROE - OPENING STATEMENT

2     to go a double patenting route.

3              But even if you go a double

4     patenting route, you're left in the same

5     situation.  It is correct that we contend that

6     the double patenting issue is as a matter of

7     law subsumed within the 103 arguments.

8              But even if it weren't, you're left

9     at the same spot.  You go to this compound in

10    the '416 patent, which, if you look at the

11    claims, is also identified in another claim as

12    specifically being an antihistamine.  And

13    nothing would have led somebody to modify that

14    antihistamine compound to get to aripiprazole

15    for treating schizophrenia.

16             Finally, I would like to touch upon

17    the defendants' unenforceability allegations.

18             The defendants have made two

19    allegations.  They've argued that Otsuka

20    committed inequitable conduct by not providing

21    the PTO with certain references in particular,

22    which we disagree are references.  They

23    contend that Otsuka should have provided the

24    patent office with the Nakagawa declaration

25    and the Wise poster.

MONROE - OPENING STATEMENT

1        Again, Otsuka's position is that
2   those are not prior art documents and need not
3   have been presented to the patent office.  But
4   even if they were, they were not material to
5   the examination of the claims at issue in the
6   '528 patent because as noted, they have taken
7   the data in the Nakagawa declaration
8   completely out of context, and the Wise patent
9   dealt with coumarins compounds.
10        Their second allegation is that
11  Dr. Hirose committed some sort of inequitable
12  conduct when he submitted a declaration during
13  the reexamination of the '528 patent.  The
14  defendants have made various --
15        JUDGE COOPER:  Was that in the
16  reexamination, or in a traverse to rejection
17  of the original application?
18        MR. MONROE:  It was in the
19  reexamination, Your Honor.
20        And what happened was Otsuka redid
21  some tests and did some comparative results
22  for the patent office to compare in the
23  reexamination some additional prior art
24  arguments that one might hear someone argue.

MONROE - OPENING STATEMENT

1
2          And that's another example, I
3     think, of the defendants taking things out of
4     context.  Otsuka was doing the right thing.
5     Otsuka went back to the patent office and said
6     it could be argued.
7          And that's the whole purpose of the
8     reexamination process is to go back and say,
9     Look, someone might argue this.  We think
10    they're wrong.  But since someone might try to
11    argue that, we'll let you decide it first,
12    patent office.  And if what we've proposed you
13    actually agree with, then we lose our patent.
14    But if our real argument is that it's
15    patentable or you believe us on that issue,
16    then our patent stays in effect.
17          And that's what Otsuka did.  They
18    in good faith went back to the patent office
19    and said, Please look at this again, and let's
20    talk about specific compounds and compare
21    them, and I'll show you again these unexpected
22    results.  And that's what they did.
23          And the defendants want to argue
24    that Dr. Hirose's declaration had, you know,
25    inaccuracies or the data wasn't correct, and

1   MONROE - OPENING STATEMENT

it really didn't prove what Dr. Hirose said he

2

was proving.

3

4   I think it's worth noting that this

5   case has been pending for three years.  And

6   the type of tests that Dr. Hirose conducted

7   are very simple, cheap and easy to conduct.

8   And the defendants have the resources and

9   incentive to replicate those tests if they

10  want to to prove that somehow the data is

11  wrong or it doesn't prove what Dr. Hirose

12  said.  I mean, that happens a lot in patent

13  cases.

14  And they didn't do it, or at least

15  they didn't disclose that to us, because we

16  would assume they would have received the same

17  results.

18  And our experts will testify that

19  the results and Dr. Hirose's declaration are

20  entirely accurate, and there is no basis for

21  their allegations against that data.

22  Before I wrap up, Your Honor, I

23  would like to just apologize for one issue.

24  To the extent our trial briefs look like

25  they're passing in the night on a few issues,

1          MONROE - OPENING STATEMENT

2      that's partly because of the way issues got

3      brought up through the pretrial order, and

4      then there have been some changes in

5      positions.

6              And the one I would like to note in

7      particular because you're going to hear a lot

8      about it at trial is the issue about the

9      anti-apomorphine stereotomy tests.

10             The defendants have taken a

11     position repeatedly throughout this case that

12     that test was not an appropriate test for

13     evaluating antipsychotic efficacy.

14             We repeatedly countered that

15     argument and provided our expert testimony and

16     our exhibits and evidence and patents and

17     literature and everything establishing that it

18     is, in fact, the proper test for conducting

19     antipsychotic efficacy.

20             The defendants' trial brief doesn't

21     mention that, so it appears that they may have

22     dropped that, and so our arguments are moot.

23     So I would apologize for the extra verbiage

24     that may no longer be relevant.

25             But our experts will still testify

1      MONROE - OPENING STATEMENT

2      about that issue because it's a central point

3      that Dr. Oshiro picked that for his test to

4      find his compound.

5              And finally, I would like to note

6      that there is a sort of irony also in the

7      arguments the defendants are making about the

8      obviousness of aripiprazole when they talk

9      about this blocking issue and how nobody would

10     have tried to do any research in this area,

11     and also when they argue it would have been so

12     easy to make aripiprazole and, therefore,

13     Otsuka is not entitled to a patent on

14     aripiprazole.

15             Evidence will show that Teva itself

16     is getting and has gotten patents on

17     aripiprazole.  And as we talked about, like

18     how the molecule is a three-dimensional item,

19     you can actually get patents on, you know,

20     twisting it around because it will have

21     different properties.

22             It's not just changing a carbon

23     here or a carbon there that can change the

24     properties.  Actually, even just changing the

25     configuration or confirmation of the molecule

1           MONROE - OPENING STATEMENT

2       can result in different properties.

3               And Teva is getting patents on the

4       exact same chemical structure, the same

5       formula.  And that's why it's important to

6       look at Claim 12, which is just the formula.

7       It's very broad.  It encompasses all twists

8       and turns of aripiprazole.

9               Teva says we can't have a patent on

10      aripiprazole, even though Otsuka discovered

11      that basic formula and its use, but Teva can

12      get a patent on aripiprazole that they have

13      twisted in a certain way, and they've alleged

14      they've got some new properties.

15              So I think it's important to put in

16      context the legitimacy of their arguments

17      based on what they also are doing in real

18      life.

19              Your Honor, I've tried to highlight

20      the key issues that we're going to address.

21      And we will present evidence contradicting

22      their invalidity positions and their

23      inequitable conduct positions, and also

24      establish that Otsuka didn't do anything wrong

25      in the patent office.  Thank you, Your Honor.

1      MONROE - OPENING STATEMENT

2              JUDGE COOPER:  Fine.  Thank you.

3              Just so everybody understands, when

4      we have a jury trial and the closing arguments

5      are over, the judge either at that point or

6      before -- excuse me.

7              When the opening arguments are

8      over, opening arguments, the judge turns to

9      the jury and says, "Now, you realize you have

10     not heard one word of evidence yet."  And

11     that's true.

12             So I look forward to this trial,

13     and I thank you for these opening statements.

14             I bet everybody would like to have

15     some lunch now, so why don't we do that.  And

16     let's aim to reconvene around 1:15 today

17     unless you feel strongly that you'd rather

18     have some other time for your break.  We've

19     earned a lunch hour.  Okay.

20             (Luncheon recess:  11:45 a.m.)

21             JUDGE COOPER:  Who will call the

22     first witness?

23             MS. HOLLAND:  Defendants call

24     Dr. Jeffery Press as their first witness.

25             JUDGE COOPER:  Thank you.

Page 106

1                    PRESS - DIRECT

2     J E F F E R Y   P R E S S,

3     having been first duly sworn by the Court

4     Clerk, was examined and testified as follows:

5                         THE COURT CLERK:  Please state and

6           spell your full name for the record, please.

7                         THE WITNESS:  My name is Jeffery

8           Press.

9                         JUDGE COOPER:  Could you spell it,

10          please.

11                        THE WITNESS:  J-E-F-F-E-R-Y,

12          P-R-E-S-S.

13                        THE COURT CLERK:  Thank you.

14                        JUDGE COOPER:  Ms. Holland.

15                        MS. HOLLAND:  Thank you, Your

16          Honor.

17    DIRECT EXAMINATION

18    BY MS. HOLLAND:

19          Q.    Dr. Press, what is your area of

20    expertise?

21          A.    I'm a medicinal chemist.

22          Q.    And what is medicinal chemistry?

23          A.    Medicinal chemistry is that aspect

24    of chemistry that looks at chemical structures and

25    their biological activity.

1                    PRESS - DIRECT

2          Q.    How long have you worked in the

3    field of medicinal chemistry?

4          A.    More than 25 years.

5          Q.    Do you have expertise in any

6    particular area within medicinal chemistry?

7          A.    I have expertise in the central

8    nervous system, which is abbreviated as CNS,

9    cardiovascular and gastrointestinal disease.

10         Q.    What is CNS or central nervous

11   system?

12         A.    The central nervous system

13   medicinal chemistry involves the study of

14   antischizophrenic agents, anxiety agents,

15   analgesic agents.

16         Q.    Do you have any expertise with the

17   research and development of antischizophrenic

18   agents?

19         A.    I do.

20         Q.    Over the course of your work on

21   antischizophrenic agents, did you gain a general

22   understanding of the symptoms of the disease?

23         A.    I did as a medicinal chemist would

24   understand them.

25         Q.    And what is that general

                    PRESS - DIRECT

1

2    understanding?

3           A.    Schizophrenia is quite a severe CNS

4    disease where there are positive and negative

5    symptoms.  The negative symptoms are symptoms that

6    most of us associate when we see people on TV that

7    have hallucinations and are talking to themselves

8    as they walk down the street.

9                 And negative symptoms we wouldn't

10   think of quite as much, but is withdrawal or

11   flattening of mood.

12          Q.    I think in your last answer you may

13   have started with negative symptoms.

14          A.    I'm sorry.  Did I say negative

15   first?

16          Q.    Yes.

17          A.    I'm sorry.  Positive symptoms are

18   those, and negative symptoms are the flattening of

19   mood.  I apologize.

20          Q.    I want to try to nail down some

21   terminology that may come up during your

22   testimony.  So far you've referred to

23   antischizophrenic agents.

24                Are there other terms for

25   antischizophrenic agents that a medicinal chemist

1                     PRESS - DIRECT

2      would use interchangeably?

3           A.     There are several.

4      Antischizophrenic is one, antipsychotic is one,

5      and neuroleptic is one that's appeared in the

6      literature.  And in current parlance, neuroleptic

7      probably has fallen out of favor because it really

8      refers to more of a side effect than to the

9      disease itself.

10          Q.     Let's turn to your educational

11     background for a moment.

12                 Where did you go to college?

13          A.     I went to Bucknell University,

14     where I received a bachelor of science degree in

15     1969.

16          Q.     What did you do after that?

17          A.     I went to graduate school.

18          Q.     Where did you go to graduate

19     school?

20          A.     The Ohio State University, where I

21     received a Ph.D. in organic chemistry in 1973.

22          Q.     Did you receive any postgraduate

23     training?

24          A.     I did.  I went to Harvard

25     University, where I did a postdoctoral study with

1                    PRESS - DIRECT

2   a Nobel Laureate, Robert Burns Woodward.

3          Q.    How long were you at Harvard?

4          A.    Two years.

5          Q.    And did you receive any grants for

6   your postgraduate training?

7          A.    The first year I received a grant

8   from Harvard, and the second year I received a

9   grant from the National Institutes of Health.

10          Q.    What was the subject of your

11  postdoctoral work at Harvard?

12          A.    Our project that we looked at was

13  the chemical construction of a natural product

14  called erythromycin, which is an antibiotic.

15          Q.    What was your first job after you

16  finished your post-doc?

17          A.    My first job was at Lederle

18  Laboratories, which was a division of American

19  Cyanamid Company, and it was located in

20  Pearl River, New York.

21          Q.    What was your position when you

22  went there?

23          A.    I joined as a research chemist.

24          Q.    And what was your first project at

25  Lederle?

1                    PRESS - DIRECT

2          A.    My first project, I joined a team

3    of people who were looking for novel antipsychotic

4    agents.

5          Q.    Did you personally discover any

6    antipsychotic agents while you were at Lederle?

7          A.    I did.

8          Q.    What compound is that?

9          A.    Well, I personally made the

10   compound called olanzapine.

11         Q.    And is olanzapine a compound that's

12   marketed by Lederle?

13         A.    Olanzapine is a compound that's

14   marketed by a company we've all heard, which is

15   called Eli Lilly Company.

16         Q.    How did it happen that you had

17   synthesized olanzapine at Lederle and it was

18   marketed by Eli Lilly?

19         A.    Well, we were undertaking a

20   systematic study of analogs of a compound called

21   clozapine.  We had discovered an active family of

22   compounds that were very interesting.

23              And at the appropriate time we

24   filed a patent application, which turned out that

25   at the same time, and unbeknownst to us, the

PRESS - DIRECT

1   chemists at Eli Lilly were doing essentially the

2   same work and had filed a patent application

3   sooner than we did.

4           Q.   So the chemists at Lederle and Eli

5   Lilly were both working on olanzapine at the same

6   time?

7           A.   That's correct.

8           Q.   Where did you go after you left

9   Lederle?

10          A.   I left Lederle to become a research

11  manager in medicinal chemistry at Ortho

12  Pharmaceutical Corporation, which is a division of

13  Johnson & Johnson.

14          Q.   Did you work on central nervous

15  system drugs during your time at Ortho?

16          A.   That was part of my research

17  program, yes.

18          Q.   Were you working at Ortho in the

19  1988 time frame?

20          A.   Yes.

21          Q.   At that time were you supervising

22  medicinal chemists who were working in the

23  research and development of central nervous system

24  drugs?

PRESS - DIRECT

1

2   A.   Yes.

3   Q.   Where did you work after you left

4   Ortho?

5   A.   I left Ortho as part of a

6   reorganization within Johnson & Johnson to

7   centralize their R&D, or research and development

8   operations, and we formed a company called

9   R.W. Johnson Pharmaceutical Research Institute.

10  And as part of that reorganization, I was promoted

11  to an assistant director and moved to their

12  research site at Springhouse, Pennsylvania.

13  Q.   Were you involved with

14  antischizophrenic drug research while you were at

15  R.W. Johnson?

16  A.   I was.

17  Q.   Can you explain.

18  A.   Well, as part of the

19  reorganization, both the R.W. Johnson Research

20  Institute and the Janssen Research Institute,

21  which was another one of the Johnson & Johnson

22  family of companies, shared research laboratories

23  and overseeing management within this site.

24       The Janssen people continued their

25  work in antipsychotic agents, and we had steering

PRESS - DIRECT

1  committee and planning meetings concerning the

3  antipsychotic research.

4       Q.    Can you briefly describe your

5  employment from the time you left R.W. Johnson up

6  through today.

7       A.    Yes.  I left R.W. Johnson

8  Pharmaceutical Research Institute and joined

9  several smaller biopharmaceutical companies as the

10  vice president of research and development, and

11  then ultimately formed my own consulting company.

12      Q.    What's the name of that company?

13      A.    Press Consulting Partners.

14      Q.    And what type of consulting do you

15  do?

16      A.    I do consulting with

17  biopharmaceutical companies, and we also do

18  consulting for scientific publication and

19  scientific editing.

20      Q.    Are you the inventor on any U.S.

21  patents in the area of medicinal chemistry?

22      A.    I am.

23      Q.    Approximately how many?

24      A.    More than 50.

25      Q.    Are any of those patents related to

1                    PRESS - DIRECT

2    antischizophrenic drugs?

3            A.    Yes, several are.

4            Q.    Have you authored any articles or

5    book chapters in the field of medicinal chemistry?

6            A.    Yes.  I've published more than 80

7    articles and ten to 12 book chapters that are

8    review chapters.

9            Q.    Are any of those articles and book

10   chapters related to antischizophrenic drugs?

11           A.    Yes, several are.

12           Q.    Have you served as an editor of any

13   scientific publications?

14           A.    Yes.  I currently serve on the

15   editorial board of Organic Reactions, which is a

16   myograph series that goes back to the 1940s.  I am

17   a managing editor of a review journal, and I have

18   been editor of several other journals over the

19   years.

20           Q.    During the course of your career

21   have you given presentations on antischizophrenic

22   drugs?

23           A.    I have given a number of

24   presentations, some of which involved

25   antischizophrenic drugs, yes.

1              PRESS - DIRECT

2         Q.    And where were those presentations

3    given, generally?

4         A.    Generally at scientific meetings

5    and at universities.

6         Q.    Would you please turn to tab 1 of

7    your exhibit book, which is DTX-1441.

8              Is that your CV, Dr. Press?

9         A.    Yes, it is.

10        Q.    Is it up to date?

11        A.    I think, if I recall correctly,

12   there is one patent at issue just this year that

13   is not included in this list, but otherwise it's

14   quite current.

15        Q.    Does it accurately set forth your

16   credentials?

17        A.    Yes, it does.

18             MS. HOLLAND:  Your Honor,

19        defendants offer DTX-1441 into evidence.

20             JUDGE COOPER:  You have a series --

21        I think you have 12 tabs here --

22             MS. HOLLAND:  Yes.

23             JUDGE COOPER:  -- for the testimony

24        of Dr. Press?

25             MS. HOLLAND:  Yes, Your Honor.

1          PRESS - DIRECT

2          JUDGE COOPER:  Are there objections

3    of which you are aware to any of these

4    exhibits?

5          MS. HOLLAND:  I'm not aware of any

6    objections.

7          MR. FLIBBERT:  No objections, Your

8    Honor.

9          JUDGE COOPER:  Okay.  So when you

10   offer it into evidence based upon testimony,

11   I'll just say "admitted."

12         MS. HOLLAND:  You'd like me to go

13   as the exhibit is mentioned, rather than at

14   the end?

15         JUDGE COOPER:  Yes, please.  But

16   you do not need to do elaborate foundation for

17   any of these documents because they've already

18   been screened by opposing counsel.

19         MS. HOLLAND:  Thank you, Your

20   Honor.

21         Your Honor, defendants offer

22   Dr. Jeffery Press as an expert in medicinal

23   chemistry and antipsychotic drug discovery.

24         MR. FLIBBERT:  Your Honor, Mike

25   Flibbert from Finnegan.

1              PRESS - DIRECT

2              We have no objection as to

3       testimony with respect to chemistry.  However,

4       with respect to any testimony concerning side

5       effects of antipsychotic medications in human

6       schizophrenia patients or the evaluation of

7       efficacy of antipsychotics in schizophrenic

8       patients, we would object.  He doesn't have

9       any experience in that area.  And also,

10      anything on the illness of schizophrenia

11      itself.

12              JUDGE COOPER:  I don't think he has

13      testified to any expert experience about the

14      illness itself, and I think he is accustomed

15      to looking at clinical data.  But if it gets

16      deeper into the actual testing in humans, you

17      can raise your objection again.

18              MR. FLIBBERT:  We don't think he

19      has actually reviewed clinical data, but

20      that's a type of voir dire.  But I understand

21      Your Honor's ruling.

22              JUDGE COOPER:  Okay.  If you have

23      objection as we get into the substantive

24      testimony, you can raise it again.

25              But as an expert in medicinal

1              PRESS - DIRECT

2       chemistry and in discovery of antipsychotic

3       drugs, I would say he has expertise.

4            Q.    Dr. Press, let's begin by

5    discussing the compound aripiprazole.

6                 MS. HOLLAND:  Let's put up the

7       slide marked TDX-2.

8                 And the demonstratives, Your Honor,

9       are going to be marked with that designation,

10      TDX.

11           Q.    Can you explain what we see on this

12   slide.

13           A.    Yes, I can.  What we see here is a

14   chemist's representation of molecular

15   aripiprazole, which I heard about this morning and

16   we'll talk about throughout my talk.

17                THE WITNESS:  And at the first

18      level I would like to try to offer a short

19      tutorial since I think the majority of people

20      become like a deer in headlights when they see

21      chemical structures.  It seems like you're

22      not, but many are.

23                JUDGE COOPER:  I'm maintaining a

24      straight face anyway.  If you interpret that

25      as knowledge or a deer-like expression, that

1                   PRESS - DIRECT

2         remains to be seen.

3                   THE WITNESS:  That's fair.  But

4         many of the times when I talk to students,

5         when I put up the first structure it

6         frequently causes panic and shock, so --

7                   JUDGE COOPER:  Yes, it does.

8         A.    What we see here, to a chemist,

9    tells a chemist more than 1,000 words about a

10   structure.

11                  THE WITNESS:  Is this going to be

12        acceptable to you?

13                  JUDGE COOPER:  Yes, that's fine.

14        A.    But fundamentally, this shows the

15   array of atoms and bonds that constitutes

16   aripiprazole.

17                  And so first of all, at a top

18   level, what this tells us is that aripiprazole

19   contains chlorines -- that's the "Cl" -- contains

20   nitrogens -- those are the Ns -- contains an

21   oxygen or several oxygens -- those are the Os.

22                  Where you don't see anything, it's

23   assumed to be carbon because -- and we'll see in

24   another slide how cluttering it becomes when you

25   write in all the carbon.

1          PRESS - DIRECT

2               And it is also assumed at all these

3    points where you see above where the carbons are,

4    there's nothing -- those are all hydrogens because

5    carbon -- and we'll talk about it a little more in

6    a minute -- carbon has to have hydrogens to fill

7    up its atomic requirements.

8                    We'll get there.  We'll get there.

9                    The other thing I'd like to note on

10   this slide is that there's two different kinds of

11   bonds.  The bonds are what attach the atoms

12   together and give it its proper array.  And there

13   are single bonds which are shown as single lines,

14   and there are double bonds which are shown as

15   double lines.

16                   And so what you see here is there's

17   a double bond of oxygen, and so that's actually

18   technically a carbonyl.  It's the name of that

19   group.  And if a carbon-carbon double bond -- if

20   there's two bonds between carbons, it's a

21   carbon-carbon double bond.

22                   And it's just common parlance, and

23   I may, in fact, during the course of today say

24   "carbon-carbon double bond," and that's what I

25   mean.

PRESS - DIRECT

1

2          I think that that covers most of

3    what I want to say about that.  It is the way

4    chemists will draw aripiprazole.  It is the way

5    chemists draw molecules.

6          Q.    Can we go to the next slide, TDX-3.

7          A.    Sure.  And this goes a little bit

8    further along the line of what I want to explain

9    so you sort of have an understanding of what we're

10   talking about.

11         At the top part of the slide you

12   see the structure of aripiprazole as we just

13   looked at.  And at the bottom is really the

14   structure of aripiprazole showing all the bonds

15   and all the atoms.

16         And so you can see, as I said in

17   the first slide, at all the points that are drawn

18   at the top is a carbon atom, which I've drawn in

19   on the bottom.

20         And what you can also see is

21   wherever there's this open space above the carbon

22   or on top -- next to the carbon, there's a

23   hydrogen.

24         And the reason why we draw it the

25   way we do it at the top is clear.  It's very

                          PRESS - DIRECT

1    cumbersome to draw what's at the bottom.  It

2    furthermore doesn't tell a chemist any more than

3    what's shown at the top.  But the rules are such

4    that there's a reason why all of those hydrogens

5    are where they are.

6                        And if we go to the next slide, I

7    think we can focus in a little bit more to talk

8    about one section.

9                        MS. HOLLAND:  That's TDX-4, for the

10   record.

11                       JUDGE COOPER:  Okay.  Question:

12   The carbon that is above the -- I guess it's

13   nitrogen on the right hand --

14                       THE WITNESS:  Right there.

15                       JUDGE COOPER:  It's the top-most

16   carbon there.

17                       THE WITNESS:  Right there.

18                       JUDGE COOPER:  That's got two

19   hydrogens off it?

20                       THE WITNESS:  Yes.

21                       JUDGE COOPER:  But the carbon of

22   the neighbor only has one?

23                       THE WITNESS:  That's correct.

24       A.    And that's exactly the point.  The

PRESS - DIRECT

1  atoms all have certain requirements.

2          And so, for example, nitrogen has a

3  requirement that it has to have three bonds.  And

4  so if you look at the nitrogen right here, you can

5  see that there's two bonds, each to a carbon, and

6  to accommodate the third bond that nitrogen

7  requires, there's a hydrogen.  The hydrogen fills

8  out the requirement the nitrogen has.

9          Oxygen requires two bonds, and so

10 fulfilled in this carbonyl by being doubly bonded

11 to the carbon.

12         Carbon requires four bonds, so in

13 this ring system right here, the carbon you asked

14 about, two of the bonds that carbon requires are

15 that carbon -- there's two carbon-carbon bonds,

16 single bonds, and there's two bonds that I have to

17 worry about.  Those are filled by hydrogens.

18         Hydrogen requires one bond, and so

19 the filler is each hydrogen goes in once.  So that

20 carbon there has four bonds accounted for, as we

21 just went through.

22         Now, a carbon-carbon double bond

23 accommodates the carbons requirement in a slightly

24 different way.  And the only thing that's worth

1                     PRESS - DIRECT

2    noting, besides what we just talked about, is that

3    that carbon-carbon double bond makes the molecule

4    much more planar, flat.

5                     JUDGE COOPER:  P-L-A-N-A-R.

6                     THE WITNESS:  P-L-A-N-A-R, flat.

7              A.    And so whereas chemistry does occur

8    in three dimensions, the more aromatic or the more

9    there are double bonds as shown -- this is

10   actually -- there's a technical term called

11   aromatic ring, and we'll talk a little bit about

12   that later.  But that aromatic ring is very flat,

13   and this carbonyl makes the molecule flatter.  So

14   this molecule as drawn here is pretty flat.  Okay.

15                    The other thing I'd like to comment

16   about that, because you'll hear about them

17   throughout, is that this is the full structure for

18   what the chemical name is, dihydrocarbostyril.

19   That's accounting for all the bonds except that

20   one of the carbostyril ring.  That is

21   dihydrocarbostyril.  And it's the base of these

22   molecules we're talking about today.

23                    Now, there's one thing missing

24   here, and it's again because we're only trying to

25   focus on atomic bond counts in this.  But this

1                    PRESS - DIRECT

2    slide here we've weighted out, but there's

3    something attached there to account for the four

4    bonds that that carbon requires.

5                    JUDGE COOPER:  You're talking about

6         the carbon on the lower left?

7                    THE WITNESS:  That is correct.

8                    JUDGE COOPER:  Of the left ring?

9                    THE WITNESS:  That is correct.

10                   JUDGE COOPER:  In TDX-4?

11                   THE WITNESS:  That is correct.

12        Well, actually, in another slide or two I'll

13        be able to tell you much more accurately

14        exactly what carbon that is.

15                   JUDGE COOPER:  Why do you call it

16        dihyrdo instead of just carbostyril?

17                   THE WITNESS:  Well, the name

18        carbostyril is the name of the molecule where

19        those are all double bonds, and there's a

20        double bond there and with this arrangement at

21        the bottom.

22                   So this is dihydro because it has

23        two hydrogens.  If that isn't there, then it's

24        carbostyril itself.

25                   JUDGE COOPER:  Thank you.

                        PRESS - DIRECT

1       Q.    Since we've been talking about

2   carbostyrils, does aripiprazole belong to a

3   particular family of chemical compounds?

4       A.    It does.  Aripiprazole is a member

5   of the family of compounds called carbostyril

6   derivatives.

7               MS. HOLLAND:  Can we see TDX-5,

8       please.

9       Q.    Would you explain more about what

10  you mean by a carbostyril derivative.

11      A.    Certainly.  First, going back, this

12  is a much nicer way of looking at the structures

13  than with all these hydrogens and carbons dangling

14  off.  I assume you agree.

15              If you look at the right-hand side

16  of the slide in the blue box, you see the

17  carbostyril -- the dihydrocarbostyril molecule

18  that we talked about in the previous slide.

19              And it's a carbostyril core

20  because -- I'm calling it a core because the name

21  of all of these molecules, they're all considered

22  carbostyril derivatives.

23              And the reason why they're called

24  carbostyril derivatives is if you just have

1                         PRESS - DIRECT

2    carbostyril, it would be just what's in the blue

3    box.  But the molecule aripiprazole has this side

4    chain substituted at one spot, so the side chain

5    is a substituent.  And by adding a substituent, it

6    makes it a carbostyril derivative.  It's derived

7    from carbostyril.

8         Q.   Can you explain what you mean by

9    the word "substituent."

10        A.   Certainly.  Substituent is really

11   derived from the term substitute.  So what's

12   happened is this side chain is substituted for the

13   hydrogen that would be in the carbostyril nucleus.

14        Q.   Dr. Press, to a medicinal chemist,

15   does the side chain of aripiprazole have different

16   components to it?

17        A.   Yes, it does.

18             MS. HOLLAND:  Can we see TDX-6.

19        Q.   Can you explain what we see on

20   TDX-6, please.

21        A.   Certainly.  This analyzes the

22   various parts of the structure a little more

23   fully.  And you can see that the carbostyril core

24   is what we've been talking about, and it's still

25   fixed.  And the side chain really is comprised of

1          PRESS - DIRECT

2    three parts.

3              On the left-hand side in the green

4    box is a phenyl group.  Phenyl is a specific

5    chemical name for a six-membered ring with three

6    double bonds, as shown.

7              In the gray box next to the phenyl

8    group is a piperazine group.  Piperazine is a

9    specific name for a six ring that contains two

10   nitrogens across from each other.

11             And between the two, linking the

12   piperazine to the carbostyril is something which

13   we call a linker because it links them.

14             In the course of our discussion

15   here today there's going to be a variation on the

16   phenyl group, and we're going to be talking about

17   variations of the linker.  The piperazine will be

18   essentially unchanged.

19             And the carbostyril unit, from a

20   medicinal chemist's standpoint, since it's the

21   core, the preference from medicinal chemistry is

22   really not to change that molecule very much

23   unless there's a need or there's a reason to study

24   some.

25             Q.   Let's look a little more closely at

1           PRESS - DIRECT

2    the aripiprazole molecule.  Can we see TDX-7.

3           Can you explain what we see here,

4    Dr. Press.

5           A.    Certainly.  What we see here is the

6    fact that all of that cumbersome description we

7    just had is a lot easier to have if you can place

8    substituents and place things.

9           This is also the case that many

10   times, as much as chemists like structures, they

11   have to write names down sometimes for the

12   purposes of typing a letter or putting a patent

13   together or writing a chemical publication.

14          And so there is a set of rules that

15   are used to put together to translate the

16   structure to a name that we can talk about.  And

17   it has to be systematic so that when I say a name,

18   somebody else will understand that name.

19          And one step under that is we need

20   a numbering system in order to be able to say

21   where things are attached.  If you recall a couple

22   of slides earlier, we had difficulty defining what

23   that carbon was or where it was.

24          Well, using the numbering system

25   which is defined by some international committees,

                         PRESS - DIRECT

1  everything in the molecule has an unambiguous

2  number, and they're according to a set of rules.

3          So the carbostyril rule is

4  officially numbered 1 through 8, where nitrogen,

5  by the rules, is No. 1.  And then you just walk

6  around the ring, so that's 1, 2, 3, 4 and so on.

7          The linker in the case of

8  aripiprazole is a butoxy linker, and so its

9  carbons are numbered 1, 2, 3, 4.

10          Piperazine, similarly 1, 2, 3, 4,

11  5, 6, and that way we can differentiate the two

12  nitrogens.

13          And the phenyl group, 1, 2, 3, 4,

14  5, 6, and that way we can differentiate the

15  various substitutions on the phenyl group.

16          And so the carbon that we were

17  struggling with earlier -- where is it -- it's

18  carbon 7 in the carbostyril group.  And so

19  aripiprazole is a seven-substituted carbostyril

20  derivative.

21          JUDGE COOPER:  Where is the 7?

22          THE WITNESS:  Right there

23      (pointing).

24          JUDGE COOPER:  Oh, I see.  The

1                    PRESS - DIRECT

2          substitution comes off the seventh position.

3                    THE WITNESS:  That's exactly

4          correct.

5              Q.    Dr. Press, you mentioned that the

6      linker on aripiprazole is a butoxy linker because

7      it has four carbons.

8                    What would the linker be called if

9      it had three carbons?

10             A.    If the linker had three carbons, it

11     would be called a propoxy linker.

12             Q.    All right.  Let's go to the next

13     slide, TDX-8, please.

14                   Can you explain what you've shown

15     on this slide, Dr. Press.

16             A.    Well, certainly.  As you can see at

17     the top of this slide we have aripiprazole, which

18     we've looked at a number of slides.

19                   And at the bottom we have the

20     compound that you just described, which is the

21     compound with one less methylene unit in it, and

22     it's the propoxy compound.

23                   Everything else in the molecule is

24     the same, save the short linker at the bottom.

25             Q.    Why do you call the aripiprazole a

1                      PRESS - DIRECT

2    2,3-dichlorobutoxy in this slide?

3            A.    Its called the 2,3-dichloro.  It's

4    really a shorthand nomenclature.  Its full name is

5    much longer.  But it really tells you, since we're

6    looking at differences, as I mentioned earlier, at

7    the phenyl group and in the side chains, what it's

8    telling the 2,3-dichloro -- and again, I should

9    have mentioned this on the previous slide.

10           If you recall, the phenyl group was

11   numbered 1 through 6, and the 2 and 3 positions of

12   the phenyl group are substituted with chlorines.

13   That's the "Cl."  Since there's two of them, it's

14   a dichloro.  And the 2,3 tell you where those

15   dichloros are located.

16           The butoxy, as we talked about

17   before, is the four-carbon unit.  The specific

18   name for four carbons attached to an oxygen as

19   butoxy.

20           The lower one is a propoxy because

21   it has three carbons attached to it, and the name

22   is propoxy.

23           So the top is a 2,3-dichlorobutoxy

24   and the bottom is a 2,3-dichloropropoxy.

25           Q.    What is the structural relationship

1                  PRESS - DIRECT

2     between aripiprazole and the 2,3-dichloropropoxy?

3          A.    These compounds would be called

4     homologs.

5          Q.    What is a homolog?

6          A.    A homolog is -- it's a scientific

7     term, but it's used another way in other

8     literature as well.  But homologs are nothing more

9     than referring to the relationship of two

10    molecules where they only differ by a single

11    repeating unit, in which case the repeating unit

12    we're talking about here is that one extra carbon.

13               But if you recall from an earlier

14    slide, that one extra carbon also has two

15    hydrogens on it, and so the name for that is

16    methylene.

17               So the 2,3-dichloropropoxy

18    structure at the bottom is one carbon unit

19    shorter, but that carbon unit takes two hydrogens

20    with it, which is a methylene.

21               And so the homolog is that

22    difference between the methylene -- between the

23    top -- that has one extra methylene group than the

24    bottom.

25          Q.    To a medicinal chemist, is there

1               PRESS - DIRECT

2    any significance in two compounds being homologs

3    of each other?

4           A.    Chemists expect homologs to be very

5    closely related and have very similar structural

6    properties.

7               JUDGE COOPER:  Structural

8        properties?

9               THE WITNESS:  Well, and chemical

10       properties.  Very similar properties.

11       Structurally, they're absolutely similar.

12          Q.    Can you explain what you mean by

13   similar properties.

14          A.    Well, similar properties, you would

15   expect them to be very, very close in the way they

16   are formulated, the way that they're handled, the

17   way they behave, their melting points.

18               A medicinal chemist would expect

19   very small differences, very similar properties

20   biologically between these two compounds.

21          Q.    Can we see TDX-9.

22               What have you shown on TDX-9,

23   Dr. Press?

24          A.    Well, on TDX-9, on this slide,

25   we're really just getting rid of the chlorine

1                    PRESS - DIRECT

2    groups at the 2 and 3 position of aripiprazole to

3    show -- at the top of the slide, this is

4    aripiprazole without the 2,3-dichloro.  And so

5    because there's no substitution on phenyl, that

6    then becomes an unsubstituted compound.  And it

7    still has the butoxy linker, and so it's an

8    unsubstituted butoxy compound.

9                    At the bottom we have unsubstituted

10   phenyl, and we have a propoxy linker, and so it's

11   an unsubstituted propoxy compound.  And once

12   again, because the only difference between these

13   two compounds is that methylene group, those are

14   homologs.

15                Q.    Let's focus now on the phenyl ring

16   of aripiprazole.  Can we see TDX-10, please.

17                A.    Certainly.  What we see here is

18   again, I've rewritten aripiprazole.  And this

19   really is underscoring what we just talked about

20   in the previous slide.  Aripiprazole has

21   2,3-dichloro substitution, chlorine at 2 and 3 of

22   the phenyl group.

23                    And the lower one is the

24   unsubstituted butoxy where it does not have that

25   substitution, and so it's an unsubstituted butoxy

1              PRESS - DIRECT

2   compound.

3          Q.    Are there any differences between

4   aripiprazole and the unsubstituted butoxy other

5   than those two chlorines you pointed out?

6          A.    No.  These are the same.  The

7   unsubstituted butoxy is, if you will, the parent

8   system, and aripiprazole is the dichloro

9   derivative of the bottom compound.

10         Q.    What do you mean by a derivative?

11         A.    We talked about it earlier with the

12  side chain.  It's derived from.  So by adding

13  these two chlorines, that is a derivative of the

14  unsubstituted butoxy compound.

15            JUDGE COOPER:  The unsubstituted

16      butoxy has carbons where those chlorines are

17      substituted in the upper figure.  Right?

18            THE WITNESS:  That is correct.

19      There's a carbon here.  These are all carbons.

20            JUDGE COOPER:  Right.

21            THE WITNESS:  And that is all

22      carbons.  That's a phenyl group.

23            MS. HOLLAND:  Let me see if I can

24      follow up on Your Honor's question.

25         Q.    Instead of chlorines of

1            PRESS - DIRECT

2   aripiprazole, what does unsubstituted butoxy have

3   in its place?

4            A.    Following up on what we talked

5   about earlier, remember carbon has to have four

6   bonds.  And when nothing is written, it's got

7   hydrogen.  So right there is a hydrogen and right

8   there is a hydrogen on the unsubstituted butoxy.

9   And to make the aripiprazole derivative, the

10  hydrogens are replaced with chlorine.

11           Q.    Dr. Press, you testified that the

12  2,3-dichloropropoxy and the unsubstituted butoxy

13  each differ from aripiprazole in a single way.

14           Is there a term that's used to

15  describe that situation?

16           A.    Yes.  There is term called

17  bracketing.

18           Q.    Can we see TDX-11, please.

19           Can you explain a little more about

20  what you mean by bracket.

21           A.    Certainly.  Bracketing in this

22  particular instance is referring to the fact that

23  aripiprazole shares common elements of both the

24  unsubstituted butoxy, that being the butoxy side

25  chain -- or excuse me -- the butoxy linker, and

1                         PRESS - DIRECT

2      the dichloro substitution, the 2,3-dichlorophenyl

3      group of the 2,3-dichloropropoxy compound.

4                    Those are both features of the top

5      two compounds and they bracket aripiprazole, one

6      with the chlorines and one with the butoxy.

7                    Q.    Dr. Press, were the unsubstituted

8      butoxy and the 2,3-dichloropropoxy compounds known

9      before October 1988?

10                   A.    Yes.

11                   Q.    With that background, let's turn to

12     the '528 patent-in-suit.  Could you turn to tab 2

13     in your binder, which is DTX-498.

14                   Is that the '528 patent?

15                   A.    That is the '528 patent.

16                   MS. HOLLAND:  Defendants offer

17         DTX-498 into evidence.

18                   JUDGE COOPER:  Admitted.

19                   (Exhibit DTX-498 admitted.)

20                   Q.    Let's look at the front page of the

21     '528 patent, DTX-498.

22                   Do you have an understanding of the

23     priority date for the '528 patent?

24                   A.    Yes.  As just got blown up, the

25     priority date is October 31st, 1988.

1               PRESS - DIRECT

2        Q.     And do you have an understanding of

3    the significance of the priority date for your

4    testimony?

5        A.     The significance is that

6    information available before October 31st, 1988,

7    would be prior art.

8               JUDGE COOPER:  Ms. Holland, I

9        noticed something in your brief to the effect

10       that the actual U.S. application date would be

11       prior art measurement date for some purposes.

12       I don't need it explained now, I don't want it

13       explained now, but I didn't understand it.

14               So I'm going with this concept

15       right now, which is this is the priority date,

16       unless a different priority date is stated.

17               MS. HOLLAND:  I don't believe

18       there's any dispute that for purposes of the

19       prior art in this case, the right date is

20       October 1988.

21               JUDGE COOPER:  Okay.

22        Q.     Dr. Press, who was the first named

23    inventor on the '528 patent?

24        A.     The first named inventor on the

25    '528 patent is Yasuo Oshiro.

1                    PRESS - DIRECT

2            Q.    And what does the '528 patent

3    describe generally?

4            A.    The '528 patent describes

5    carbostyril derivatives that are useful as

6    antischizophrenic agents.

7            Q.    Do you have an understanding of

8    which claims Otsuka is asserting in this case?

9            A.    I do.

10           Q.    Which are those?

11           A.    I believe they are Claims 12, 17

12   and 23.

13           Q.    Let's look at Claim 12.  And let's

14   see TDX-12.  TDX-12 is an excerpt from the

15   '528 patent with Claim 12.  It's just easier to

16   read.

17                 What does Claim 12 of the

18   '528 patent cover?

19           A.    Claim 12 gives the full chemical

20   name for aripiprazole.

21           Q.    Can we see TDX-13, please.

22                 Can you explain generally how the

23   name in Claim 12 represents the structure of

24   aripiprazole.

25           A.    I will, and this is using all of

1                          PRESS - DIRECT

2     the information that we talked about earlier.

3                      Aripiprazole is a carbostyril

4     derivative.  And in nomenclature, the core part of

5     the molecule is the base of the name.  And it's

6     much like the German language where you have to

7     read the whole sentence in order to get to the

8     verb at the end to find out what's going on.  The

9     core is always the last thing written.

10                     And so to understand what it is,

11    you look at the end first, which is in blue

12    matching the box, and you can see that

13    aripiprazole is a 3,4-dihydrocarbostyril.

14                     Now, unlike German, or maybe like

15    German, in order to find out where it is

16    derivatized, you've got to go all the way over to

17    the left to find out where the substituent is.

18                     And what you can see is all the way

19    over to the left, it's a 7 substituted

20    carbostyril, 7-dihydrocarbostyril.  That's telling

21    where the substituent is, and everything in the

22    bracket is the substituent.

23                     And now we have to name the

24    substituent, and so it really almost reads left to

25    right.  It's almost English at this point.

Page 143

PRESS - DIRECT

So reading the first part of the name, it's a 2,3-dichlorophenyl.  So the 2,3 tells you where the chlorine is there, 2 and 3.

The next thing it tells you is that that dichlorophenyl is attached to a piperazine which is there.

And then that whole thing is attached to a butoxy, and the butoxy links the carbostyril and that side of the link.

And so Claim 12 gives the full chemical name of aripiprazole, and the structure above translates from the name below.

JUDGE COOPER:  Just because we are at this point, you've used a convenient coloring system in order to associate various portions of this chemical name with the four basic components of this compound.

And reading as we would down the line, you say that the 7 at the beginning of the line characterizes the carbostyril core?

THE WITNESS:  No.  It characterizes where the attachment is to the carbostyril core.

JUDGE COOPER:  Of course.  Of

1                    PRESS - DIRECT

2     course.   I misspoke.

3                    THE WITNESS:   That's fine.

4                    JUDGE COOPER:   And then the fancy

5     bracket, the fancy parentheses -- or not

6     parentheses there -- that other type of

7     symbol, but it's just to say, and this is

8     inside it?

9                    THE WITNESS:   That's correct.

10                    JUDGE COOPER:   Then you have --

11                    THE WITNESS:   This 4 --

12                    JUDGE COOPER:   There are two 4

13    numbers sequentially.

14                    THE WITNESS:   That's correct.   But

15    again, since you've asked the question, the

16    core is named at the end of the molecule.   And

17    now you have to use the numbers to identify

18    points of connection.

19                    And so since you asked the

20    question, the butoxy, which is this linker,

21    just like you had to go to the left-hand side

22    to see where it's attached to carbostyril, you

23    have to go to the left-hand side to see where

24    the next thing is attached to butoxy.

25                    And so butoxy 1 -- which isn't

                        PRESS - DIRECT

1    named because it doesn't need to be named;

2    it's not ambiguous -- the butoxy 1 carbon is

3    attached to the oxygen at 7.  It's the

4    butoxy -- butoxy tells you it's at 7.

5                But the other side, this piperazine

6    could be at conceivably 1, 2, 3 or 4.

7                JUDGE COOPER:  Of the linker?

8                THE WITNESS:  Of the linker.

9                But it's at 4.  Again, we're

10   reading outside in to go that way.

11               And so the next one in, what you

12   see is piperazine has got two nitrogen.  Which

13   one is which?  Well, the first nitrogen is

14   telling you where it's attached to butoxy, and

15   the other nitrogen is where the dichlorophenyl

16   is attached.  So you're just reading in.

17   Okay.

18               And so you can either let this

19   drive you crazy, or you can accept the fact

20   that names could drive anybody crazy.

21       Q.   But Dr. Press, is this a systematic

22   naming system that any medicinal chemist would

23   understand?

24       A.   Yes.  And this goes according to

PRESS - DIRECT

1  the rules we talked about earlier about how the

2  system is numbered and why you would number it in

3  order to be able to communicate.

4      Q.    And would any medicinal chemist be

5  able to take that name and convert it to a

6  structure?

7      A.    Yes.  That's the purpose of that

8  type of systematic naming system.

9          JUDGE COOPER:  I'll never ask

10     again, but that was very helpful.

11         THE WITNESS:  Thank you.

12     Q.    Okay.  Let's go back to the

13  '528 patent, DTX-498, and I want to look at the

14  structure that is in Claim 1 of the '498 patent.

15  That's at the bottom of column 17.

16     A.    Yes, I see that.

17     Q.    Thank you.

18         Does aripiprazole fall within that

19  general structural formula?

20     A.    Yes, it does.

21     Q.    Now, that structure looks a little

22  bit different than what we've been looking at so

23  far because it kind of bends up.  Do you see

24  that --

1          PRESS - DIRECT

2          JUDGE COOPER:  Just a second,

3      counsel.  I'm juggling between your

4      demonstratives and the patent.  And I think

5      you're focusing now on the patent and there's

6      no demonstrative for it, so let me get there.

7               MS. HOLLAND:  It's at the bottom of

8      column 17.  It's the structure of Claim 1.

9               JUDGE COOPER:  Okay.  Just a

10     minute.  Okay.

11               MS. HOLLAND:  May I continue, Your

12     Honor?

13               JUDGE COOPER:  Yes.

14          Q.    Dr. Press, this structure looks a

15     little different than what we've been used to,

16     which was drawn out in a straight line.

17               Is there a difference in the

18     structure?

19          A.    Chemically, not at all.

20          Q.    Can you explain.

21          A.    Certainly.  First of all, the way

22     this is written, being sensitive to the issues of

23     publication, you have a certain column spacing

24     that you need to pay attention to.

25               And I wasn't there, so I don't know

1                    PRESS - DIRECT

2    exactly, but my guess is they wrote it this way so

3    it would fit in the column properly.  But it also

4    reflects chemistry.

5                    Whereas earlier, if you recall, I

6    mentioned this is fairly planar, and I really

7    can't do much to it.  I can't twist it around.

8    These single bonds in a chain are pretty flexible.

9    And in fact, they wrote it this way for

10   convenience for publication.

11                   But the fact is it reflects that

12   these bonds are rotatable and flexible and you can

13   move the molecule around.

14                   In fact, I think I have it.  You've

15   heard about --

16                   JUDGE COOPER:  Hold it up a little

17        more so maybe some other people can see it,

18        too.

19                   THE WITNESS:  I will.  But this has

20        gotten twisted around because we brought it

21        over.

22        A.    So this is the molecule as you've

23   seen it on the screen, as the way we've been

24   writing it all along.

25                   If you look, on your left-hand side

Page 149

PRESS - DIRECT

1   is the 6 ring with the two chlorines.

2           And the next thing over is the

3   piperazine.  You can see it.  It's a 6 ring.

4   These two blue balls are -- I mean, they're

5   painted blue because it's communication, but those

6   are the nitrogens.

7           This thing in the middle, this

8   linker, is shown.  Here is the oxygen.

9           And on the right-hand side you can

10  see that this is the dihydrocarbostyril unit or

11  the core.

12          And so first of all, what you can

13  see just by looking at the molecule is -- we were

14  talking earlier about planarity.  The

15  dihydrocarbostyril is pretty planar.

16              JUDGE COOPER:  Flat.

17              THE WITNESS:  Flat.  I'm sorry.

18      Planar, flat.  Thank you.

19              JUDGE COOPER:  I'll go with your

20      words.

21              THE WITNESS:  Well, planar is good,

22      though, and flat is good.  It's the same,

23      pretty flat.

24          A.   And so what you can see is, here is

1          PRESS - DIRECT

2    the molecule as we've been looking at it, and here

3    is the molecule as drawn, okay, and it's the same

4    molecule.

5              JUDGE COOPER:  You just sort of

6         twisted it because it's flexible enough to

7         twist?

8              THE WITNESS:  And in the real

9         world, that flexibility is real.

10        A.    I mean, the thing about medicinal

11   chemistry and chemistry in general is we know

12   about stable, flat, and we know about flexible.

13             And what we have is really, the

14   rings are much less flexible than a linker.  I can

15   move the rings around a little bit, but not a lot.

16   But the linker has a lot of flexibility.  And just

17   using that flexibility, I can get to what you see

18   on the screen, I believe.  That looks about right.

19             JUDGE COOPER:  The record will

20        reflect that there's a model being used here

21        by Dr. Press, and he's just moving the model

22        around to show how the image under the first

23        few words of Claim 1 is depicted physically.

24             MS. HOLLAND:  And we've marked the

25        model as TDX-1.

Page 151

1          PRESS - DIRECT

2          JUDGE COOPER:  Oh, okay.

3      Q.     Thank you, Dr. Press.  You can put

4  that down.

5      A.     You're welcome.

6      Q.     Let's look at Claim 17 now, which

7  is --

8          JUDGE COOPER:  But I don't

9      understand because I lost something when we

10     did the schematic drawing.  I can see the

11     carbostyril there.  The linker looks like a

12     straight line.

13          Go back up, would you, to your

14     prior slide.

15          MS. HOLLAND:  I think I can ask a

16     few questions --

17          JUDGE COOPER:  Claim 1.

18          MS. HOLLAND:  -- to clear that up,

19     Your Honor, if I may.

20          Go back and blow up Claim 1 again,

21     please, the structure.

22          JUDGE COOPER:  Not that I don't

23     believe you.

24          THE WITNESS:  That's fine.

25          MS. HOLLAND:  It's at the bottom of

1                    PRESS - DIRECT

2         column 17.  Let me ask a few questions to see

3         if I can clear it up.

4              Q.    Dr. Press, is this the structure of

5    Claim 1 of the '528 patent?

6              A.    Yes, it is.

7              Q.    Okay.  Does it represent one

8    compound or a family of compounds?

9              A.    This represents the family of

10   compounds that are claimed in Claim 1 of the

11   '528 patent.

12             Q.    And does Claim 1 provide certain

13   substitutions you can make to that general formula

14   to give you different specific compounds?

15             A.    It does.  It provides substitutions

16   for this R group here.

17             Q.    And in the case of aripiprazole,

18   what would that R group be?

19             A.    That R group would be, as we talked

20   about before, 2,3-dichlorophenyl would be the

21   R group.

22             Q.    So if you substituted in

23   2,3-dichlorophenyl for the R group, we would be

24   looking at the aripiprazole model?

25             A.    That's exactly correct.

1          PRESS - DIRECT

2          MS. HOLLAND:  Does that clear it

3     up, Your Honor?

4          JUDGE COOPER:  Just a minute.  The

5     O(CH2)4 is the butoxy linker?

6          THE WITNESS:  And it's a shorthand

7     way of writing it, and it's partly because

8     they're so similar.  And so a chemist, in

9     order to save space, can combine this because

10    they're just CH2 units and can condense it to

11    a CH2 and then a parenthesis.  That tells you

12    methylene.

13          And then it's a question of just

14    how many there are.  And so in the case of

15    '528 they specifically tell you four, but in

16    fact, in other cases it could be three, in

17    which case it would be the propoxy.

18          JUDGE COOPER:  But this reading in

19    Claim 1 is a butoxy?

20          THE WITNESS:  That is correct.

21    '528 claim is butoxy.

22          JUDGE COOPER:  Okay.

23          Thank you, counsel.

24          MS. HOLLAND:  Yes, Your Honor.

25    Q.    Let's look at Claim 17 now.  Can we

1                    PRESS - DIRECT

2      see TDX-14.  And this, again, is an excerpt from

3      the '528 patent, Claim 17.

4                    What does Claim 17 cover,

5      Dr. Press?

6           A.    17 specifically says pharmaceutical

7      composition, but in the business world we call

8      those formulations.  And basically, a formulation

9      is how you would take something that you know has

10     biological activity and make it into something

11     that can be used as a drug; a dose form, so to

12     speak.

13                    So Claim 17 is claiming a

14     formulation that contains aripiprazole, which we

15     already know has antipsychotic activity.  It

16     claims to put it into a formulation to treat

17     schizophrenia.

18          Q.    And let's go to Claim 23 on TDX-15.

19                    What does Claim 23 cover?

20          A.    Claim 23 covers a method of using

21     the composition that we just made that contains

22     aripiprazole to treat schizophrenia in a patient.

23          Q.    Now, Dr. Press, is the '528 patent

24     the first patent with claims covering

25     aripiprazole?

1                      PRESS - DIRECT

2          A.     No, I don't believe it is.

3          Q.     What patent was that?

4          A.     I believe aripiprazole was covered

5     by the '416 patent.

6          Q.     Let's look at the '416 patent.  Can

7     you go to tab 3 of your binder, which is DTX-6.

8                  Is this the '416 patent that you

9     discussed in your last answer?

10         A.     What tab did you --

11         Q.     Tab 3.

12         A.     Tab 3.  Sorry.  Yes, this is the

13    '416 patent.

14                 MS. HOLLAND:  Defendants offer

15        DTX-6 into evidence.

16                 JUDGE COOPER:  Admitted.

17                 (Exhibit DTX-6 admitted.)

18         Q.     Let's look at the first page of the

19    '416 patent, Dr. Press, again, Exhibit 6.

20                 When did the '416 patent issue?

21         A.     The '416 patent issued March 29th

22    of 1988.

23         Q.     Do you have any understanding as to

24    whether the '416 patent is prior art to the

25    '528 patent?

1            PRESS - DIRECT

2        A.    It is prior art because it is

3   before October of 1988.

4        Q.    And does the '416 patent have any

5   inventors in common with the '528 patent?

6        A.    '416 also has Yasuo Oshiro as an

7   inventor.  I apologize for the pronunciation.

8        Q.    You testified that aripiprazole is

9   covered by the '416 patent, but which claims in

10  particular of the '416 patent?

11       A.    '416 is covered by claims 1 and

12  claims 30 of the '416 patent.

13       Q.    Did you mean to say aripiprazole is

14  covered by claims 1 and claims 30?

15       A.    What did I say?  Yes, aripiprazole

16  is covered by claims 1 and claims 30 of the

17  '416 patent.

18       Q.    Now, is Claim 1 of the '416 patent

19  another claim that covers a wide number of

20  compounds?

21       A.    Claim 1 is -- I believe the lawyers

22  call it a genus patent.  Medicinal chemists just

23  call it a family of compounds.  But it covers a

24  large number of compounds, a genus of compounds.

25            JUDGE COOPER:  Not genesis; genus?

1          PRESS - DIRECT

2          THE WITNESS:  Genus.  Sorry.

3          JUDGE COOPER:  G-E-N-U-S?

4          THE WITNESS:  G-E-N-U-S, genus.

5     I'm sorry.  Pronunciation.  We can trade

6     nomenclatures.

7          JUDGE COOPER:  I would defer.

8     We're just trying to figure out how to spell

9     it.

10          Q.    How many compounds are included in

11     this genus of Claim 1?

12          A.    Oh, I haven't calculated, but

13     millions.

14          Q.    And what about Claim 30; what does

15     Claim 30 cover?

16          A.    Claim 30 covers a subset of that

17     genus, specifically defining a subset that are

18     dihalophenyl substituted compounds.

19          Q.    Well, let's go to TDX-16 and maybe

20     you can explain what you meant by dihalo

21     substituted phenyl compounds.

22          Can you explain in a little more

23     detail how aripiprazole is covered by the genus of

24     compounds that is Claim 30 of the '416 patent.

25          A.    I can try.  First of all, we've

PRESS - DIRECT

1    introduced a new term, which is halo.  You haven't

2    heard that before.  But halo is short for halogen.

3    Halogen is an atomic type.  And you're familiar

4    with the types of compounds.  Iodine, bromine,

5    chlorine are halogens.  And so dihalogen covers

6    compounds that are dichloro compounds.

7    Q.    Maybe you can start with Claim 30

8    and just explain generally what we see here.

9    A.    Oh, all right.  Fine.  Claim 30

10   shows the genus of compounds that are covered in

11   Claim 30 which specifically says diphenylhalo.

12   The diphenylhalo is replacing the R in Claim 1, I

13   believe.  I think it's an R prime or a 3.  So this

14   is specifically reflecting the substitution

15   required by Claim 30.

16   The rest of this is shown is what

17   is in Claim 1 because Claim 30 is dependent on

18   Claim 1.

19   Q.    Let's try to break that down a

20   little more.

21   A.    Fine.

22   Q.    Are you saying that Claim 30 is a

23   subset of the compounds in Claim 1?

24   A.    Yes, I am.

1                    PRESS - DIRECT

2          Q.    And is it a subset because it

3    requires that it contain a phenyl group

4    substituted of two halogens?

5          A.    Yes.  That is what I believe I

6    said, but obviously didn't say it very well.

7          Q.    Can you now show how the structure

8    on top relates to aripiprazole and how

9    aripiprazole is included within that structure.

10         A.    Certainly.  At the bottom we have

11   the structure aripiprazole which we've seen many

12   times.  And what you can see is Claim 1, of which

13   Claim 30 is a subset.  Claim 1 allows you to make

14   various replacements for R1, R2, X, R3, M and L,

15   and those all can be hydrogen.  So R1, R2, X and

16   R3 can all be hydrogen, according to the patent.

17             Claim 1 also defines what M and L

18   can be.  These are these little numbers here.  And

19   if M is 2 and L is 1 and R3 is H, this becomes a

20   butoxy group.  That's two methylenes.  The

21   methylene because R3 is hydrogen, and a methylene

22   here.  One, two, three, four butyl.

23             JUDGE COOPER:  For the record, you

24      are referring to the middle structure, the

25      linker structure in the top figure in TDX-16,

Page 160

PRESS - DIRECT

1       namely Claim 30?

2               MS. HOLLAND:  Thank you, Your

3       Honor.

4               JUDGE COOPER:  Right?

5               THE WITNESS:  That is correct.

6       Q.    Are those substitutions that you

7   referred to a minute ago for the M, the R3 and the

8   L, are those all substitutions that are permitted

9   within Claim 30 of the patent?

10          A.    Well, they're all permitted within

11  Claim 30 because they're all permitted within

12  Claim 1.

13          Q.    Please continue.

14          A.    Claim 30 specifically calls for

15  dihalophenyl substitution at that position.

16  Again, what I just mentioned earlier, halogen

17  encompasses bromine or iodine or chlorine or

18  fluorine, for that matter.

19               And if the halogens are chlorine,

20  it requires -- it can have two chlorines on the

21  phenyl.  And aripiprazole has two chlorines at the

22  2 and 3 position.  And so the structure of

23  claim 30 has under its umbrella aripiprazole.

24          Q.    Let's look at a different claim of

Page 161

PRESS - DIRECT

2  the '416 patent now, Claim 13.  Can we see TDX-17.

3          A.    This is Claim 13 of the

4  '416 patent, and it is claiming a specific

5  compound, and that is its full official chemical

6  name.

7          Q.    And what compound is that?

8          A.    That's the compound that we talked

9  about earlier as the unsubstituted butoxy

10  compound.

11          Q.    And is that the full chemical name

12  for the unsubstituted butoxy compound?

13          A.    That is the full chemical name for

14  the unsubstituted butoxy compound.

15          Q.    So far you've testified that the

16  '416 patent claims cover both aripiprazole and the

17  unsubstituted butoxy.

18                Does the '416 patent state what the

19  claimed compounds can be used for?

20          A.    '416 describes that these compounds

21  can be used for several things, one of which is as

22  an antischizophrenic agent.

23          Q.    Can we see TDX-18.  TDX-18 is an

24  excerpt from DTX-6, the '416 patent, at column 3,

25  lines 13 to 17.

1        PRESS - DIRECT

2             So what exactly does the

3   '416 patent say about the utility of the claimed

4   compounds, Dr. Press?

5        A.    Well, it says the utility of the --

6   compounds of the present invention can be used as

7   central nervous controlling agents, such as

8   antischizophrenia agents.

9        Q.    Does the '416 patent provide any

10  other information that would teach a medicinal

11  chemist that the disclosed compounds were

12  potential antischizophrenic agents?

13       A.    Yes, it does.

14       Q.    And what type of information is

15  that?

16       A.    Well, it describes animal tests

17  that are used to evaluate the biological activity

18  of compounds.

19       Q.    Any particular biological activity?

20       A.    At the top of column 3 it defines a

21  number of tests, many of which one who is working

22  in this field would recognize as animal tests

23  for -- as tests for schizophrenia.

24       Q.    Can we see TDX-19.  This is, again,

25  an excerpt from the '416 patent, DTX-6, column 3,

Page 163

PRESS - DIRECT

1                   PRESS - DIRECT

2   lines 3 to 11 and 13 to 17.

3             You mentioned in your last answer

4   that the '416 patent contains certain tests for

5   animal models for antischizophrenic activity.

6             Which tests were you talking about?

7        A.   Well, before I comment a little

8   further on that, let me just put myself within

9   this story so people know where medicinal chemists

10  fit.

11            Medicinal chemists, as we've talked

12  about, make compounds.  They're looking at

13  structures and trying to understand how the

14  structures and their changes to structures affect

15  biological activity.

16            So medicinal chemists make

17  compounds and submit them to pharmacologists to

18  run animal tests on those compounds in a variety

19  of systems.  And the pharmacologists get data,

20  which then chemists can use the data and correlate

21  with structures.

22            So within what I do, I make some

23  compounds like aripiprazole and I submit them for

24  testing.

25            The tests that we mentioned earlier

Page 164

1                         PRESS - DIRECT

2    which to me, as one who's working in the field,

3    would recognize as tests that would be looking for

4    antipsychotic agents would include the apomorphine

5    vomiting inhibitory action test, the spontaneous

6    movement controlling action test, hyper-motion

7    controlling action of rats, antimethamphetamine

8    action, and methamphetamine group toxicities.

9                  Those are all tests that have been

10   used in laboratories looking for antischizophrenic

11   agents.

12         Q.    While you were working on

13   antischizophrenic drugs while you were at Lederle,

14   did your group actually use any of these tests?

15         A.    Yes, we used several.  And specific

16   of these, we looked at spontaneous movement

17   controlling and methamphetamine group toxicity.

18             JUDGE COOPER:  In your question,

19         counsel, were you asking for antischizophrenic

20         or reducing side effects?

21             MS. HOLLAND:  Thank you for the

22         clarification, Your Honor.  I was asking for

23         antischizophrenic.

24             JUDGE COOPER:  I know the question

25         said antischizophrenic.

PRESS - DIRECT

1

2      A.      That was correct.   These two tests

3  we used.   And the pharmacologists I worked with

4  used methamphetamine group toxicity testing and

5  spontaneous motion controlling testing.   We used

6  those as measures of antipsychotic testing when I

7  was working at Lederle on the compounds I was

8  working on.

9           MS. HOLLAND:   Does that clarify,

10     Your Honor?

11           JUDGE COOPER:   Yes.   Thank you.

12           And counsel, when you reach a good

13      stopping point, I think we are going to take a

14      little recess.   Even though it's not been an

15      hour and a half, it's been intense.

16           MS. HOLLAND:   I agree, Your Honor.

17     One more question, and that will give the

18     point.

19           JUDGE COOPER:   Okay.

20      Q.      Based on everything you've seen in

21  the specification of the '416 patent, would a

22  medicinal chemist understand that the patent is

23  directed to carbostyril derivatives that can be

24  used as drugs to treat schizophrenia?

25      A.      Yes, they would.

Page 166

PRESS - DIRECT

1

2    Q.    Thank you.

3    JUDGE COOPER:  All right.  Fine.

4    Thank you.  Ten minutes.

5    (Recess taken.)

6    JUDGE COOPER:  All right.  So that

7    matinee has begun.

8    MS. HOLLAND:  May I continue, Your

9    Honor?

10    Q.    Dr. Press, before the break we

11    talked about the claims of the '528 patent and the

12    claims of the '416 patent.  I'd like to now focus

13    on the issue of double patenting.

14    Do you have a general understanding

15    of what a double patenting analysis entails?

16    A.    I'm not a patent attorney, but I

17    have an understanding as a medicinal chemist.

18    Q.    What is that understanding?

19    A.    Well, the understanding is that you

20    would look at a later claim and see if it's an

21    obvious variant of an earlier claim if the patents

22    are owned by the same party.

23    Q.    Do you have an understanding as to

24    whether that analysis is to be done from the

25    viewpoint of the person of ordinary skill in the

Page 167

PRESS - DIRECT

art?

A.    That is my understanding, yes.

Q.    Have you formed an opinion as to
the qualifications of the person of ordinary skill
in the art of the '528 patent?

A.    Yes.

Q.    What is that opinion?

A.    I believe it should be somebody who
is either an organic chemist or a medicinal
chemist or a pharmacologist or someone in a
related field that has a Ph.D. or an equivalent
that has worked in the field of antipsychotic
research for several years and has made compounds
and correlated the test results from animal models
with the structures.

Q.    Does the person of ordinary skill
in the art ordinarily work on their own?

A.    In my experience, one of skill in
the art works with people who help in
understanding the parts of business that
coordinate and connect so we move a drug or a lead
forward.

Q.    And in the case of a medicinal
chemist, who would be the person who would work in

1               PRESS - DIRECT

2    the coordinated field?

3           A.    Most closely I would work with

4    the -- I had worked with pharmacologists who will

5    do the animal testing, and I do the chemistry side

6    of things.

7               JUDGE COOPER:  Question:  What is

8        your understanding of what a pharmacologist

9        basically does?

10               THE WITNESS:  Pharmacologists look

11        at the effects of biologically active

12        compounds in animal test models.

13               JUDGE COOPER:  Thank you.

14           Q.    Dr. Press, do you have an opinion

15    as to whether the person of ordinary skill in the

16    art would have considered the asserted claims of

17    the '528 patent that we saw earlier to be obvious

18    variants of the unsubstituted butoxy of Claim 13

19    of the '416 patent?

20           A.    Yes, I do.  And I believe they are

21    obvious variants.

22           Q.    Before we get into a more in-depth

23    discussion of that opinion, can you describe

24    generally how a person of ordinary skill in the

25    art goes about designing a potential

1                     PRESS - DIRECT

2      antischizophrenic drug.

3           A.    If one of skill were directed to

4      research novel antischizophrenic drugs, one would

5      go to the literature and see what's available and

6      make a choice according to a set of criteria that

7      meets my goal, or their goal, and would then

8      choose that compound of interest to go about

9      making systematic chemical modifications to it in

10     order to find how those systematic chemical

11     modifications would affect the biological

12     activity.

13          Q.    Is there a term that's used for

14     that correlation between the systematic chemical

15     changes and the biological activity?

16          A.    Yes.  It's called creating a

17     structure activity relationship, or probably from

18     time to time we'll talk about SAR, which is short

19     for structure activity relationship.

20               JUDGE COOPER:  Relationship between

21          structure and activity?

22               THE WITNESS:  Structure and

23          activity, exactly.

24          Q.    With that background, let's start

25     with Claim 12, which you testified is the compound

1                    PRESS - DIRECT

2   aripiprazole.

3            Why do you believe that

4   aripiprazole is an obvious variant of the

5   unsubstituted butoxy?

6        A.    Well, it's an obvious variant

7   because one of the things medicinal chemists

8   routinely do is make substitutions on compounds,

9   on starting materials -- on compounds of interest,

10  I guess is more correct.  And one of the very

11  first things they would do is make chloro

12  derivatives of those compounds.

13       Q.    Would you take the model and

14  demonstrate what it would look like to go from an

15  unsubstituted butoxy and put the chlorines on it

16  to make aripiprazole?

17       A.    Sure.  So this is aripiprazole, as

18  we've been looking at it.  These are the two

19  chloros.  And the unsubstituted butoxy is this.

20  And so --

21            JUDGE COOPER:  Indicating, for the

22       record, he has just simply physically removed

23       the two chloro units from the phenyl ring, is

24       it?

25            THE WITNESS:  That's correct.

1          PRESS - DIRECT

2          JUDGE COOPER:  And thereby leaving

3     carbons up there and hydrogens.  Right?

4          THE WITNESS:  That's correct.

5     Q.    And to get from there to

6     aripiprazole, what would you do?

7     A.    Well, you would do a synthesis

8     where the compound had -- you would substitute the

9     chlorines for the hydrogens.

10    Q.    And in your previous answer you

11    mentioned that chlorine was one of the first

12    things you would try in that substitution.

13         Is there any evidence you've seen

14    when a person of ordinary skill in the art would

15    try chlorine in particular when looking at the

16    unsubstituted butoxy?

17    A.    Yes.  In fact, the Nakagawa

18    declaration shows that chlorine would be a very

19    worthwhile thing to substitute on that.

20    Q.    Can you turn to tab 4 in your

21    binder, which is DTX-214.

22         Is that the Nakagawa declaration

23    that you mentioned in your last answer?

24    A.    Yes, it is.

25         MS. HOLLAND:  Defendants offer

Page 172

                    PRESS - DIRECT

1        DTX-214 into evidence.

2                    JUDGE COOPER:  Admitted.

3                    (Exhibit DTX-214 admitted.)

4          Q.    What is your understanding of the
Nakagawa declaration?

5          A.    It's my understanding that

6    Dr. Nakagawa provided this declaration to the

7    patent office as part of the patent application

8    that led to '416.

9          Q.    And what is your understanding of

10   the purpose of the Nakagawa declaration?

11         A.    His purpose was to demonstrate that

12   compounds of '416 were superior to prior art

13   compounds.

14         Q.    Do you have an understanding as to

15   when the Nakagawa declaration became public?

16         A.    I believe it became public at the

17   same time that the '416 patent issued.

18         Q.    Dr. Press, I'd like to explore your

19   opinion about the Nakagawa declaration.

20                Why do you believe that it would

21   teach the person of ordinary skill in the art to

22   add chlorines to the unsubstituted butoxy?

23         A.    Well, the information in the

1                     PRESS - DIRECT

2    Nakagawa declaration is the first -- there is no

3    data available in the '416 patent with respect to

4    antipsychotic activity.

5                     And in the Nakagawa declaration he

6    reports the biological activity of nine select

7    compounds in a test for antipsychotic activity --

8              Q.    What test --

9              A.    -- in an animal test.

10             Q.    -- what test is that?

11             A.    It's called the Mouse Jumping Test,

12   but in spite of the name, it really is a test that

13   looks to interfere with Mouse Jumping.  In

14   principle, it reduces the number of jumps that a

15   mouse does.  But it's easier to say mouse jumping

16   than mouse non-jumping.

17             Q.    Have you seen any evidence that

18   Otsuka considered the Mouse Jumping Test to be a

19   test of antischizophrenic activity?

20             A.    I have.

21             Q.    And generally, what was that

22   evidence?

23             A.    In documents that they filed with

24   respect to another patent application, they

25   submitted documentation that said they believed

Page 174

1                    PRESS - DIRECT

2       that Mouse Jumping was very indicative of

3       antipsychotic activity.

4              Q.    Can we see DTX-471, which is tab 5

5       of your binder.

6                    Can you identify this document.

7              A.    This is the document to which I

8       just referred.

9              Q.    Otsuka's statement to the patent

10      office?

11             A.    Otsuka's statement to the patent

12      office wherein they describe that Mouse Jumping is

13      an excellent test for antischizophrenic activity.

14                   MS. HOLLAND:  Your Honor,

15          defendants offer DTX-471 into evidence.

16                   JUDGE COOPER:  It's admitted.

17                   (Exhibit DTX-471 admitted.)

18                   MS. HOLLAND:  Can we go to TDX-20,

19          please.  For the record, this is an excerpt

20          from page 4 of DTX-471, which is a file

21          wrapper amendment submitted during prosecution

22          of U.S. Patent 4,619,932.

23                   JUDGE COOPER:  So the patent that

24          issued to which this amendment transmission

25          applies is called the '932 patent?

1          PRESS - DIRECT

2          MS. HOLLAND:  Yes, Your Honor.

3      This is a statement by Otsuka during that

4      prosecution.

5          JUDGE COOPER:  Okay.

6      Q.   What did Otsuka tell the patent

7  office about the Mouse Jumping Test?

8      A.   Otsuka in its document said that

9  the Mouse Jumping Test is a test method to

10  determine whether a compound has antischizophrenic

11  activity, and that the compounds that they

12  specifically looked at for this particular case

13  all had good antischizophrenic activity because

14  they all had excellent activity in the Mouse

15  Jumping Test.

16          MS. HOLLAND:  Let's go to Table 8

17      of the Nakagawa declaration.  We can look at

18      that on TDX-21.

19          Again, the Nakagawa declaration,

20      for the record, is DTX-214.

21      Q.   Can you explain what we see here,

22  Dr. Press.

23      A.   Yes.  This is the table as written

24  in the Nakagawa declaration.  It lists two

25  columns.  The leftmost column is called test

1                    PRESS - DIRECT

2    compound number, and the rightmost compound is

3    called ED50 value.

4              The test compound number is a

5    method of identifying and speaking easily about

6    compounds he's looking at in this test.  And you

7    can see that there are nine select compounds.

8              In the right-hand column talking

9    about ED50s, the ED50 is the biological data that

10   he's reporting for the Mouse Jumping Test, which

11   is the test looking for reduced mouse jumping.

12             And ED50 is an effective dose --

13   that's the ED -- and 50 is the 50 percent effect.

14   And so it is reporting in the column the ED50s for

15   those test compounds.  And ED50s are used between

16   scientists to describe and compare potencies of

17   the compounds.

18        Q.    And what does an ED50 value tell the

19   person of ordinary skill?

20        A.    Well, basically, the ED50 gives you

21   the dose to produce a 50 percent effect.  And by

22   and large, the lower the dose, the more potent the

23   compound.  That's the definition of potency.  And

24   by and large, the lower the dose -- low doses is

25   one of the goals of medicinal chemical research.

PRESS - DIRECT

Q.    Is one of the nine compounds in Table 8 the unsubstituted butoxy?

A.    Yes, it is.  It's compound 41.

Q.    Now, you testified earlier that the Nakagawa Mouse Jumping data would teach the person of ordinary skill to put the chlorines on the unsubstituted butoxy.

Can you explain why.

A.    Yes.  I believe it will take a little bit, but the first thing you need to do in order to do this is construct, again, something we mentioned earlier, which is a structure activity relationship.  And in order to do that, you need to talk about structures and correlate it with activity.

Q.    Can we see the next slide, TDX-22.

A.    And so the first thing that one needs to do in order to understand what the data means is to take the compound numbers and understand what the structures are that those compound numbers represent.

And Dr. Nakagawa earlier in the Nakagawa declaration gave a listing of compound numbers and what those compounds were by name.

1                    PRESS - DIRECT

2    I've taken those names and I've transformed them

3    using the approach that we've talked about earlier

4    today, into their requisite structures.

5         Q.     Let me stop you there.   Maybe we

6    can go back to DTX-214.

7                 MS. HOLLAND:   And just to point out

8         for the Court where the compound numbers are

9         in the Nakagawa declaration, DTX-214, the

10        bottom of page 2.

11        Q.     Is this the information you were

12   referring to, Dr. Press?

13        A.     This is the information.

14               Dr. Nakagawa gives a listing of the

15   compound number and the official chemical name or

16   the full chemical name, so that is how we

17   understand what compounds we're using.

18        Q.     Okay.  Let's go back, please, then.

19   TDX-22.

20        A.     Okay.  And so first of all, a

21   chemist who is interested in the antipsychotic

22   agent would take the Nakagawa data that is

23   reported in Table 8, which is the Mouse Jumping

24   data, and would do the conversion of the test

25   compound number to what the compound really is, so

1                    PRESS - DIRECT

2    that one can visually see what the structure is.

3    And compare it to its ED50 or its biological

4    activity result.

5                    And what you're struck with or what

6    one of skill in the art would be struck with when

7    doing that conversion for the nine select

8    compounds is already being tuned into Claim 13 of

9    the '416 patent that is compound 41, the

10   unsubstituted butoxy compound that we talked about

11   earlier, that there is the substituted propoxy

12   compound also listed in his data table.

13                   And you can see that's compound 6,

14   and it's unsubstituted propoxy using the

15   terminology we've used throughout.  And what you

16   can see from this is that the unsubstituted butoxy

17   compound is more potent than the unsubstituted

18   propoxy compound.

19                   To a medicinal chemist, you're

20   looking at one structural change and looking at a

21   biological result that it affects.  And what you

22   can see is the unsubstituted butoxy compound is

23   more potent and, therefore, would be a better

24   compound to look at.

25                   Q.    Let's see TDX-23.

1          PRESS - DIRECT

2          Can you continue your explanation

3    of the Nakagawa declaration.

4          A.    Another thing that strikes you when

5    you look at the data from the compounds that

6    Dr. Nakagawa selected to test, you can see that

7    there are three additional compounds related to

8    the unsubstituted propoxy compound.  The

9    unsubstituted propoxy compound was compound 6, as

10   we talked about in the last slide.  And you can

11   see that compound 16, 39 and 43 all differ from

12   the unsubstituted propoxy compound by only one

13   change.

14          In the case of 16, it is a

15   four-chloro derivative, and so it's a four-chloro

16   propoxy.  In the case of 39 it's a three-chloro

17   derivative, in which case it's a three-chloro

18   propoxy.  And for compound 43 it is a two-chloro

19   derivative, and so it's a two-chloro propoxy.

20          Q.    When you say "two-chloro

21   derivative," can you be specific about where the

22   chlorine is.

23          A.    In all of these cases, just like we

24   were talking about earlier, these are substitution

25   changes on the phenyl ring, which is the ring that

PRESS - DIRECT

1

2  routinely through these slides has been the ring

3  on the left-hand side in the green box.

4              And so with my pointer, once again,

5  16 has a four chloro, 39 has a three chloro, 43

6  has a two chloro.  This is essentially the type of

7  structure activity correlation that medicinal

8  chemists do, and look for the result.

9              What you can see is that if I put a

10  four-chloro substitution on phenyl, the compound

11  becomes less potent.  The unsubstituted compound

12  has an ED50 of 9.3.  The four-chloro derivative

13  has a potency of 15.1.  That's not the direction

14  that we prefer to go.  We were looking for more

15  potent, not less potent.  We're looking for lower

16  numbers.

17              If you look at compound 39 and 43,

18  which are the three-chloro and the two-chloro

19  derivatives, you see that they go to 2.5 and 3.4

20  ED50s, as compared to the unsubstituted propoxy

21  9.3.  So there's a significant improvement in

22  potency by putting chlorines at the 2 and

23  3 positions.

24              Q.   And what would that teach the

25  person of ordinary skill in the art?

1                    PRESS - DIRECT

2          A.    For the propoxy series right here,

3    it teaches that two- and three-chloro is good.

4    And combining the information that's shown here

5    with the information that was shown on the

6    previous slide that showed propoxy is not as good

7    as butoxy, learning from the structure activity

8    lessons that are taught by these compounds, it

9    would lead a medicinal chemist to want to make the

10   2,3-dichlorobutoxy compound.

11         Q.    And what compound is that?

12         A.    That would be aripiprazole.

13         Q.    Why would the person of ordinary

14   skill in the art use the data from the propoxy

15   series of compounds to make the butoxy series of

16   compounds?

17         A.    Medicinal chemistry works by a set

18   of rules and a set of assumptions, and the

19   assumption throughout this work is that these are

20   not unrelated events.  Not only do we make

21   compounds in a systematic way, but the results we

22   get from the systematic changes teach you

23   something that can be generalized and learned and

24   applied to related compounds.

25              And so propoxy to butoxy is a very

1                    PRESS - DIRECT

2   related compound.  Unsubstituted butoxy and

3   unsubstituted propoxy we've already seen earlier

4   are very similar compounds.  And a medicinal

5   chemist would expect that the chlorine

6   substitution learned on the propoxy series would

7   be directly applicable to the butoxy series.

8            Q.    Was the Nakagawa declaration

9   submitted to the patent office during prosecution

10  of the '528 patent?

11           A.    Not to my knowledge.

12           Q.    Have you seen anything in the prior

13  art that actually showed a chlorine substitution

14  at the 2 and 3 positions of the propoxy compound?

15           A.    Yes, I have.

16           Q.    And what did you see in the prior

17  art?

18           A.    I see a 2,3-dichloro substituted

19  compound in the Swedish patent, SE '945.

20           Q.    Would you turn to tab 6 in your

21  binder, please.  At tab 6 in the binder are

22  DTX-1159T and DTX-1159.

23                 MS. HOLLAND:  Your Honor, we've

24       been using the designation T to signify a

25       translation of a foreign document.

1          PRESS - DIRECT

2          Q.    If you look at DTX-1159T, is this

3   the Swedish '945 application you referred to in

4   your last answer?

5          A.    Yes, it is.

6               MS. HOLLAND:  Defendants offer

7       DTX-1159T and DTX-1159 into evidence.

8               JUDGE COOPER:  Does the binder have

9       just the translation, I hope?

10              MS. HOLLAND:  The binder has the

11      original exhibit in back of the translation.

12      I think there's -- at least in my copy there's

13      a blue sheet that separates the translation,

14      which is on top, from the original exhibit,

15      which is on the bottom.

16              JUDGE COOPER:  I'll admit both of

17      them.

18              (Exhibit DTX-1159T and Exhibit

19      DTX-1159 admitted.)

20              MS. HOLLAND:  Is it your

21      preference, Your Honor, to just have the

22      translations in the binders?

23              JUDGE COOPER:  We can talk about

24      that off the record.

25              MS. HOLLAND:  Yes, Your Honor.

PRESS - DIRECT

1   Q.   Can we see TDX-24.  This is an

3  excerpt from DTX-1159T, which is the Otsuka

4  Swedish SE '945 published patent application, and

5  the excerpts are from pages 60, 62 and 5.

6           Can you explain what the SE '945

7  published patent application would teach the

8  person of ordinary skill in the art in terms of

9  the 2,3-dichloro substitution.

10          A.   Certainly.  Example 134 in the

11  patent application specifically describes the

12  2,3-dichloropropoxy compound, and it also

13  describes that the compounds in the invention are

14  useful as antischizophrenic agents.

15          JUDGE COOPER:  Counsel, would you

16      just tell me where you find that excerpt in

17      this exhibit.  You're citing SE '945 at 60, 62

18      and 5.

19          MS. HOLLAND:  As you can see, Your

20      Honor, there are separations from different

21      quotes, and we put them all on one slide.  But

22      the first one, Example 134, is on page 60.

23      The formal chemical name for the

24      2,3-dichloropropoxy is at page 62.  And then

25      the description on the bottom is at page 5.

1          PRESS - DIRECT

2          JUDGE COOPER:  And you're referring

3     to the translation?

4          MS. HOLLAND:  Yes, I am, Your

5     Honor.

6          JUDGE COOPER:  Okay.  Thank you.

7          Q.    Was the SE '945 published

8  application submitted to the patent office during

9  prosecution of the '528 patent?

10         A.    Not to my knowledge, no.

11         Q.    Dr. Press, have you prepared a

12 slide summarizing your opinion as to why a person

13 of ordinary skill in the art would view

14 aripiprazole as an obvious variant of the

15 unsubstituted butoxy?

16         A.    I have.

17         Q.    Can we see TDX-25.

18               Can you summarize your opinion,

19 Dr. Press.

20         A.    Certainly.  And I think these are

21 all things we've mentioned during the course of

22 our discussion.

23               It is routine for chlorine

24 substitution by medicinal chemists, and chlorine

25 substitution is frequently used in CNS drugs, CNS

1                    PRESS - DIRECT

2    being central nervous system drugs, to increase

3    potency.

4                    The Nakagawa declaration, analyzing

5    the data that he teaches, shows that the

6    unsubstituted butoxy is more potent than the

7    unsubstituted propoxy in the Mouse Jumping Test.

8    It also shows that if you substitute chlorines at

9    the 2 and 3 positions of the phenyl group, it

10   increases potency.  And the SE '945 shows that

11   when you make a 2,3-dichloro compound, it has

12   antischizophrenic activity.

13             Q.    So far we've been discussing

14   Claim 12 of the '528 patent, which is the

15   aripiprazole itself.  Let's talk now about

16   Claim 17 of the '528 patent.

17                    Can we put up TDX-14 again, please.

18                    Is it your opinion that Claim 17 of

19   the '528 patent is an obvious variant of the

20   unsubstituted butoxy of Claim 13 of the

21   '416 patent?

22             A.    Yes, it is.

23             Q.    Why is that?

24             A.    Well, because aripiprazole is an

25   obvious variant of the unsubstituted butoxy

Page 188

1                    PRESS - DIRECT

2      compound, and it was chosen as an antipsychotic

3      agent.   It is typical and expected that a drug

4      candidate requires an active compound, in this

5      case, aripiprazole, to be put into a composition,

6      which is actually called a formulation, to be used

7      as a drug.

8                    And furthermore, it's expected that

9      a compound that was evaluated and found to be an

10     antischizophrenic agent would be useful in a

11     formulation to treat schizophrenia since it had

12     antischizophrenic activity.

13          Q.     Let's turn to Claim 23 of the

14     '528 patent.   Can we see TDX-15 again.

15          A.     I see that, yes.

16          Q.     Would a person of ordinary skill

17     consider Claim 23 of the '528 patent to be an

18     obvious variant of the unsubstituted butoxy, which

19     is Claim 13 of the '416 patent?

20          A.     Yes, they would.

21          Q.     Why is that?

22          A.     Well, it is obvious since one of

23     skill would know that aripiprazole had

24     antipsychotic activity, and that it was formulated

25     into a dose form that could be used to treat

1                         PRESS - DIRECT

2     schizophrenia, that you would then use that agent

3     to treat schizophrenia in a patient.

4              Q.    Dr. Press, are you aware that

5     Otsuka's experts have applied a different

6     definition of the person of ordinary skill in the

7     art?

8              A.    Yes, I am aware of that.

9              Q.    Would your opinions in this case be

10    different if you used the definition of the person

11    of ordinary skill in the art that Otsuka's experts

12    adopted?

13             A.    No, they would not.

14             Q.    And why is that?

15             A.    Well, the structure activity that

16    we talked about to get to aripiprazole is very

17    simple, straightforward medicinal chemistry, and

18    with the data laid out in front of them, would

19    easily be achieved by someone of skill in the art

20    the way that they could be defined.

21             Q.    Now that we've discussed your

22    opinions on double patenting, I want to move on

23    and switch to the issue of obviousness.

24                   Do you have an opinion as to

25    whether the subject matter of Claims 12, 17 and 23

PRESS - DIRECT

1    of the '528 patent, the claims asserted by Otsuka,

2    would have been obvious to the person of ordinary

3    skill as of October 1988?

4           A.    Yes.

5           Q.    And what is that opinion?

6           A.    I believe they would be obvious.

7           Q.    Let's start with a person of

8    ordinary skill in the art as of 1988 who was

9    interested in developing an antischizophrenic

10   agent.

11               How would he or she decide which

12   compounds to pursue?

13          A.    Well, when presented with a task as

14   you've just described it, the first thing that one

15   of skill would do is to either be aware of or look

16   into the literature to discover what was known.

17               What they would find is in that

18   time period that there were several compounds that

19   were in clinical trial, meaning in humans, being

20   tested for antischizophrenic activity, or as

21   antischizophrenic drugs.

22               And one of those compounds that

23   were in the clinic, of which there were only a

24   few, was a carbostyril group, and would be drawn

1                     PRESS - DIRECT

2    to look at compounds in the clinic more closely,

3    and could choose the carbostyril derivative

4    OPC-4392 as a point to look at more closely.

5          Q.    You mentioned that OPC-4392 had

6    been reported in the literature.

7                Had any other carbostyril

8    derivatives as of 1988 been reported in the

9    published literature?

10          A.    Yes, there were others.

11          Q.    Was one of them OPC-4139?

12          A.    Yes.  That was a compound that was

13    a carbostyril derivative reported in the

14    literature prior to OPC-4392.

15          Q.    Can we see TDX-26, please.

16                Can you describe the structures of

17    OPC-4139 and OPC-4392, which you say were the four

18    published compounds as of 1988.

19          A.    Certainly.  First of all, just in

20    case there's some mystery about the names,

21    certainly full names get in the way of describing

22    things and communicating.  And every research and

23    development operation has its own way of naming

24    compounds to talk about as they're studying them

25    in development.

PRESS - DIRECT

1

2          In this case, OPC is Otsuka

3    Pharmaceutical Company, and 4139 is the compound

4    that was in their registration system.  When a new

5    compound is made at a pharmaceutical company, it's

6    registered into their system so that it can be

7    tracked.

8               JUDGE COOPER:  Internally?

9               THE WITNESS:  Internal tracking.

10              JUDGE COOPER:  Right.

11         A.    And drug names aren't assigned

12    until much later in the process.

13              So OPC-4139 and OPC-4392 are both

14    internal names that OPC gave the compounds when

15    they were made and registered in their system.

16              And you can see on the top the

17    compound OPC-4139, as I mentioned, was reported in

18    the literature prior to OPC-4392.  But both of

19    these compounds are literature compounds.

20         Q.    Can you describe the structures

21    generally.

22         A.    Certainly.  As you can see from

23    both structures, top and bottom, they both have

24    carbostyril cores.  They both have 7 substitution.

25    And the 7 is the place in the numbering system

1          PRESS - DIRECT

2    where carbostyril -- that's the seventh carbon.

3    They both have 7 substitution.

4              They both have side chains which

5    consist of a linker which is in both cases

6    propoxy.  They both have attached to the linker a

7    piperazine.  And they both have attached to the

8    piperazine on the other side a phenyl group that

9    varies only in its substitution.

10             In the case of OPC-4139, it has a

11   three-chloro substituent.  And in the case of

12   4392, it has a 2,3-dimethyl substituent.

13             We haven't talked about methyls

14   before, but methyl is the chemical name for a

15   one-carbon unit.  And using the rules that we

16   talked about earlier, one carbon is bonded to the

17   phenyl ring, and the other three are hydrogens, so

18   those are the four bonds for a methyl group.

19             And so these compounds share a

20   tremendous amount of similarity of structure.

21        Q.    Would you please turn to tab 7 in

22   your binder, which is DTX-514.

23             What does this reference?

24        A.    This is a reference to OPC-4319,

25   published by Hiyama and several other authors who

Page 194

PRESS - DIRECT

1

2    worked at Otsuka.

3          Q.    If you turn to the first page of

4    DTX-514, when was this published?

5          A.    This was published in 1981.

6          Q.    Is it prior art to the '528 patent?

7          A.    It is prior art to the '528 patent.

8          Q.    Now, if you turn the page to the

9    page numbered 380 on the bottom, I see three

10   abstracts.

11                Which is the one you're referring

12   to?

13          A.    Oh, the abstract is Abstract 520.

14   It's at the bottom of the page.

15                MS. HOLLAND:  Your Honor,

16       defendants offer DTX-514 into evidence.

17                JUDGE COOPER:  It's a two-page

18       exhibit.  Right?  Actually, it's double-sided,

19       one page.

20                MS. HOLLAND:  Yes, Your Honor.

21                JUDGE COOPER:  Admitted.

22                (Exhibit DTX-514 admitted.)

23                MS. HOLLAND:  Thank you.

24          Q.    Can we see TDX-27, please.  This is

25   an excerpt from DTX-514, from the Abstract 520.

PRESS - DIRECT

1  What does the Hiyama abstract tell

2  the person of ordinary skill in the art?

3       A.    Well, it tells one of skill in the

4  art that compound OPC-4139 is a compound that has

5  been tested preclinically.

6            JUDGE COOPER:  That means before

7     human testing?

8            THE WITNESS:  That is correct.

9       A.    And to someone of skill in the art,

10 there is different levels of development.

11 Preclinical is a code to someone like me that the

12 compound was of sufficient interest to look at in

13 more detail.

14           And that has relevance because the

15 more detail, it costs more money and takes more

16 time.  The fact that it's preclinical alerts me

17 that this compound has raised itself up above the

18 crowd, so to speak, within Otsuka.

19           Further, it says that the compound

20 has actions of a neuroleptic.  Neuroleptic, if you

21 recall earlier, is a term that has been used to

22 describe antipsychotic drugs.

23           And lastly, it tells you that the

24 compound has activity in the Mouse Jumping Test.

1      PRESS - DIRECT

2           JUDGE COOPER:  I don't need to know

3      much about the Mouse Jumping Test right now.

4      But these words, since we're here, it says:

5           "The compound inhibited jumping

6      behavior of mice induced by L-DOPA and

7      methamphetamine."

8           And I know that you're not the

9      animal testing person, but the inducement is

10     like introduction of L-DOPA and meth into the

11     mouse, and then you introduce the compound?

12          THE WITNESS:  Well, I'm certainly

13     not really the guy to ask the question to, but

14     I will say that that is correct.  The test has

15     been established.  It correlates with

16     antipsychotic activity and known antipsychotic

17     agents.

18          And the animal test is set up where

19     they've established the jumping by inducing

20     L-DOPA and methamphetamine and then treating

21     with the test compound.

22          JUDGE COOPER:  Thank you.

23     Q.    Dr. Press, please turn to tab 8 in

24     your binder, which is DTX-377T, and behind that,

25     DTX-377.

1          PRESS - DIRECT

2          And if you go past the certificate

3  of translation on the top, and you go to page 1 of

4  the translation, what is this exhibit?

5          A.    This exhibit is a publication that

6  reports OPC-4392, and was published by Kikuchi and

7  a variety of other authors who are employees at

8  Otsuka Pharmaceutical Company.

9          Q.    And when was this published?

10         A.    This was published in 1985.

11         Q.    Is it prior art to the '528 patent?

12         A.    It is prior art to the '528 patent.

13              MS. HOLLAND:  Defendants offer

14      DTX-377 and DTX-377T into evidence.

15              JUDGE COOPER:  Admitted.

16              (Exhibit DTX-377 and Exhibit

17      DTX-377T admitted.)

18         Q.    What does the Kikuchi article

19  disclose to the person of ordinary skill in the

20  art about OTC-4392?

21         A.    Well, most importantly, it

22  discloses that they're reporting it as a new

23  antipsychotic drug with its name, and they're

24  giving the full chemical name of OPC-4392 so that

25  chemists and one of skill in the art can know

1                    PRESS - DIRECT

2    exactly what its structure is.

3         Q.    Can you turn to tab 9 in your

4    binder, please.  This is DTX-388T and 388.

5              What is this exhibit, Dr. Press?

6         A.    This is a publication by Murasaki

7    in 1987.  It is the review article.

8         Q.    Is this Murasaki article prior art

9    to the '528 patent?

10        A.    It is.

11             MS. HOLLAND:  Defendants offer

12        DTX-388 and 388T into evidence.

13             JUDGE COOPER:  Admitted.

14             (Exhibit DTX-388 and Exhibit

15        DTX-388T admitted.)

16        Q.    Can we go to TDX-28, please, which

17   is an excerpt from the Murasaki article.

18             MS. HOLLAND:  And again, Your

19        Honor, there's two citations at the bottom for

20        the different pieces of the Murasaki article

21        that appear on the demonstrative.

22        Q.    What does the Murasaki article

23   disclose to the person of ordinary skill about

24   OPC-4392?

25             A.    Well, the Murasaki article, first

                    PRESS - DIRECT

1    of all, is a review article written by someone who

2    doesn't work for Otsuka and is a review article

3    reporting out on the state of the art as of 1987

4    of compounds in central nervous system disease.

5              And the first compounds he focused

6    on were antipsychotic drugs.  And under

7    antipsychotic drugs he has a section talking about

8    under clinical testing.  So he's reporting out on

9    compounds that are in the clinic, antipsychotic

10   drugs.

11             And his second report out is on

12   OPC-4392.  In it he reports that OPC-4392 has been

13   progressed into Phase II trials.

14             Which as we talked about earlier,

15   in the sense of progression, the first step is to

16   get it into humans.  And once it's been shown

17   safe, Phase II is the beginning of the testing to

18   show efficacy.

19             JUDGE COOPER:  So that's where

20      you're administering it to patients with

21      schizophrenia?

22             THE WITNESS:  That is correct.

23        A.    And in this report, in treating

24   those patients, he reports that it has

PRESS - DIRECT

1

2    antipsychotic activity which he says was not

3    strong, but it also treats negative symptoms, and

4    he anticipates that it would be useful in the

5    treatment of schizophrenia.

6         Q.    I believe you addressed this

7    earlier, but can you briefly describe what the

8    positive and negatives symptoms are and the

9    difference.

10        A.    Certainly.  The positive symptoms

11   are the ones that everybody thinks of, the

12   hallucinations and the bizarre behavior.  The

13   negative symptoms are the withdrawal and the mood

14   flattening that you see in patients that have

15   schizophrenia.

16        Q.    Would the disclosure in Murasaki

17   that the effect of OPC-4392 on the positive

18   symptoms was not strong deter the person of

19   ordinary skill from pursuing carbostyril

20   derivatives?

21        A.    In my opinion, it would be

22   encouragement if you were one of skill in the art

23   looking for new drugs because, as we talked about

24   earlier, one of the things medicinal chemists do

25   is make derivatives to look to increase potency.

PRESS - DIRECT

1    We know how to make substitution.  And we have

2    animal tests that test for the positive symptoms.

3           That hasn't been said throughout,

4    but many of the tests listed in the '416

5    application where they itemized all the animal

6    tests, those were all tests that we have been

7    using for years -- "we" being people of skill in

8    the art, but not medicinal chemists -- to test the

9    antischizophrenic activity of drugs, and those are

10   really tests against the positive symptoms.  We

11   don't have good tests for negative symptoms.

12          So what this says is that it's not

13   strong antipsychotic, which by implication is the

14   positive symptoms.

15          And medicinal chemists have a

16   cookbook, if you will, of knowing how to test and

17   make compounds more potent.  And the compound has

18   activity in negative symptoms, which is something

19   I don't have good animal tests for.  I don't know

20   how to look for it.  This compound has those.  And

21   so I'd be very encouraged to look more closely at

22   that compound.

23          JUDGE COOPER:  This writer -- what

24      kind of a journal article would you view this

1                    PRESS - DIRECT

2       as?

3                    THE WITNESS:  This would be a

4       review journal article.

5                    JUDGE COOPER:  Someone summarizing

6       and commenting on what's out there?

7                    THE WITNESS:  That's correct.  And

8          he's a university professor, so he's looking

9          for what's going on in the state of the art.

10         Q.    Can we see TDX-29, please.  This is

11      another excerpt from the Murasaki article.

12                   Can you explain, Dr. Press, what

13      Murasaki is teaching the person of ordinary skill

14      in the art about the side effects of OPC-4392.

15         A.    Certainly.  This goes further.

16      Another reason why I would be interested in 4392,

17      besides the fact that it's in human clinical

18      trials and besides the fact that I have ways of

19      trying to look to increase potency and it has

20      activity in negative symptoms, one of the things

21      in the 1980s and beyond that we're seeking is a

22      compound that treats schizophrenia but does not

23      cause extrapyramidal side effects, or EPS.

24                   Extrapyramidal side effects are a

25      series of relatively severe side effects that

1                        PRESS - DIRECT

2    first-generation antipsychotic agents caused in

3    patients.

4                        And I'm certainly not a person to

5    talk about patients, but I am aware, being in this

6    field of study, that extrapyramidal side effects

7    are something that has been a goal where we want

8    to find antipsychotic activity, but without

9    causing EPS.

10                       So Murasaki reports that OPC-4392

11   says extrapyramidal disturbances, which would be

12   extrapyramidal side effects, are extremely weak.

13   That's an extremely encouraging sign to somebody

14   who's looking for a novel antipsychotic agent in

15   the '80s and today.

16            Q.    Dr. Press, before you go on, can

17   you just generally describe what these

18   extrapyramidal side effects are.

19            A.    Well, I can do a little bit.

20   Again, I'm a medicinal chemist, but as I

21   understand it, there's a series of muscular --

22   there's facial distortions.  There's repetitive

23   motions.  There's muscular rigidity.  For people

24   who suffer the extrapyramidal side effects of

25   antischizophrenic drugs, it's sufficient to cause

                    PRESS - DIRECT

1    them to stop taking the drugs.

2              And so a goal to find compounds

3    that are antischizophrenics without EPS liability

4    is extremely important.

5              The other thing worth mentioning is

6    that in the Murasaki article reviewing OPC-4392,

7    that he did note that there were digestive

8    symptoms such as nausea and vomiting.

9              That's not a particularly worrisome

10   report to me because it's early in the clinical

11   trials, and he reports there are ways of

12   overcoming it within the trials.

13             But those are things that you would

14   address in formulation work as you go about

15   developing a drug.

16        Q.    What do you mean by the fact that

17   you would address it in formulation work?

18        A.    Well, part of the job of making a

19   drug, and we talked about this, is taking an

20   active substance, putting it into a formulation,

21   and making a dosing regimen for the compound.

22             And I'm not a formulations person,

23   but part of the making of the formulations is

24   finding ways to deliver the drug so that it may

1                      PRESS - DIRECT

2    dissolve after it goes through the stomach, if

3    there's stomach upset, or find a way to deliver it

4    in a time-released way to prevent the upset.

5                      And so it's not unusual to have

6    these kind of symptoms in the early clinical

7    trials.  And again, I have not observed those

8    personally.

9              Q.    Looking at the OPC-4139 and

10   OPC-4392 references together, the Hiyama, Pecucci

11   and Murasaki articles you've just discussed, what

12   would they teach the person of ordinary skill in

13   the art in 1988?

14             A.    Well, first of all, it would teach

15   one of skill in the art that carbostyril

16   derivatives are very interesting compounds as

17   antipsychotic agents.

18             Q.    Would they provide any motivation

19   to the person of ordinary skill to pursue

20   carbostyril derivatives?

21             A.    If one were tasked with looking for

22   novel antipsychotic agents, one would look at

23   those compounds, be very encouraged by the

24   results, recognize there are improvements that

25   could be made, and then go into the literature and

PRESS - DIRECT

1  look more fully to see what else is known about

2  those compounds.

3

4        Q.    If the person of ordinary skill in

5  the art was motivated to pursue carbostyril

6  derivatives as antischizophrenics, how would he or

7  she choose which compounds to modify?

8        A.    Well, he or she would look into the

9  literature and see what else is known.  And what

10  they would find by those reports, when they looked

11  back to see what else was known, they would find

12  that both of those compounds are covered by the

13  '416 patent.

14        If they looked at the '416 patent

15  and the data that it reports, they would find

16  animal testing data that shows related compounds

17  are active as antipsychotic agents.

18        Q.    Would the '416 patent -- let me

19  withdraw that.

20        You testified earlier that the

21  '416 patent covers potentially millions of

22  compounds.

23        Does the '416 patent provide any

24  reason to focus the person of ordinary skill in

25  the art at any particular carbostyril derivatives?

1          PRESS - DIRECT

2          JUDGE COOPER:  Are you asking a

3    question about something that would help with

4    schizophrenia?

5          MS. HOLLAND:  Yes, Your Honor.

6    Thank you.  Let me preface the question again,

7    then.

8          Q.   If a person of ordinary skill in

9    the art was interested in antischizophrenic drug

10   discovery and they had the '416 patent, was there

11   anything in the '416 patent that would focus them

12   on any particular compounds to pursue?

13         A.   Well, the '416 patent does cover in

14   Claim 1 millions of compounds, but it identifies

15   specifically in specific claims 25 or so single

16   molecules.

17              And one of skill in general would

18   be drawn to the compounds that are specifically

19   claimed because it suggests to one of skill

20   looking at the patent that those compounds are of

21   more interest to the inventor.

22         Q.   Are any of those 25 specifically

23   claimed compounds ones we've talked about today?

24         A.   Yes, in fact, they are.  One of

25   them is Claim 13, the unsubstituted butoxy

1                   PRESS - DIRECT

2    compound.

3              Q.    Now, in addition to the

4    '416 patent, would the person of ordinary skill in

5    the art come across the Nakagawa declaration?

6              A.    They would.

7              Q.    And would the Nakagawa declaration

8    focus the person of ordinary skill in the art who

9    was interested in antischizophrenic drug discovery

10   on any particular carbostyril derivatives?

11             A.    It would focus them because within

12   the Nakagawa declaration, as we talked about

13   before, he selects nine specific compounds to

14   report out antischizophrenic activity in animal

15   tests.

16             Q.    Can you explain -- well, let me

17   withdraw that.

18                   Of the nine compounds that were

19   selected by Nakagawa to test in the mouse jumping

20   test, would the person of ordinary skill in the

21   art have focused on any particular compound as a

22   carbostyril derivative to pursue for

23   antischizophrenic drug discovery?

24             A.    I believe they would, yes.

25             Q.    What compound is that?

PRESS - DIRECT

1

2      A.     That would be the compound that is

3  Claim 13, the unsubstituted butoxy compound.

4      Q.     Can you explain why the person of

5  ordinary skill would have chosen the unsubstituted

6  butoxy from among the nine compounds disclosed in

7  the Nakagawa declaration.

8      A.     Certainly.

9      Q.     Perhaps we can see TDX-30.

10      Please explain what is on this

11  slide, Dr. Press.

12      A.     There's a lot of information on

13  this slide, some of which we've seen before, so

14  let's review what we've seen before.

15      This is the Nakagawa declaration

16  Table 8 information.  And what we have seen before

17  is the test compound numbers on the left-hand side

18  of the slide, and we can see the ED50 values on

19  the right-hand side of the slide.

20      If we recall, the ED50 are the

21  effective dose to get a 50 percent effect in the

22  mouse jumping test.

23      And what I've done, instead of

24  translating them into full structures, which would

25  take too many slides, I focused on the areas of

PRESS - DIRECT

1   difference amongst the many compounds.

2              And so the column adjacent to the

3   test compound number addresses compounds.  It

4   talks about the substitution on the phenyl group,

5   which is the left-hand side of the molecule as

6   we've been drawing it all day.

7              The middle column, the orange

8   column, talks about the linker group which we've

9   been talking about all day.

10              And the right-hand two columns, the

11  two blue columns, talk about substitution on

12  carbostyril.  Again, it's blue and it's on the

13  right-hand side of the structures we've talked

14  about all day.

15              And so I've itemized the structural

16  differences between the nine compounds that are

17  reported as having antipsychotic activity in the

18  Nakagawa declaration without full structures, but

19  rather with this abbreviated structure.

20              So that's the explanation of how

21  the grid is set up.

22              The next thing of note is there are

23  some blanks here.  If you recall throughout, if

24  there's nothing shown, it's hydrogen.

1              PRESS - DIRECT

2          And so compound 6, for example, is

3 the compound we've talked about all day as the

4 unsubstituted butoxy.  There's no substitution on

5 phenyl, so that's a hydrogen.  And there's no

6 substitution on carbostyril, so all the

7 carbostyril ring has hydrogens, just as we've

8 talked about all day.

9        Q.   Dr. Press, I apologize.  Let me

10 interrupt you for a second.  You said that test

11 compound 6 was the unsubstituted butoxy.

12        A.   I'm sorry.  I misread that.  It's

13 the unsubstituted propoxy, obviously, as shown in

14 this slide.  I apologize for that misspeak.

15        JUDGE COOPER:  We all do that in

16     the courtroom.  We all do that, and so we

17     catch ourselves and we go on.

18        A.   So in any event, that, for example,

19 shows the derivation of that compound and what it

20 means.

21        Probably more importantly is

22 compound 41, which we've seen before.  And it is

23 no substitution on phenyl and the butoxy maker and

24 no substitution on the carbostyril.

25        So what we have here is the

PRESS - DIRECT

1

2  compounds as broken out or parsed in a different

3  way than we've been looking at them, but the exact

4  same compound.

5            And the first thing you note, and

6  something we haven't talked about all day, is that

7  compound 42 has a methyl substituent at the

8  1 position, which is the nitrogen of carbostyril.

9            We haven't talked about carbostyril

10 substitution all day, but trust me, that is the

11 one position -- we can pull up a model if you'd

12 like to see.

13            If you recall, I mentioned earlier

14 medicinal chemists for much of this work prefer

15 not to change the core piece of the molecule

16 unless they need to.  And A, this changes the

17 core, puts a methyl group on it, and shows

18 actually that the changes aren't necessarily a

19 good thing.

20            The compound 42, which is a

21 propoxy, substituted at the 7 position of the

22 carbostyril, which has a methyl group on the

23 carbostyril.  Everything else except for that

24 methyl group is the same as compound 6.

25            And what you can see is compound 6

1                    PRESS - DIRECT

2    of propoxy, a 7 substituted carbostyril propoxy

3    side chain, has an ED50 of 9.3.  And putting a

4    methyl group on the carbostyril makes it less

5    potent.

6              So my inclination as one of skill

7    in the art would be to not pursue carbostyril

8    substitution, and I would ignore that particular

9    data point.

10             The next thing you'll notice here

11   is that in the position on the carbostyril, there

12   are three compounds reported out that are

13   substituted in the 5 position of carbostyril.

14   That's the up position.  For the sake of argument,

15   that's putting it here rather than here.  And

16   there are five compounds that have 7 substitution

17   on the carbostyril, which is the substitution

18   pattern we've seen all day.

19             Medicinal chemists, one of skill in

20   the art, would try not to change substitution on

21   the core unless there was a reason to do so

22   because it has the potential of having effects

23   that I can't expect.  We'll talk a little bit in a

24   minute.

25             But the bottom line is that I

PRESS - DIRECT

1   would -- one of skill in the art would consider

2   the five substitutions as a change to the

3   compounds that we've seen in the literature and in

4   human clinical trials and would try to focus

5   ourselves on compounds that are in the clinic and

6   have human activity.

7              And so I would or one of skill in

8   the art would choose to ignore the five

9   substituted compounds and focus on the seven.

10             JUDGE COOPER:  Is that just because

11       you've got those two Otsuka named compounds

12       already in the literature, that at least one

13       of them had made it to clinical trials?

14             THE WITNESS:  That's the most

15       important reason.  We already know something

16       about that molecular array with the seven

17       substitution.  And if I take that molecular

18       array and move it, it has potential for

19       causing unexpected results.

20             And one of the reasons I said

21       earlier medicinal chemists would prefer not to

22       make those changes is because they understand

23       a little bit about what this molecule shows.

24             This molecule represents the

1              PRESS - DIRECT

2       three-dimensionality of the molecule, which we

3       really have been looking at flat molecules all

4       day.

5              JUDGE COOPER:  Now, you're holding

6       the No. 1 demonstrative?

7              THE WITNESS:  That's correct.

8       A.    But as you can see, just to sort of

9    give you a flavor as to why a medicinal chemist

10   would not like to make that change unless they

11   needed to, look at the position of the relation of

12   the two nitrogens and the piperazine to the

13   nitrogen in the carbostyril.  Okay.

14              If you make that change -- and look

15   at the five compounds.  In spite of the fact that

16   they're isomers of each other -- they're the same

17   compound, but with a different position of

18   attachment.  What you see is I've changed the

19   relationship of the nitrogens of the piperazine to

20   the nitrogen of the carbostyril.

21              And so I know more about the 7

22   substitution, and my preference is not to change

23   it.  And I know more because those compounds, as

24   you pointed out, are in the clinic or were in

25   development.  I know more about this type of

1                     PRESS - DIRECT

2   compound.

3           Q.    Dr. Press, is that true even

4   though, as you can see, for example, test

5   compound 44 has an ED50 of .53?

6           A.    Well, that's a very interesting

7   observation.  And certainly the potency of .53 is

8   striking and is worthy of note and certainly

9   probably worthy of pursuit at some point.

10          But at the moment, I'm looking to

11  improve compounds that I already know something

12  about, and I prefer not to make that change, but

13  it's certainly something I would be inclined to go

14  back to at a future time.

15          But right now, my goal is to

16  maximize or optimize the performance of the

17  compound family that we're looking at.

18          Q.    Dr. Press, now you're left with

19  five compounds on Table 8 of the Nakagawa

20  declaration.

21          What would the person of ordinary

22  skill do next?

23          A.    Well, you would use the data that

24  you have.  And the data that you have shows that

25  of the five compounds left, four are propoxy

1                    PRESS - DIRECT

2   compounds and differ only by the substitution on

3   the phenyl ring.

4                    JUDGE COOPER:  Where you're putting

5        it?

6                    THE WITNESS:  Where you're putting

7        it, where the chlorine is, 4, 3, or 2, and

8        that's as compared to the unsubstituted

9        propoxy.

10            A.    And what you're drawn to is that

11  the substitution at 4 on the phenyl group causes a

12  decrease in potency.  That's the wrong direction,

13  and so I would choose to go the other way.  A

14  medicinal chemist is not drawn to the 4 chloro

15  compound.

16                    On the other hand, obviously from

17  the data, substitution at the two-chloro on phenyl

18  and the three-chloro on phenyl improve potency.

19  So it's telling me from the data that I have that

20  chlorination is good.

21                    The other thing of note is that as

22  a medicinal chemist, and we talked about this a

23  little bit earlier, chemists make derivatives of

24  the parent ring, so to speak.

25                    If you recall earlier, we took this

1                      PRESS - DIRECT

2    model and took the chlorines off to see the

3    unsubstituted butoxy.  The unsubstituted compound

4    is really what -- one terminology for it would be

5    the parent ring system.  You start there, and you

6    put substitutions on it to see the effect.

7                      And so if you look at the

8    unsubstituted compounds, you compare the propoxy

9    linker to the butoxy linker, and what you see is

10   that putting an extra carbon into the linker

11   improves the potency and, as an unsubstituted

12   compound, presents a perfect platform for a

13   medicinal chemist to start a structure activity

14   study correlating structural changes with

15   biological effect.

16                     And so what this data all leads to

17   is as a starting point, the butoxy compound 41 is

18   a perfect platform to start the structure activity

19   studies of that family of compounds which are

20   homologs in the propoxy.

21                     And the first things you would do

22   is chlorinate the phenyl because I already know

23   that chlorination enhances potency.  I expect that

24   to be true and carry over in a homologous series.

25                     Q.    Dr. Press, getting back to the

1                    PRESS - DIRECT

2    question of 7 versus 5 position on carbostyril for

3    a minute, have you seen anything in the prior art

4    that would teach away from the use of the 7

5    substitution compounds?

6          A.    No, there's no teaching away.  And

7    in fact, there's obviously teaching for -- we've

8    talked about the 4139 and the 4392 compound.

9          Q.    As we've seen in the Nakagawa

10   declaration, there is a propoxy with a chlorine at

11   the 3 position and one with a chlorine at the

12   2 position.

13               Why would the person of skill in

14   the art put chlorines at both the 2 and

15   3 positions, as you suggest?

16         A.    Well, this is somewhat following

17   along the lines of things we talked about earlier

18   today.  Medicinal chemists make systematic changes

19   to molecules and measure the effect on biological

20   activity.  Throughout that, we assume that we can

21   learn from that and project it forward.  So our

22   research builds on itself, especially when it

23   comes to very similar compounds.

24               So first of all, we already know

25   the potency increases from propoxy to butoxy, and

1               PRESS - DIRECT

2    we already know that potency increases within the

3    propoxies by putting 3 chloro or 2 chloro.  We

4    expect that those substituent effects to

5    biological activity will be additive.

6               And so we would expect that a

7    2,3-dichloro substitution would, in fact, be

8    better than a two-chloro or a three-chloro

9    compound.

10          Q.    Dr. Press --

11              JUDGE COOPER:  Can it make it

12      worse, adding too much chlorine?

13              THE WITNESS:  The question is

14      what's too much?

15              JUDGE COOPER:  I mean, you know,

16      two is good.  Three is good.  What's to say

17      that two and three together would be good or

18      just not work out?

19              THE WITNESS:  The principle that we

20      work on is that we would expect the

21      2,3-dichloro to be better.

22          Q.    Is that the additive effect you

23    just mentioned?

24          A.    That's the additive effect I just

25    mentioned.

Page 221

PRESS - DIRECT

1

2      Q.    Are you aware that Otsuka has

3  alleged that aripiprazole demonstrated unexpected

4  results compared to the prior art compounds?

5      A.    Could you repeat your question,

6  please.

7      Q.    Sure.  Are you aware that Otsuka

8  has alleged in this case that aripiprazole

9  demonstrated unexpected results compared to the

10  prior art compounds?

11      A.    Yes, I am aware of that.

12      Q.    Do you agree with that?

13      A.    No, I don't agree with that.

14      Q.    Why not?

15      A.    Well, I would expect, based on the

16  analysis that we just did, using the data that

17  Otsuka supplied, that aripiprazole would be a

18  good -- an excellent compound.

19      Q.    Can medicinal chemists ever predict

20  with 100 percent certainty that a compound will

21  have the activity that is expected?

22      A.    I don't think anyone can predict

23  100 percent of anything.

24            But in this regard, no, we can't

25  predict, but we have a high expectation that that

PRESS - DIRECT

1

2   would be the right thing to do and would be very

3   successful.

4          Q.    Is there anything particular in

5   this case that would lead to that high

6   expectation?

7                Maybe I can rephrase my question.

8                Based on the data in the Nakagawa

9   declaration and the '416 patent that you've

10  discussed already today, would a medicinal chemist

11  have a high expectation that aripiprazole would be

12  a good antipsychotic drug?

13         A.    Absolutely, for all of the reasons

14  that we just went through.

15         Q.    Dr. Press, have you prepared a

16  slide summarizing your opinion as to why

17  aripiprazole would have been obvious to the person

18  of ordinary skill in the art?

19         A.    Yes, I have.

20         Q.    Can we see TDX-31.

21                Is this the slide you prepared,

22  Dr. Press?

23         A.    It is.

24         Q.    Can you explain what we see here.

25         A.    Certainly.  This goes back really

1                         PRESS - DIRECT

2    and summarizes what we've just been talking about.

3                    If one of skill were to look in the

4    literature for antipsychotic agents, they would

5    find carbostyrils as antipsychotic compounds and

6    were of interest both because they were in humans

7    as well as two compounds were in development.  So

8    one of skill would look at carbostyrils as a good

9    place to make an antipsychotic agent.

10              Q.    Next.

11              A.    For the reasons that we just went

12   through, analyzing the data that was supplied to

13   us and looking at the structure activity

14   information and considering how medicinal chemists

15   go about their business of looking at substitution

16   effects on the parent ring system, the

17   unsubstituted butoxy compound reported in the

18   Nakagawa declaration had good potency and was very

19   available to create an SAR study.

20                   In doing the SAR study, based on

21   the data that Nakagawa furnished us, you would

22   want to make a chlorine substitution on the phenyl

23   at the 2 and 3 position.

24                   And you would expect the additive

25   effect to be better if you make a 2,3-dichloro

Page 224

PRESS - DIRECT

1

2      compound which uses the data that Nakagawa

3      itemizes.

4                  And it also takes advantage of

5      knowing that in the literature, the Swedish patent

6      '945 reports that a 2,3-dichloro compound has

7      antipsychotic activity.

8                  Q.    And if you pursued carbostyril

9      derivatives and shows the unsubstituted butoxy as

10     the starting point and made the 2,3-dichloro

11     substitution, what compound would you end up with?

12                 A.    Aripiprazole.

13                 Q.    Would a person of ordinary skill in

14     the art have any difficulty making aripiprazole?

15                 A.    Absolutely not.

16                 Q.    Why do you say that?

17                 A.    There's a variety of synthetic

18     methods described in the '416 patent.  The

19     starting materials are all available.  It's a very

20     simple molecule to construct using routine

21     chemical procedures.

22                 Q.    Let's turn to Claim 17 of the

23     '528 patent because we've been discussing

24     aripiprazole itself so far, which is Claim 12.  I

25     believe it's TDX-14.

PRESS - DIRECT

1

2          Why would Claim 17 have been

3   obvious to the person of ordinary skill in the

4   art?

5          A.    Well, I believe this has been

6   mentioned earlier, but it's obvious to one of

7   skill that if you have a compound that has

8   antipsychotic activity and you want to make a drug

9   out of it, you have to put it into a formulation

10  that's routine in the industry.  There's nothing

11  surprising about it.

12          And because the compound

13  aripiprazole was tested and shown to have

14  antipsychotic activity, it would be obvious that

15  the composition or formulation would be used to

16  treat schizophrenia.

17          Q.    Dr. Press, if you didn't have the

18  compound aripiprazole, but you just had all the

19  information from the prior art that you've been

20  discussing, the Nakagawa declaration and the '416

21  and SE '945, would Claim 17 of the '528 patent be

22  obvious?

23          A.    Yes.

24          Q.    Can you explain again why, please.

25          A.    Could you repeat your question so

1                    PRESS - DIRECT

2    that I don't miss a point.

3          Q.    Yes.  I'm saying if you didn't have

4    the compound aripiprazole, but you had all the

5    prior art information you've been discussing, such

6    as the Nakagawa declaration, '416 patent and

7    SE '945, would the subject matter of Claim 17 of

8    the '528 patent be obvious?

9          A.    Yes, for the same reason that

10   Claim 12 would be obvious.  All of that

11   information together teaches to make aripiprazole.

12   And it's obvious once you've made aripiprazole

13   that you would put it in a formulation to treat

14   schizophrenia.

15         Q.    Now, let's look at Claim 23, which

16   was TDX-15.  Thank you.

17               Would the subject matter of

18   Claim 23 have been obvious to a person of ordinary

19   skill in the art in 1988?

20         A.    Yes.

21         Q.    Can you explain why.

22               JUDGE COOPER:  This has already

23      been asked and answered, absolutely.

24               MS. HOLLAND:  Yes, Your Honor.  It

25      was asked and answered in the context of

1              PRESS - DIRECT

2        double patenting.

3              JUDGE COOPER:  Oh.  Go ahead.

4        A.    Could you repeat your question,

5   please.

6        Q.    Yes.  Would the subject matter of

7   Claim 23 of the '528 patent have been obvious to a

8   person of ordinary skill in the art as of 1988?

9        A.    Yes.  For the reasons we just

10  mentioned with respect to Claim 17, the making of

11  aripiprazole would be obvious following the

12  Nakagawa data and following the information we had

13  available.

14              We would make aripiprazole.  We

15  would expect it to be a good antipsychotic agent.

16  We would expect that once we put it into a

17  pharmaceutical composition, which is a formulation

18  which is a drug form to treat schizophrenia, that

19  using that medication in patients would treat

20  schizophrenia.

21        Q.    In your opinion, if aripiprazole

22  and its use as an antischizophrenic agent would

23  have been obvious to the person of ordinary skill

24  in the art as of 1988, why didn't anyone else

25  besides Otsuka develop aripiprazole?

PRESS - DIRECT

1

2    A.    Well, they were prevented from

3    looking at aripiprazole because the '416 patent

4    owned by Otsuka blocked other people from owning

5    that compound.

6              It's just like earlier today we

7    talked about my credentials where I made

8    olanzapine, but we could not look at it any

9    further because it was owned by somebody else.

10             JUDGE COOPER:  When you say "look

11         at" --

12             THE WITNESS:  Investigate.

13             JUDGE COOPER:  Okay.

14    Q.    If I may follow up for a second.

15    In your last answer when you said "look at," when

16    you're talking about from the perspective of a

17    pharmaceutical company, can you explain what you

18    mean by that.

19    A.    Certainly.  Look at to one extent

20    means to investigate.  But as a scientist, I

21    always hate to admit this, but pharmaceutical

22    companies do this because they hope to make a drug

23    out of it to make money.

24             If they have their scientific staff

25    looking at a drug or drug candidate that's owned

1                        PRESS - DIRECT

2       by somebody else, they're not expending their

3       resources very well.

4                  And so people in another company

5       that don't own the compound wouldn't pursue those

6       compounds because they know they wouldn't have a

7       benefit to their company at the end.

8                  JUDGE COOPER:  If I may -- and I do

9              not know all the evidence that's going to be

10             put forth in this case.  But let's say the

11             '416 patent is in effect, and it covers

12             potentially millions of compounds, as you've

13             said, and it's going to have a finite

14             effective period and then it's going to

15             expire.  The '416 patent will expire.  And you

16             don't work for Otsuka, the owner of the

17             '416 patent.

18                  Can you as another research entity

19             work to see whether one of those compounds

20             could be applied for once the '416 ends, one

21             of those millions of compounds, and get

22             yourself ready to -- in other words,

23             experiment around that million compound area

24             in hopes of when '416 expires, you'll have

25             something that is a patentably distinct

1                    PRESS - DIRECT

2        compound within that genus?

3                    THE WITNESS:  Speaking as one of

4        skill in the art as a medicinal chemist, my

5        answer to you is yes, I could do those

6        investigations.

7                    However, that question you ask has

8        business decision concerns and also really has

9        legal concerns that -- I really am not in a

10       position to be able to answer your question

11       very well.

12                   JUDGE COOPER:  Of course.  Of

13       course.

14           Q.    Dr. Press, I want to shift gears

15   for a minute now and focus on some statements that

16   Otsuka made to the patent office during the

17   reexamination of the '528 patent.

18                   Would you turn to tab 10 in your

19   binder, which is DTX-399.

20           A.    Yes, I'm there.

21           Q.    And what is this document?

22           A.    This is a document -- a declaration

23   from Dr. Hirose that is supplying information as

24   part of the '528 patent process.

25                   MS. HOLLAND:  Defendants offer

PRESS - DIRECT

1    DTX-399 into evidence.

2              JUDGE COOPER:  Admitted.

3              (Exhibit DTX-399 admitted.)

4         Q.    What is your understanding of the

5    purpose of the Hirose declaration?

6         A.    I believe he was supplying

7    information concerning the superiority of the

8    compounds that they were considering over the

9    prior art.

10        Q.    When you say the compounds of the

11   '528 patent, what are you referring to?

12        A.    He chose some selected compounds

13   from the '528 patent, including aripiprazole.

14        Q.    So you have an understanding that

15   Dr. Hirose compared compounds from the '528 patent

16   to prior art compounds?

17        A.    That is the purpose of this

18   document, yes.

19        Q.    Let's go to paragraph 9 of the

20   Hirose declaration, and it's on page 4 of DTX-399.

21              Are these the prior art compounds

22   that Dr. Hirose tested?

23              JUDGE COOPER:  What's he testing?

24   I'm sorry.

1          PRESS - DIRECT

2          MS. HOLLAND:  Dr. Hirose is testing

3      prior art carbostyril derivatives against the

4      compounds of the '528 patent, including

5      aripiprazole, in order to show the patent

6      office that there were unexpected results for

7      aripiprazole.

8          A.    Could you repeat your question,

9  please.

10          Q.    Yes.  I just wanted to confirm that

11  the compounds in paragraph 9 of the Hirose

12  compounds are the prior -- I'm sorry.  Let me

13  start over again.

14              I wanted to confirm that

15  paragraph 9 of the Hirose declaration shows the

16  structures of the four compounds from the prior

17  art that Dr. Hirose tested.

18          A.    Yes, they do, yes.  The document

19  shows those four compounds.

20          Q.    And what is the first compound in

21  paragraph 9?

22          A.    The first compound in paragraph 9

23  is the dichloropropoxy compound that we talked

24  about earlier.

25          Q.    Did Dr. Hirose test the

Page 233

PRESS - DIRECT

1  unsubstituted butoxy?

2          A.    He did not test the unsubstituted

3  propoxy.

4          Q.    I'm sorry.  Let me repeat my

5  question.

6                JUDGE COOPER:  I think this will be

7      a good time for a break.

8                (Recess taken.)

9                JUDGE COOPER:  Back in session.

10     Proceed, counsel.

11               MS. HOLLAND:  Thank you, Your

12     Honor.

13         Q.    Dr. Press, before the break we were

14  looking at the Hirose declaration, and you had

15  testified that Dr. Hirose compared four prior art

16  compounds to aripiprazole and three other

17  compounds from the '528 patent in order to show

18  unexpected results.  And then I directed you to

19  paragraph 9 of the Hirose declaration, which is

20  page 4.

21               Do you see there are four compounds

22  in paragraph 9?

23         A.    I do see that, yes.

24         Q.    And are those the four prior art

1           PRESS - DIRECT

2    compounds that Dr. Hirose used to compare to

3    aripiprazole and the other '528 patent compounds?

4           A.    Yes, they are.

5           Q.    And what is the first compound in

6    paragraph 9?

7           A.    The first compound is a compound

8    we've talked about earlier today and is the

9    2,3-dichloropropoxy compound.

10          Q.    Did Dr. Hirose test the

11   unsubstituted butoxy?

12          A.    It does not appear that he did, no.

13          Q.    Let's go to paragraph 8 of the

14   Hirose declaration.

15                Do you see that Dr. Hirose states

16   that the prior art compounds that he tested were

17   the most structurally similar to the '528 patent

18   compounds?

19          A.    Yes, I do see that.

20          Q.    Do you agree with that?

21          A.    I do not agree with that.

22          Q.    Why not?

23                JUDGE COOPER:  Where are we again,

24        paragraph 8?

25                MS. HOLLAND:  Yes.  We've gone from

PRESS - DIRECT

1
2      9 and then back to 8.

3           Q.    Dr. Press, you had said that you

4      don't agree with Dr. Hirose's statement that the

5      compounds of the prior art that he tested were

6      those that were most structurally similar to

7      aripiprazole and the other '528 patent compounds.

8                 Why is that?

9           A.    Well, because he's omitted looking

10     at the butoxy compound, which is the direct

11     comparison for this.

12          Q.    When you say the "butoxy compound,"

13     are you referring to the unsubstituted butoxy?

14          A.    I am referring to the unsubstituted

15     butoxy.

16          Q.    Okay.  Now, let's turn to tab --

17     I'm done with the Hirose declaration.  Let's turn

18     to tab 11 in your binder, which is DTX-459.

19                Dr. Press, what is this document?

20          A.    This is a document that Otsuka

21     filed with the U.S. Patent Office as part of its

22     '528 patent application.

23          Q.    During the reexamination

24     proceedings?

25          A.    Yes, in regards to reexamination.

Page 236

PRESS - DIRECT

1                    PRESS - DIRECT

2                    MS. HOLLAND:  Defendants offer

3        DTX-459 into evidence.

4                    JUDGE COOPER:  Admitted.

5                    (Exhibit DTX-459 admitted.)

6        Q.    I want to direct your attention now

7   to page 12 of this amendment.  Can we go to the

8   paragraph that starts "four" in the first two

9   sentences.  Thank you.

10                   Dr. Press, do you see that Otsuka

11  is referring here to five exemplary carbostyril

12  derivatives identified by the examiner?

13       A.    I do see that, yes.

14       Q.    Before we go further, let's figure

15  out what those five exemplary compounds are.

16                   Can we go to pages 10 and 11 of

17  DTX-459.  Can you highlight those compounds,

18  please.

19                   JUDGE COOPER:  Where did you get

20       those?

21                   MS. HOLLAND:  Those are at the

22       bottom of page 10 and the top of page 11 of

23       DTX-459.

24                   JUDGE COOPER:  Okay.

25       Q.    And are these the five exemplary

1                    PRESS - DIRECT

2   carbostyril derivatives that had been identified

3   by the patent examiner during the reexamination of

4   the '528 patent?

5            A.    Yes, they are.

6            Q.    And let's just focus on the page

7   with the last three.

8                 Do you see Example 54 of the

9   '416 patent?

10           A.    I do see that.

11           Q.    What compound is that?

12           A.    That is the unsubstituted butoxy

13  compound that is Claim 13 of the '416 patent.

14           Q.    Okay.  So the unsubstituted butoxy

15  was one of the five compounds that the examiner

16  identified during the '528 patent prosecution.  Is

17  that correct?

18           A.    That is correct.

19           Q.    Okay.  So let's go back, then, to

20  the sentence that we were looking at on page 12.

21                Do you see that Otsuka told the

22  patent office that the five exemplary carbostyril

23  derivatives, one of which is the unsubstituted

24  butoxy, that there is no evidence that it has the

25  recited property of treating schizophrenia; do you

1                      PRESS - DIRECT

2    see that?

3            A.    Yes, I do.

4            Q.    Do you agree with that statement?

5            A.    Not at all.

6            Q.    Why not?

7            A.    Well, we've already reviewed

8    biological data that Otsuka had from the Nakagawa

9    declaration that said that the unsubstituted

10   butoxy compound was a potent compound in the Mouse

11   Jumping Test, which we have already talked about

12   as a test for antischizophrenic activity.

13           Q.    Let's go now to tab 12 in your

14   binder, which is DTX-4.

15               Can you identify this exhibit.

16           A.    This is another document that

17   Otsuka supplied to the U.S. Patent Office as part

18   of the reexamination of '528.

19               MS. HOLLAND:  Defendants offer

20       DTX-4 into evidence.

21               JUDGE COOPER:  Admitted.

22               (Exhibit DTX-4 admitted.)

23           Q.    Let's turn to page 7 of DTX-4, and

24   the paragraph that begins "finally."

25               Do you see that there is another

1                    PRESS - DIRECT

2    reference here, Dr. Press, to the five exemplary

3    carbostyril derivatives identified by the

4    examiner?

5              A.    I do see that.

6              Q.    And does that include the

7    unsubstituted butoxy?

8              A.    Yes, it does.

9              Q.    Do you see that Otsuka is telling

10   the examiner again that there is no prior art

11   evidence that the unsubstituted butoxy has the

12   property of treating schizophrenia?

13             A.    I do see that.

14             Q.    Do you agree with that statement?

15             A.    I don't agree, for the reasons we

16   just talked about.  Otsuka itself supplied the

17   U.S. Patent Office, as part of the '416 patent

18   application, to show that that compound, the

19   unsubstituted butoxy, had antischizophrenic

20   activity.

21             Q.    Thank you, Dr. Press.

22             MS. HOLLAND:  Your Honor, I'm done

23        with the questioning for now, and subject to

24        leaving it open to the morning, if I may.

25             JUDGE COOPER:  Yes, indeed,

1                PRESS - DIRECT

2       counsel.  Thank you very much.

3                All right.  We discussed before the

4       break, off the record, that this would be a

5       good time for us to adjourn for the day, so

6       let's do that.  I'll see you tomorrow.

7                MR. FLIBBERT:  Your Honor, I just

8       wanted to note for the record that we did have

9       our objections to some of the prosecution

10      history documents, and there was a motion in

11      limine that Your Honor had considered, but I

12      just didn't want to interrupt the testimony.

13               But I wanted to make it clear for

14      the record that we still maintain the position

15      that the Nakagawa declaration is not prior

16      art, as well as the '932 patent file history

17      that was discussed during the testimony today.

18               JUDGE COOPER:  Your objection is to

19      the relevance of these documents as prior art?

20               MR. FLIBBERT:  As prior art.  Yes,

21      Your Honor.

22               JUDGE COOPER:  So noted.

23               But you don't object to their

24      admissibility in general relevant in the case?

25               MR. FLIBBERT:  That's correct.  I

Page 241

1           PRESS - DIRECT

2      just wanted to note it for the record.

3                JUDGE COOPER:  Then that's fine.

4      Please continue to do that whenever you have a

5      need to do so, both sides.

6                Thank you.  Have a good evening.

7         (Proceedings adjourned at 4:25 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 242

                        CERTIFICATE

1  STATE OF NEW JERSEY )

2                      )ss:

3  COUNTY OF MERCER    )

4         I, JOMANNA DeROSA, a Certified

5  Shorthand Reporter and Notary Public within

6  and for the States of New York, New Jersey,

7  California and Arizona, do hereby certify that

8  within is a true and accurate transcript of the

9  proceedings held on August 5, 2010.

10        I further certify that I am not

11 related to any of the parties to this action

12 by blood or marriage, and that I am in no

13 way interested in the outcome of this

14 matter.

15        In witness whereof, I have hereunto

16 set my hand this 5th day of August, 2010.

17

18                      s/JOMANNA DeROSA

19

20

21

22

23

24

25

Page 243

1                        I N D E X

2

3                                            PAGE

4    Appearances                              3

5    Opening Statement - Ms. Holland          8

6    Opening Statement - Mr. Cherry          34

7    Opening Statement - Mr. Monroe          58

8    WITNESS JEFFERY PRESS

9     Direct Examination - Ms. Holland      105

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25