Page 3827

1                    UNITED STATES DISTRICT COURT

2                      DISTRICT OF NEW JERSEY

3    OTSUKA PHARMACEUTICAL, CO., LTD.,)Case No. 07-cv-1000-MLC-LHG
                                      )
4                    Plaintiff,       )
          v.                          )
5                                     )
     SANDOZ, INC.,                    )
6    TEVA PHARMACEUTICALS USA, INC.,  )
     TEVA PHARMACEUTICAL INDUSTRIES,  )
7    LTD., BARR LABORATORIES, INC.,   )402 East State Street
     BARR PHARMACEUTICALS, INC.,      )Trenton, NJ 08608
8    APOTEX, INC., APOTEX CORP., SUN  )
     PHARMACEUTICAL INDUSTRIES, LTD., )
9    SYNTHON BV, SYNTHON              )
     PHARMACEUTICALS, INC., and       )
10   SYNTHON LABORATORIES, INC.,      )
                                      )
11                   Defendants.      )October 21, 2010
     --------------------------------)9:28 a.m.
12
                       TRANSCRIPT OF HEARING
13              BEFORE HONORABLE MARY L. COOPER
               UNITED STATES DISTRICT COURT JUDGE
14

15   A P P E A R A N C E S:

16   For the Plaintiff:        Finnegan, Henderson, Farabow,
                               Garrett & Dunner, LLP
17                             By:  PAUL W. BROWNING, Ph.D.
                                    JAMES B. MONROE, ESQ.
18                                  MICHAEL J. FLIBBERT, ESQ.
                               901 New York Avenue, NW
19                             Washington, D.C. 20001

20                             Fitzpatrick Cella Harper & Scinto
                               By:  JOHN D. MURNANE, ESQ.
21                             1290 Avenue of the Americas
                               New York, New York 10104
22
     Court Reporter:           Jomanna DeRosa
23                             Job #33016

24

25

```
                                                      Page 3828

 1    A P P E A R A N C E S (Cont'd.):

 2    For Defendants Teva
      and Barr:                  Kenyon & Kenyon, LLP
 3                               By:  ELIZABETH HOLLAND, ESQ.
                                      MARIA LUISA PALMESE, ESQ.
 4                                    PETER L. GIUNTA, ESQ.
                                 One Broadway
 5                               New York, New York 10004

 6                               Lite DePalma Greenberg, LLC
                                 By:  MAYRA V. TARANTINO, ESQ.
 7                               Two Gateway Center, 12th Floor
                                 Newark, New Jersey 07102
 8
      For Defendant Apotex:      Husch Blackwell Sanders, LLP
 9                               By:  DANIEL R. CHERRY, ESQ.
                                      STEVEN E. FELDMAN, ESQ.
10                                    JAMES P. WHITE, ESQ.
                                 120 South Riverside Plaza, Ste 2200
11                               Chicago, Illinois 60606

12                               Flaster Greenberg
                                 By:  JEFFREY A. COHEN, ESQ.
13                               1810 Chapel Avenue West
                                 Cherry Hill, New Jersey 08002
14

15

16

17

18

19

20

21

22

23

24

25
```

1            THE COURT:  Good morning, everyone.  Everyone may be

2    seated except those who will state their appearances, and you

3    may do so now.

4            MR. MONROE:  James Monroe, Finnegan Henderson, on

5    behalf of Otsuka Pharmaceuticals.

6            MR. FLIBBERT:  Mike Flibbert of Finnegan on behalf of

7    Otsuka.

8            MR. BROWNING:  Paul Browning, also of Finnegan, also

9    on behalf of Otsuka.

10           MR. MURNANE:  John Murnane, Fitzpatrick Cella, on

11   behalf of Otsuka.

12           MS. HOLLAND:  Elizabeth Holland of Kenyon & Kenyon on

13   behalf of the Teva and Barr defendants.

14           MS. PALMESE:  Maria Palmese of Kenyon & Kenyon on

15   behalf of Teva.

16           MR. GIUNTA:  Peter Giunta of Kenyon & Kenyon on

17   behalf of Teva and Barr.

18           MR. FELDMAN:  Steven Feldman of Husch Blackwell on

19   behalf of the Apotex defendants.

20           MR. CHERRY:  Daniel Cherry, Husch Blackwell, for

21   Apotex.

22           MR. WHITE:  James White, Husch Blackwell, on behalf

23   of the Apotex defendants.

24           MR. COHEN:  Good morning, Your Honor.  Jeffrey Cohen

25   from Flaster Greenberg on behalf of the Apotex defendants.

1          MS. TARANTINO:  Good morning, Your Honor.  Mayra

2    Tarantino from Lite DePalma Greenberg, also on behalf of Teva

3    and Barr.

4          THE COURT:  Welcome.

5          Welcome back to our excellent court reporter.  Thank

6    you.

7          So I suppose defendants will go first?

8          MS. HOLLAND:  Yes, Your Honor.

9          THE COURT:  Do you want to take up this motion to

10   strike now or later?

11         I think I'd rather do it later.  I have looked it

12   over, and you can make your comments as you go along.  I'll

13   let you get to the meat of your presentation.

14         MS. HOLLAND:  Thank you, Your Honor.  Counsel for

15   Otsuka and I have discussed this, and I think along the lines

16   of what Your Honor said, Otsuka is, during its closing

17   argument -- at the end of its closing argument, going to

18   address the motion to strike.  And then we will, during our

19   rebuttal, respond to that.

20         THE COURT:  That's fine.

21         MS. HOLLAND:  So having said that, we would like to

22   reserve some time for rebuttal.

23         THE COURT:  Of course.

24         MS. HOLLAND:  Thank you.

25         THE COURT:  And you're not on a clock here anyway,

Page 3831

1    within reason.

2           MS. HOLLAND:  Thank you.  Your Honor, I'm going to be

3    addressing the issues of double patenting and inequitable

4    conduct, and then Mr. Feldman is going to address the issue

5    of obviousness.

6           As Your Honor heard at trial, Otsuka obtained two

7    patents covering the compound aripiprazole.  That fact is not

8    disputed.  Otsuka's earlier '416 patent contained claims that

9    covered the compound aripiprazole, and Otsuka actually used

10   the '416 patent to keep others off the market with competing

11   aripiprazole products.  None of that is disputed.

12          It's also undisputed that the '416 patent, in

13   addition to covering aripiprazole, covered billions of other

14   carbostyril derivatives.  And by claiming this whole class of

15   compounds, Otsuka was able to keep other researchers from

16   investigating them and their potential as antischizophrenic

17   drugs.

18          The follow-on, the '528 patent, which is the

19   patent-in-suit in this case, is exactly what the doctrine of

20   double patenting was meant to prevent.  It was meant to

21   prevent the unjustified timewise extension of the right to

22   exclude.  And that is a quote from the Eli Lilly vs. Barr

23   case.

24          Double patenting, its adoption, that's grounded in

25   public policy and as the Federal Circuit found in the

1    In re Longi case, which we cited in our conclusions of law:

2           "The public should be able to act upon the assumption

3    that upon the expiration of the patent, it will be free to

4    use not only the invention claimed in the patent, but also

5    modifications or variants which would have been obvious to

6    those of ordinary skill in the art."

7           So the double patenting analysis here is very

8    straightforward.  Under the Federal Circuit law the Court

9    must compare the asserted claims in this case to the claims

10   of Otsuka's earlier '416 patent; in this case, Claim 13 of

11   the '416 patent, which is the unsubstituted butoxy compound.

12          Otsuka's principal argument in this case is that a

13   person of ordinary skill in the art would not have chosen the

14   unsubstituted butoxy as a lead compound.

15          But that argument, Your Honor, is completely

16   irrelevant to obviousness -- to obviousness-type double

17   patenting.  That argument only goes to the issue of

18   obviousness.

19          The Court, when it's looking at double patenting, is

20   required to start with the unsubstituted butoxy.  That's just

21   one of several differences between double patenting and

22   obviousness.

23          Can we see closing slide 1.

24          This is from the Federal Circuit's recent decision,

25   2009.  This is a quote from the Federal Circuit's 2009

Page 3833

1   decision in the Procter & Gamble case.  And the Court was

2   very clear that there were three distinctions between

3   obviousness and double patenting.

4           The first is the one I just discussed, which is the

5   fact that in a double patenting analysis, it's not the prior

6   art that's being compared to the claim.  It's the claim in

7   the earlier patent; in this case, the Claim 13 of the

8   '416 patent, which is the unsubstituted butoxy.  That must be

9   the starting point.

10          Second, in a double patenting analysis, the issue of

11  motivation to modify the prior art is not a relevant

12  consideration.

13          Finally, for double patenting, secondary

14  considerations of nonobvious or so-called objective criteria

15  of nonobviousness are also not relevant to double patenting.

16          Because of these differences, double patenting and

17  obviousness are distinct defenses, and they have to be

18  analyzed separately.

19          So on double patenting there is really only one

20  question for the Court to answer:  Is aripiprazole an obvious

21  variant of the unsubstituted butoxy?

22          In other words, would a person of ordinary skill in

23  the art, based on what was known in the prior art at the

24  time, have considered aripiprazole to be obvious in light of

25  the unsubstituted butoxy, Claim 13 of the '416 patent?

Page 3834

1          Can we see closing slide 2, please.

2          These are the structures of aripiprazole and the

3     unsubstituted butoxy.  Aripiprazole -- as Your Honor heard at

4     trial, an aripiprazole molecule has formed parts.  We have

5     the carbostyril core.

6          THE COURT:  Do you want that model that is in

7     evidence?  If you do, you can ask us to bring it out.

8          MS. HOLLAND:  Thank you very much, Your Honor.

9          The aripiprazole molecule has a carbostyril core.  It

10    has a linker; in the case of an aripiprazole, a butoxy

11    linker.  It has a piperazine group and it has -- I'm sorry --

12    a phenyl ring.

13         The unsubstituted butoxy has these same four

14    components to it, and in fact, it is identical to

15    aripiprazole except for the phenyl ring.  There is a phenyl

16    ring on the unsubstituted butoxy.

17         Aripiprazole has chlorines at the 2- and 3-position

18    of the phenyl ring.  And the unsubstituted butoxy, as the

19    name implies, is unsubstituted, or in other words, has

20    hydrogens at those positions.

21         The structural similarity that you can see here, Your

22    Honor, between the aripiprazole and the unsubstituted butoxy

23    makes aripiprazole what is called prima facie obvious.

24         In other words, under the case law, because of the

25    structural similarity, there's a presumption that

Page 3835

1    aripiprazole is obvious in light of the unsubstituted butoxy.

2           But we have much more in this case than just a

3    presumption, as Your Honor heard at trial.  The Nakagawa

4    declaration contains data that would direct the person of

5    ordinary skill in the art to take the unsubstituted butoxy

6    and put chlorines at the 2- and 3-positions.

7           As Your Honor heard, the Nakagawa declaration was

8    submitted during prosecution of the '416 patent by Otsuka in

9    order to prove to the patent office that the compounds of the

10   '416 patent were superior to Otsuka's prior art compounds.

11          One of the tests that Otsuka used to prove to the

12   patent office that the '416 compounds were superior was the

13   Mouse Jumping Test.

14          Dr. Marshall, who is an expert in pharmacology,

15   testified at trial that the Mouse Jumping Test is a test for

16   antischizophrenic activity.

17          And none of Otsuka's witnesses disagreed with him.

18   In fact, Otsuka's expert, Dr. Nichols, under questioning from

19   the Court, finally admitted that the Mouse Jumping Test in

20   the Nakagawa declaration was a test for antischizophrenic

21   activity.

22          THE COURT:  Basically, I was just asking what else

23   could it be for.

24          And he said, Well, I guess it's for this.

25          That's what he said.

Page 3836

1          MS. HOLLAND:  Yes.  I have the testimony here, Your

2     Honor.

3          THE COURT:  I know you do.

4          MS. HOLLAND:  The Court asked Dr. Nichols what

5     property Otsuka was trying to demonstrate through the

6     Nakagawa, and he said it was antipsychotic activity, even

7     though Otsuka seems to still be pressing this point in its

8     posttrial papers, given Dr. Nichols' testimony, and given

9     Otsuka's previous admissions that Your Honor heard about

10    during trial, including during prosecution of the

11    '932 patent, when Otsuka told the patent office in no

12    uncertain terms that the Mouse Jumping Test was a test that

13    provides reasonable assurance that a compound has

14    antischizophrenic activity.  And the cite for that is

15    DTX-471.

16         So even though Otsuka is still pressing the point, in

17    light of all these admissions by Otsuka, this really should

18    be a nonissue right now.

19         Now, as the evidence showed, of the billions of

20    carbostyril derivatives covered by the '416 patent, Otsuka

21    chose only nine compounds to test in the Mouse Jumping Test

22    in the Nakagawa declaration.

23         In other words, Otsuka looked at the '416 patent and

24    selected the nine compounds that it thought would best

25    demonstrate to the patent office antischizophrenic activity.

Page 3837

1   And it's undisputed that one of these handful of compounds

2   that Otsuka selected was the unsubstituted butoxy.

3          As defendants' experts Dr. Press and Dr. Castagnoli

4   testified, the data in the Nakagawa declaration provides what

5   medicinal chemists call a structure-activity relationship, or

6   shorthand, SAR information.  It tells a medicinal chemist how

7   a change in structure is going to affect a change in

8   activity.

9          Now, Otsuka argues that the Nakagawa declaration was

10  not intended as an assay or a study.  But that's really

11  beside the point, Your Honor, because the testimony is

12  undisputed that this SAR information does exist in the

13  Nakagawa declaration and would teach the person of ordinary

14  skill in the art how to modify the unsubstituted butoxy.

15         Can we see closing slide 4, please.

16         This summarizes the unrebutted testimony about what

17  the person of ordinary skill would understand from the

18  Nakagawa declaration, as testified to by Dr. Press and

19  Dr. Castagnoli.

20         The Nakagawa declaration teaches the person of

21  ordinary skill exactly what to do to the unsubstituted butoxy

22  in order to increase antischizophrenic activity.

23         No. 1, it tells the person of ordinary skill in the

24  art to place chlorines at the 2- and 3-positions of the

25  phenyl ring because that increases potency.

Page 3838

1          It tells the person of ordinary skill not to put a

2    chlorine at the 4-position because that will decrease

3    potency.

4          It also tells the person of ordinary skill in the art

5    not to change the butoxy linker because butoxy linked

6    compounds are more potent than propoxy linked compounds.

7          There is no evidence in the record, Your Honor, that

8    rebuts any of these points.  They were not directly addressed

9    by Otsuka's experts.

10         Now, Dr. Press and Dr. Castagnoli also explained why

11   the Nakagawa declaration data about the unsubstituted propoxy

12   would also apply to the unsubstituted butoxy.

13         The only difference between the unsubstituted propoxy

14   and the unsubstituted butoxy is in the length of the linker.

15   The propoxy has three CH2 or methylene units, and the

16   unsubstituted butoxy has four CH2 or methylene units.  This

17   makes the unsubstituted propoxy and unsubstituted butoxy

18   homologs of each other.

19         And as Dr. Press testified at trial -- and again,

20   Your Honor, this is unrebutted testimony -- the person of

21   ordinary skill would expect homologs to behave in the same

22   way and to have similar properties.

23         So a medicinal chemist would operate under the

24   assumption that the structure-activity relationship of the

25   propoxy series found in the Nakagawa declaration would apply

Page 3839

1   equally to the butoxy series.

2        Dr. Press also explained why the person of ordinary

3   skill would substitute chlorines at both the 2- and

4   3-positions of the unsubstituted butoxy.

5        He explained that there's a principle of medicinal

6   chemistry called the additive effect.  In other words, each

7   substituent in a molecule makes an independent contribution

8   to biological activity, and these contributions can be

9   combined in an additive way.

10       So if you know from the Nakagawa declaration that the

11  2 chlorine substitution improves activity and you know that

12  the 3 chlorine substitution improves activity, the additive

13  effect of this principle of medicinal chemistry tells you

14  that these can be combined to make a molecule with increased

15  antischizophrenic potency.

16       None of Otsuka's experts disputed this concept of the

17  additive effect, that it's a principle of medicine chemistry,

18  and that it's a principle of drug design.

19       In this case, the person of ordinary skill would also

20  know from the prior art that Otsuka had actually made a

21  2,3-dichloro compound.  It's undisputed that the

22  2,3-dichloropropoxy compound was in the prior art.  It's in

23  Otsuka's published Swedish patent application SE '945.

24       Can we see closing slide 5.

25       The 2,3-dichloropropoxy is Example 134 of SE '945,

Page 3840

1    and that's DTX-1159T.  And the specification of that

2    published patent application states that the compounds of the

3    invention are useful as, among other things,

4    antischizophrenia agents.

5             So the person of ordinary skill would know that

6    2,3-dichloro substitution was known and that the compounds

7    were disclosed as having, among other things,

8    antischizophrenic potency.

9             As I said, Your Honor, Otsuka's experts did not take

10   issue with any of the very specific evidence provided by

11   defendants' experts about the teachings of the Nakagawa

12   declaration.

13            Otsuka's main strategy for dealing with the Nakagawa

14   declaration is to ask the Court to just completely disregard

15   it because Otsuka claims that it's not prior art.  But Otsuka

16   doesn't have a single case to support its position.

17            Defendants have found three cases that address this

18   issue.  In each of those cases the Court found that a

19   document from the file wrapper of an issued patent was prior

20   art and must be considered in the invalidity analysis.  And

21   those cases are the Takeda, Bruckelmyer and Bamberger cases

22   which are in our briefs.

23            There's no question that the contents of a U.S. file

24   wrapper becomes public when the patent issues.

25            Can we see closing slide 6.

Page 3841

1              This is the relevancy of our section, Your Honor.  It

2    states quite clearly that after a patent issues, the papers

3    in the file wrapper or the file history become public.

4              Otsuka has tried to distinguish the Bruckelmyer case

5    by arguing that the specification of the '416 patent doesn't

6    contain information that would lead somebody -- an interested

7    person of ordinary skill to search for and locate the '416

8    file wrapper, but the evidence at trial was to the contrary.

9              Can we see slide 7.

10             This is from DTX-6, the '416 patent.  As you heard at

11   trial, Your Honor, the patent is entitled "Pharmaceutically

12   Useful Carbostyril Derivatives," clearly teaching the person

13   of ordinary skill that the patent is about carbostyril

14   derivatives.  And the specification is a very specific

15   disclosure that the compounds can be used as

16   antischizophrenic agents.

17             Can we see closing slide 9.

18             In fact, Otsuka pretty much conceded this point in

19   its reexamination request.  This is an excerpt from DTX-121,

20   Otsuka's request for reexamination.  And when Otsuka asked

21   the patent office to reexamine the '528 patent, it pointed

22   specifically to the '416 patent as providing a substantial

23   question of patentability.

24             And Otsuka told the patent office that it could be

25   argued that the use of the compounds of the '416 patent as

Page 3842

1    antischizophrenia agents is specifically contemplated.

2          Most of the other arguments that Otsuka makes go to

3    statutory obviousness under Section 103 and not double

4    patenting.  For example, Your Honor, Otsuka argues that a

5    person of ordinary skill in the art with the Nakagawa

6    declaration would have chosen the 2-ethoxy compound with the

7    lowest ED50 value as --

8          THE COURT:  No. 44?

9          MS. HOLLAND:  Yes, that's it.  Thank you, Your Honor.

10         THE COURT:  I'm not ready for the ten-minute quiz.

11         MS. HOLLAND:  So Otsuka makes an argument that the

12   person of ordinary skill would have chosen this compound 44,

13   the 2-ethoxy compound, as the lead compound, rather than

14   choosing the unsubstituted butoxy.

15         But that is not an argument relevant to double

16   patenting because as we saw from the Proctor & Gamble case

17   earlier, you can't start the double patenting analysis from

18   any compound in the prior art.  It has to be the compound

19   that's claimed in the earlier patent.

20         And in this case, that compound is the unsubstituted

21   butoxy, Claim 13 of the '416 patent.

22         THE COURT:  So you're saying you're only supposed to

23   look at the unsubstituted butoxy in the prior art for

24   obviousness type double patenting analysis and see how that

25   looks in terms of whether it looked promising toward this

Page 3843

1    application, namely antischizophrenic.  Right?

2              MS. HOLLAND:  Yes, Your Honor.  You have to look at

3    the unsubstituted butoxy as compared to aripiprazole.  That's

4    the only comparison you can make in the double patenting

5    analysis.

6              And then the question is, if you look at the

7    unsubstituted butoxy, what does the prior art tell you about

8    what to do with it to increase its antischizophrenic

9    activity?

10             THE COURT:  Even in the first place, you have to look

11   to see whether it looks like it might be antischizophrenic

12   instead of antihistamine or whatever other application.

13   Right?

14             MS. HOLLAND:  Well, I don't think that's correct,

15   Your Honor, because the double patenting jurisprudence from

16   the Federal Circuit says you look at the claims of the prior

17   patent; in this case, the '416 patent.

18             You start there, and then you say, looking at this

19   unsubstituted butoxy, would it have been obvious to modify it

20   to make aripiprazole?

21             In this case, when you look at the unsubstituted

22   butoxy, you, first of all, see from the Nakagawa declaration

23   that Otsuka chose it as a paradigm of antischizophrenic

24   activity.  It was one of the nine compounds that Otsuka

25   selected to test in the Mouse Jumping Test.  So you already

Page  3844

1   start off with the premise that it has antischizophrenic

2   activity.

3            The question then is:  How do I boost that

4   antischizophrenic activity if I'm the person of ordinary

5   skill in the art?  What do I see in the prior art?  What does

6   it tell me to do once I have this unsubstituted butoxy?

7            And the Nakagawa declaration is really quite specific

8   about the changes that need to be made to the unsubstituted

9   butoxy to increase the activity.

10           THE COURT:  Okay.  I'm following the argument now.

11  Go ahead.

12           MS. HOLLAND:  Thank you, Your Honor.

13           THE COURT:  But you're looking at that test data

14  right there in the Nakagawa declaration?

15           MS. HOLLAND:  Yes, Your Honor, because that's part of

16  the prior art.  So you start with the earlier claim.

17           And then the question is, a person of ordinary skill

18  with this earlier claim, you know, with the unsubstituted

19  butoxy in their hand, what would they do with it?  How would

20  they boost the antischizophrenic activity?  What does the

21  prior art tell them to do?

22           And those teachings are right in the Nakagawa

23  declaration.  We're not in a situation here where there's no

24  specific teaching of the prior art, and you just try and kind

25  of, you know, figure out based on a lot of general teachings

Page 3845

1    what to do.  That's not the case here.

2           We have a specific teaching in this case about what

3    to do with the unsubstituted butoxy in order to boost its

4    antischizophrenic activity.

5           Otsuka has some other arguments that are also not

6    relevant to double patenting, such as its arguments about

7    secondary considerations, like --

8           THE COURT:  I follow that.

9           MS. HOLLAND:  Okay, Your Honor.  Thank you.

10          THE COURT:  In other words, I know what you're going

11   to say.  The grand factors you don't look at when you're

12   doing your obviousness type double patenting analysis,

13   according to you.  Right?

14          MS. HOLLAND:  Yes, Your Honor, that is what I was

15   going to say.

16          THE COURT:  Okay.  Got it.

17          MS. HOLLAND:  So just to sum up on the double

18   patenting point, defendants submit that there was clear and

19   convincing evidence at trial that aripiprazole is an obvious

20   variant of the unsubstituted butoxy, based on all the

21   information in the Nakagawa declaration, and that the

22   asserted claims would, therefore, be invalid for double

23   patenting.

24          THE COURT:  So you don't have to go beyond the

25   Nakagawa declaration to complete your double patenting

Page 3846

1   argument?

2          MS. HOLLAND:  Correct.  That's all you need, Your

3   Honor.

4          THE COURT:  Even though you did pick up the Swedish

5   '945 patent --

6          MS. HOLLAND:  Yes, Your Honor.

7          THE COURT:  -- in your discussion here?

8          MS. HOLLAND:  All you would need was the Nakagawa

9   declaration because that teaches you to make the 2,3-chlorine

10  substitution.  The person of ordinary skill in the art would

11  know, because they are medicinal chemists, that there is an

12  additive effect.  So of course they would put the 2 -- the

13  chlorines at both the 2- and 3-positions.

14         THE COURT:  Okay.  Fine.  But are you answering my

15  question?

16         MS. HOLLAND:  Yes.  I was --

17         THE COURT:  Nakagawa will do it for you, as you see

18  it, in your double patenting argument?

19         MS. HOLLAND:  Yes.  And the SE '945 Swedish

20  application would support that.  It would be additional

21  evidence that the person of ordinary skill in the art would

22  make this double substitution, the 2-chlorine and the

23  3-chlorine, because they would see it in the prior art in the

24  SE '945.

25         THE COURT:  Thank you.

Page 3847

1          MS. HOLLAND:  If the Court -- I'm sorry.  Go ahead,

2     Your Honor.

3          THE COURT:  I'll tell you when I'm ready.

4          Okay.  Go ahead.

5          MS. HOLLAND:  Shall I move on to inequitable conduct,

6     Your Honor?

7          THE COURT:  Whatever your outline is.

8          MS. HOLLAND:  As long as the Court has no more

9     questions on --

10         THE COURT:  No, I don't.  I was just taking some

11    notes.

12         MS. HOLLAND:  So moving on to inequitable conduct, I

13    just want to say up front that the Federal Circuit is set to

14    hear oral argument in the en banc Therasense case on

15    November 9th.

16         THE COURT:  Can you just spell that, please.

17         MS. HOLLAND:  T-H-E-R-A-S-E-N-S-E.

18         THE COURT:  Go ahead.

19         MS. HOLLAND:  And that en banc argument is on issues

20    related to inequitable conduct.

21         But there are certain fundamental points about

22    inequitable conduct, Your Honor, that are clear even if the

23    law may shift in some way based on the Federal Circuit's

24    decision in Therasense.

25         First of all, it's absolutely fundamental that anyone

Page 3848

1    substantively involved in the prosecution of a patent owes a

2    duty of candor to the patent office, and inequitable conduct

3    is a breach of that duty.  It occurs either when somebody

4    with the duty of candor withholds material information from

5    the patent office or makes false or misleading material

6    statements to the patent office with an intent to deceive.

7           The evidence in this case showed that Dr. Oshiro,

8    Dr. Hirose, and Otsuka's outside counsel, Mr. Van Horn of the

9    Finnegan firm, were all substantively involved in the

10   reexamination prosecution, and they, therefore, all owed a

11   duty of candor to the patent office.

12          The evidence also shows that they completely

13   disregarded their duty because they needed the patent office

14   to confirm the claims of the '528 patent during

15   reexamination.

16          THE COURT:  So you're saying that the inequitable

17   conduct arises in the reexamination?

18          MS. HOLLAND:  Yes, Your Honor, that's what we're

19   saying.

20          And I want to focus first on the Hirose declaration.

21          As Your Honor heard at trial, Otsuka submitted the

22   Hirose declaration to the patent office after everything else

23   had failed.  The examiner had already issued a final

24   rejection.  The '416 patent, which had been providing patent

25   protection for Otsuka's Abilify product, had already expired.

Page 3849

1           So unless Otsuka convinced the patent office to

2    confirm the claims, Otsuka was in a position to lose the

3    '528 patent and to lose its monopoly over aripiprazole.

4           Since all of the arguments that it made to the patent

5    office had failed, Otsuka knew that the only thing it could

6    do at that point was to try to submit a declaration to the

7    examiner that would show or demonstrate that aripiprazole and

8    the other butoxy compounds that were claimed in the

9    '528 patent were unexpectedly superior to the prior art

10   compounds that had the propoxy linker versus the butoxy

11   linker.

12          And for aripiprazole, it was agreed with the examiner

13   that the closest prior art compound was the

14   2,3-dichloropropoxy compound because the only difference

15   between aripiprazole and the 2,3-dichloropropoxy is in the

16   length of the linker.  Aripiprazole has a butoxy linker, and

17   the 2,3-dichloropropoxy has a propoxy linker.

18          As Dr. Hirose testified at trial, he was instructed

19   by his superiors to conduct testing that would prove that

20   aripiprazole and the butoxy compounds were superior to the

21   2,3-dichloropropoxy and the other prior art propoxy

22   compounds.  And Dr. Hirose designed his experiments to make

23   sure that the result he got was the result that his employer

24   wanted.

25          After Dr. Hirose concluded his experiments, Otsuka

Page 3850

1    put in the Hirose declaration to the patent office, and it

2    represented to the patent office in that declaration that

3    aripiprazole was unexpectedly 23 times more potent than the

4    2,3-dichloropropoxy compound, and it was more potent in the

5    Anti-Apomorphine Stereotypy Test for antischizophrenic

6    activity.

7              After the patent office got the Hirose declaration

8    and looked at the results, it decided to confirm the claims

9    of the '528 patent.

10             Can we see closing slide 10, please.

11             This is an excerpt from the document that the

12   examiner -- that's in the prosecution history file, which is

13   the examiner's reasons for patentability and confirming the

14   claims of the '528 patent.

15             As you heard at trial, Your Honor, the examiner

16   confirmed the claims based on the data in the Hirose

17   declaration because, according to that data, the compounds

18   with the butoxy linker, including aripiprazole, were

19   unexpectedly superior to the compounds with the propoxy

20   linker as the 2,3-dichloropropoxy.  And again, Your Honor,

21   the examiner came to this conclusion based on the results in

22   the Hirose declaration.

23             But the evidence at trial showed that Dr. Oshiro

24   withheld information that he knew contradicted what Otsuka

25   told the patent office in the Hirose declaration.  He knew

Page 3851

1   that aripiprazole was not unexpectedly superior to the

2   2,3-dichloropropoxy, and certainly not 23 times more potent.

3          The evidence at trial showed that Otsuka had internal

4   data from its own Anti-Apomorphine Stereotypy testing that

5   was done outside the context of trying to get the claims

6   approved in the reexamination that showed that the difference

7   in activity was not 23 times, like what Otsuka told the

8   patent office in the Hirose declaration; it was six times.

9          Can we see closing slide 11.

10          This is a demonstrative that was used during

11   Dr. Oshiro's testimony, Your Honor, and it compares the data

12   in the Hirose declaration to what Otsuka knew and Dr. Oshiro

13   knew was the real answer from Otsuka's internal data.

14          The Hirose declaration told the Court that there was

15   a 23-fold difference between aripiprazole and the

16   2,3-dichloropropoxy, where Otsuka's internal data showed only

17   a six-fold difference.

18          Dr. Oshiro could not deny that he was aware of the

19   Otsuka internal data because it was his data.  It was

20   actually contained in one of Dr. Oshiro's presentations that

21   he made contemporaneously with his development of

22   aripiprazole at Otsuka.

23          We also know, based on Dr. Oshiro's testimony, that

24   Dr. Oshiro did not consider a six-fold difference to be

25   anything out of the ordinary, to be unexpected, to be

Page 3852

1    surprising.

2              Can we see closing slide 12.

3              This was from Dr. Oshiro's testimony concerning the

4    six-fold increase in activity that Otsuka saw when it took

5    the propoxy linker in OPC-4392 and made it into a butoxy

6    linker.  Dr. Oshiro testified that the difference in

7    activity, which was a six-fold difference, was not a

8    considerable increase and it was not surprising.

9              The evidence showed that Dr. Oshiro was intimately

10   involved in the prosecution of the reexamination and in the

11   drafting of the Hirose declaration.  Dr. Oshiro actually

12   testified at trial that he edited the Hirose declaration.

13             Dr. Hirose said at trial that Dr. Oshiro attended at

14   least ten meetings with the Finnegan lawyers and with other

15   Otsuka personnel concerning the reexam.

16             And Otsuka's privilege log, which is also in

17   evidence, shows that Dr. Oshiro had over 300 communications

18   with the Otsuka IP department and with Otsuka's counsel at

19   Finnegan Henderson related to the reexamination.

20             So Dr. Oshiro clearly knew about Otsuka's internal

21   data that is inconsistent with the Hirose declaration data,

22   and he also knew about the Hirose declaration data because he

23   actually edited and attended meetings where it was discussed.

24             In addition to withholding the data on the

25   2,3-dichloropropoxy and aripiprazole, the internal Otsuka

Page 3853

1    data, Otsuka also withheld the Nakagawa declaration, which,

2    as we saw earlier and which was discussed at trial, would

3    lead the person of ordinary still in the art to expect that a

4    butoxy compound would be more potent than a propoxy compound.

5    In the Nakagawa declaration the unsubstituted butoxy was more

6    potent than the unsubstituted propoxy.

7            Even if the Court were to believe Dr. Oshiro that he

8    didn't know about the Nakagawa declaration -- which is highly

9    unlikely since Dr. Oshiro was an inventor on the '416 patent

10   and Dr. Nakagawa was also his boss at the time.

11           But even assuming the Court were to believe

12   Dr. Oshiro, he admitted that he was aware of internal Mouse

13   Jumping data on the unsubstituted butoxy.  This Mouse Jumping

14   data was not submitted to the PTO during prosecution of the

15   reexamination.

16           And Mr. Van Horn, who was Otsuka's attorney at

17   Finnegan, must have known about the Nakagawa declaration

18   because, of course, he prepared the reexamination request.

19   And the reexamination request told the patent office that the

20   '416 patent presented a substantial new question of

21   patentability.

22           So Mr. Van Horn had to have looked at the '416 patent

23   and the '416 patent file wrapper which contains the Nakagawa

24   declaration.  He couldn't have submitted that reexamination

25   request without looking through the '416 patent file wrapper.

Page 3854

1            This information that was withheld, the information

2    on the 2,3-dichloropropoxy and the unsubstituted butoxy, are

3    highly material in this case because they directly contradict

4    the one essential single argument that Otsuka made to

5    overcome the patent office's rejection:  That a change from a

6    propoxy linker to a butoxy linker showed unexpected

7    superiority in antipsychotic activity.

8            The internal Otsuka data and the Nakagawa declaration

9    data both show that any increase would be expected, not

10   unexpected.

11           Dr. Oshiro was on the stand, Your Honor, and he never

12   explained why the inconsistent data wasn't disclosed to the

13   patent office.

14           And Mr. Van Horn never even showed up at trial.  He

15   was on Otsuka's witness list, but Otsuka decided not to call

16   him to the stand.  And we submit, Your Honor, that the Court

17   should be able to infer from that that his testimony would

18   not have been helpful to Otsuka.

19           Not only did Dr. Oshiro and Mr. Van Horn withhold

20   information about the 2,3-dichloropropoxy and the

21   unsubstituted butoxy; the Hirose declaration actually has a

22   false statement in it, or at the very, very least, a

23   misleading statement.

24           Can we see closing slide 13.

25           Closing slide 13 has an excerpt from the Hirose

Page  3855

1   declaration, which is DTX-399.  This is a statement that was

2   discussed at trial at length.  Otsuka told the patent office

3   that the observation for stereotyped behavior will be

4   performed by an observer blind to the treatment received by

5   the mice.

6           A reasonable examiner would have understood that

7   statement to mean that only one observer scored the

8   stereotyped behavior, and that that one observer did not know

9   which drug the mouse had been given at the time he was

10  observing the stereotyped behavior.

11          But the raw data and the testimony at trial

12  demonstrated, and this is undisputed, Your Honor, that there

13  were not one observer.  There were two observers, Dr. Hirose

14  and Dr. Kikuchi, and that they were not blind to the

15  treatment.  They knew exactly what drug had been given to the

16  mouse that they were observing and, of course, they also knew

17  the purpose of the test.  They knew that they needed to show

18  that aripiprazole was more potent than the

19  2,3-dichloropropoxy.

20          So why is this false statement important?

21          Can we see closing slide 14.

22          As Dr. Beninger testified at trial, the data in the

23  Hirose declaration can't be meaningfully interpreted because

24  of the confound and bias.  The confound, as Dr. Beninger

25  testified, results from the fact that there were two

Page 3856

1    observers rather than one observer.  And the bias comes from

2    the fact that the observers knew exactly what drug the mouse

3    had been given.  And they could, therefore, bias their

4    results to show that aripiprazole was more potent than the

5    2,3-dichloropropoxy.

6            Now, what did Dr. Roth, Otsuka's expert, say about

7    this?

8            We know, Your Honor, it's undisputed that Otsuka

9    could have designed the experiment to have one observer

10   rather than two observers, and that the observers could have

11   been blinded to the treatment, and those all would have

12   improved the test.

13           What did Dr. Roth, Otsuka's expert, say?  To him, the

14   design of the Hirose declaration experiments was marvelous.

15   He said it was a marvelous way to do the experiment.  He had

16   no problems with it at all.

17           And Your Honor, we think this is just one example of

18   Dr. Roth providing testimony at trial that was simply not

19   credible.

20           Now, a reasonable examiner would have, of course,

21   considered it important to know what Dr. Hirose actually did

22   rather than what the declaration says he did, which is not

23   accurate, because the examiner needed to be able to assess

24   whether or not the results of the Hirose declaration were

25   reliable.  Otsuka didn't give the examiner enough information

Page 3857

1    to be able to make that assessment.

2           Can we see closing slide 15.

3           Dr. Beninger testified at trial that the information

4    about the conduct of the experiment is critical to

5    understanding and judging and evaluating the data.  And the

6    patent office simply did not have accurate information about

7    the conduct of the experiment.

8           The false statement in the declaration was,

9    therefore, highly material.  If the PTO had known about this

10   potential for confounding and bias, it wouldn't have relied

11   on Dr. Hirose's results, for all the reasons that

12   Dr. Beninger gave at trial about the confound and bias.

13          In addition to all the problems with the Hirose

14   declaration, Otsuka made other false and misleading

15   statements during the reexam.

16          The examiner repeatedly rejected all the claims of

17   the '528 patent.  There were five, what the examiner called

18   exemplary prior art carbostyril derivatives.  One of those,

19   it's undisputed, was the unsubstituted butoxy.

20          How did Otsuka respond to the examiner's rejection?

21          Can we see closing slide 16, please.

22          Otsuka made an affirmative statement to the patent

23   office that there is no evidence that the five exemplary

24   carbostyril derivatives -- and the evidence showed, Your

25   Honor, and it's undisputed that one of those was the

Page 3858

1    unsubstituted butoxy -- have the property of treating

2    schizophrenia.  That's a statement that Otsuka made during

3    prosecution, and that statement is false.

4           As the evidence at trial showed, the prior art

5    Nakagawa declaration provided data confirming that the

6    unsubstituted butoxy had good antischizophrenic activity.  It

7    was actually one of the compounds that Otsuka itself chose as

8    an exemplary compound to demonstrate antischizophrenic

9    activity.

10          So Otsuka's statement that the unsubstituted butoxy

11   did not have the property of treating schizophrenia was

12   false.

13          THE COURT:  I know we have a transcript, but since

14   we're going to hear argument back and forth today, just

15   taking these few notes helps me.

16          MS. HOLLAND:  Yes, Your Honor.  Shall I continue?

17          THE COURT:  You may now.  Thank you.

18          MS. HOLLAND:  I want to spend a moment talking about

19   intent to deceive.  As the Court is no doubt aware, it's very

20   rare for someone to get up on the witness stand and admit

21   that they intended to deceive somebody.  Federal Circuit law

22   recognizes this, and it doesn't require direct evidence of

23   intent.

24          Can we see closing slide 17.

25          This is from the Federal Circuit's decision in the

Page 3859

1    Bruno case.  What the Federal Circuit said was that intent to

2    deceive is generally inferred when there is no credible

3    explanation, because normally you would expect somebody, if

4    they were innocent, to get up on the stand and try to present

5    some kind of reason for its action or inaction.

6         In this case, the record shows a pattern of

7    misleading information to the PTO and withholding of material

8    information from the PTO in order to get the '528 patent

9    claims confirmed in the reexam, no matter what had to be said

10   or what had to be done to get that accomplished.

11        Astonishingly, Otsuka did not make any attempt at

12   trial to explain its actions.

13        Dr. Oshiro was on the stand.  He never explained why

14   he didn't submit the internal data on the

15   2,3-dichloropropoxy.  He never explained why he didn't submit

16   the internal data on the unsubstituted butoxy.

17        And Mr. Van Horn never even testified, so of course

18   he didn't offer an explanation for why he didn't disclose the

19   Nakagawa declaration during the reexamination.

20        The only reasonable inference here is that

21   Dr. Oshiro, Mr. Van Horn and Dr. Hirose intended to deceive

22   the PTO.

23        And defendants submit that the evidence established

24   by clear and convincing evidence that the '528 patent is

25   unenforceable for inequitable conduct.

Page 3860

1           THE COURT:  Thank you, Ms. Holland.

2           Would we like to take a five-minute break before we

3    get into obviousness?

4           (Recess taken.)

5           THE COURT:  Okay.  Mr. Feldman.

6           MR. FELDMAN:  Good morning, Your Honor.  I'm Steven

7    Feldman on behalf of the Apotex defendants.

8           Your Honor, I'm going to talk to you this morning

9    about obviousness.  I have this outline here and whatnot, but

10   I think it might make more sense for me just to sort of get

11   to the issues that I think are most important right now.

12          THE COURT:  As you wish.  However you want to do it.

13          MR. FELDMAN:  You know, one issue -- and I'd like to

14   really get to this -- is the issue of lead compound because

15   it's come up in the briefing.  And I just want to explain it

16   to the Court and give you our views on it and where the

17   evidence is on the compound.

18          Lead compound is really just about justifying your

19   starting place, Your Honor.  And I think that we have

20   justified our various starting places.

21          THE COURT:  Three starting places?

22          MR. FELDMAN:  Yes.

23          THE COURT:  Okay.  Let's get them down.  You have the

24   unsubstituted butoxy.  Right?

25          MR. FELDMAN:  Correct.  You have OPC-4392.  And you

Page 3861

1    have the propoxydichloro compound.

2           And then generally, the rest of the analysis is about

3    explaining, showing your work, connecting the dots; in other

4    words, explaining how you get from the starting place to the

5    claimed compound.

6           And I think that our evidence in this case is very

7    strong in that respect because it really follows the

8    teachings of the art.

9           Some of the cases that the defendants rely on,

10   there's problems with the starting place.  There was no

11   reason to start there.  It was taught in the art that that

12   was a bad place to start.  There were specific teachings

13   really negating it.

14          And then there's other problems in the cases that

15   they cite.  And the cases I'm talking about are like the

16   Daiichi case and the Takeda case and the Lilly case.  And the

17   problems in those cases were that in the way that they tried

18   to connect the starting place to where they eventually got,

19   the art didn't really teach them to do that, either.

20          And so those cases really were problematic and could

21   be criticized with respect to hindsight and trying to sort of

22   justify the compound that you ultimately reached by starting

23   there.

24          That's not our case, Your Honor.  I think if we

25   fairly treat the prior art, particularly the teachings of the

Page 3862

1    Nakagawa declaration, the teachings concerning the OPC-4392

2    contain, for example, the Murasaki '87 article, the teachings

3    of the Wise poster, and the other teachings.

4           And I think what we have here is a real direction,

5    real pointers to make the types of changes that we're talking

6    about to get to the compound aripiprazole and the other

7    similar compounds that Dr. Castagnoli talked about, having

8    methyl and chloro substituents and chloro-chloro substituents

9    at the 2,3 positions on the phenyl ring.

10          Your Honor, this is also sort of a special case,

11   compared to some of the cases the defendants cite, although

12   not all of them, in that it's a genus species case.

13          When you have a genus species case, the reason that

14   someone is able to claim a genus is that there's some

15   commonality between all the compounds claimed therein.  If

16   there's not that sort of commonality in properties, you

17   cannot claim the genus.  You're not allowed to claim the

18   genus.

19          So for Otsuka to have claimed the genus -- and they

20   describe the sorts of activities that these compounds were

21   expected to have.  And I'm talking about now the '416 patent.

22   And in the specification of that patent, they described in

23   detail the types of activities that these sorts of

24   carbostyril derivative compounds would be expected to have.

25          And what were those properties?  Those properties

Page 3863

1    included antischizophrenic behavior.  There was testing that

2    was described in the specification.  Those are antipsychotic

3    and antischizophrenic testing.  Those were the types of

4    testing that Otsuka itself had used to identify antipsychotic

5    agents.

6          So for Otsuka to come in here and tell the Court

7    that, no, you would never think that anything in the

8    '416 patent was anything but an antihistamine, I think it's

9    contrary to what's stated in that patent, what they told the

10   patent office, and what they really tried to do here, which

11   was block off that whole area of carbostyrils from

12   competition in both the antihistamine, but also the

13   antischizophrenic area.

14         Your Honor, when there's a genus species situation,

15   and now you're going to try to claim a specific species from

16   within the genus, it's not enough just to claim a particular

17   species.  There's got to be something special about that

18   particular species that then distinguishes it over and above

19   what's already claimed in the genus.

20         And I think if we go to where the patent office was

21   in examining these compounds --

22         And Darren, if you could pull up DTX-121, pages 1322

23   to 23.

24         I think we'll see that the patent office was sort of

25   in the same place that we are.  It's talking about the

Page 3864

1    '416 patent, the DE '105 patent, and it says the teachings

2    are very clear in the prior art.

3           And it talks about the fact that you have this genus.

4    The priority has exemplified a fair amount of compounds to

5    cover the scope of the genus, the motivation and teachings

6    within the scope of the prior art.  It is inherent to the

7    scope of disclosure with a reasonable expectation of success.

8           It is not a question of picking and choosing among

9    several variables.  It is just making other species of the

10   taught genus.  That's where the patent office was.

11          THE COURT:  What's your citation, for the record?

12          MR. FELDMAN:  Sure.  It is DTX-121, and the pages are

13   1322 to 1323.  We had numbered it at the bottom.

14          THE COURT:  Thank you.

15          MR. FELDMAN:  Okay.  So the reason that Otsuka then

16   had to come back to the patent office -- and again, this was

17   a final rejection -- the patent office wasn't buying them

18   just claiming the particular species of aripiprazole was

19   enough.

20          So they had to come back to the patent office, and

21   what they had to do was they had to show some unexpected

22   superiority of this particular compound.

23          And that's why they bothered to do the Hirose

24   declaration, why they bothered to do this testing.  They had

25   to try to prove that there was something special about

1    aripiprazole over the prior art.

2           And Otsuka -- and the patent office agreed that the

3    closest prior art was the propoxy dichloro compound.  Otsuka

4    complains now that that's the starting place.  Well, that's

5    the starting place that they agreed with the patent office

6    was a logical starting place, and it was the closest prior

7    art.  So I think it's a logical starting place here as well.

8           What they represented to the patent office was that

9    that propoxy dichloro compound wasn't nearly as good in the

10   Stereotypy Test, in terms of potency, as a butoxy homolog of

11   that particular compound, which was aripiprazole.  And that's

12   the representation that they made.

13          And the premise that they had is going from a propoxy

14   linked compound to a butoxy linked compound.  Okay.  The

15   butoxy linked compound would be unexpectedly better.  Okay.

16   That's why they ran these tests.  They were trying to prove

17   this unexpected better-ness.  Okay.

18          But the problem is, you're in 2005, and they knew

19   what they needed to show.  They had to show that this

20   particular compound was not just a little bit better because

21   I think the examiner would have found, and I think, as

22   Otsuka's witnesses and Otsuka itself has said, you know, just

23   a little bit of better isn't enough to distinguish the other

24   compounds.  So you needed a lot of better.  Okay.

25          So when we get into the compound and the bias and

Page 3866

1    knowing what you're trying to test for, as opposed to just

2    sort of interpreting scientific results and knowing what

3    you're trying to do to show this unexpected better-ness,

4    that's why 23 times is significant.

5            Well, what's also significant, Your Honor, is the

6    fact that in 1987 they already had stereotypy data, okay, and

7    it didn't say 23 times better.  It said six times better.

8    And as we've heard, six times really isn't all that

9    significant, it's not all that much better, and it wouldn't

10   have been enough for the examiner, either, in terms of

11   allowing this particular patent.

12           That's why it's so significant in terms of the Hirose

13   declaration.  That's why it's so significant that the way it

14   was tested wasn't as clean as it should have been.  And the

15   fact is they weren't really interpreting test results.  They

16   were trying to create test results to prove a point to the

17   patent office.  That's not really science, Your Honor.

18           In terms of the expectations --

19           THE COURT:  Okay.  Go ahead.

20           MR. FELDMAN:  In terms of the expectations, in terms

21   of what was taught in the art or expected in the art in going

22   from a propoxy linked compound to a butoxy linked compound, I

23   think the Nakagawa declaration and the Wise poster fairly

24   clearly taught that making that change, extending the linker

25   link, was going to have an impact on potency that was going

Page 3867

1   to increase the potency.  So I think the expectation going in

2   is that it is going to increase the potency.

3           As Ms. Holland said and explained from the evidence,

4   Otsuka had to have known about the Nakagawa declaration.  It

5   was its own declaration.

6           And if you look at the Haruki memo and some of these

7   other things, clearly Otsuka was paying attention to what

8   Parke-Davis was doing on these things.  Too.  And the data

9   was all there to be seen.

10          So for Otsuka then to come in and say that this is

11  unexpected that you're going to get an increase in potency, I

12  think the evidence really belies that.  So that can't be

13  what's special about aripiprazole in this case.  The increase

14  in potency from going from a propoxy linked compound to a

15  butoxy linked compound was expected.

16          Now, Ms. Holland talked a little bit about the Mouse

17  Jumping Test and why that was a known antipsychotic test and

18  a schizophrenic determining test.  There was the Lal paper.

19  Dr. Marshall testified at length.  We covered it a lot in our

20  briefs.

21          And of course, most importantly, I think, is

22  Mr. Irving's statement in the prosecution of the '932 patent,

23  where now Otsuka is trying to get a patent on this stuff,

24  relying on the Mouse Jumping Test, and they tell the patent

25  office that, yes, mouse jumping is what you use to show an

Page 3868

1    antischizophrenic agent.  Everybody knows that.

2          So I think Otsuka is really stuck with that

3    statement, and they're stuck with the Mouse Jumping Test as

4    showing antipsychotic potency.

5          And I think, as the testimony showed, it does

6    ultimately talk about dopamine blocking, the dopamine

7    hypothesis, this theory that I think everybody agreed was

8    sort of the prevailing theory at the time in terms of what

9    people were trying to do.  I think the Mouse Jumping Test

10   lines up very well with that.

11         And as Dr. Marshall also testified, you can correlate

12   the Mouse Jumping results to the Stereotypy results with

13   respect to a lot of the prior art known antischizophrenic

14   agents.

15         Now, Otsuka attacks the Wise poster in a couple of

16   ways.  One is evidentiary.

17         THE COURT:  So you're saying Mouse Jumping pertains

18   to showing a potential for antipsychotic effect, and it

19   pertains to probably blocking the D2 postsynaptic receptor?

20         MR. FELDMAN:  Yes, Your Honor.

21         THE COURT:  Both?

22         MR. FELDMAN:  Yes.

23         If I can just talk briefly about the Wise poster.

24   We've covered in our briefs why it is prior art.  The fact is

25   it was actually dated.  Dr. Wise testified in his deposition,

Page 3869

1    I think, credibly explaining.  He remembered the conference.

2    He remembered making the poster.  He remembered passing out

3    the poster.

4           There's really no contrary evidence.  There's nothing

5    showing that there's something to refute Dr. Wise's testimony

6    and the fact that the Wise poster is, in fact, prior art.

7           And as you'll recall from the MIT case and some of

8    the other cases that we've cited, the fact of it being

9    available to the public, at this public display, and the fact

10   that it was passed out to members of the public is enough to

11   make it a 102(b) prior art printed publication.

12          Now, Otsuka also challenges the Wise poster on the

13   grounds that it's not a carbostyril; it's a coumarin.  And I

14   think we went on at length at trial explaining that it's

15   really a small difference.

16          Structurally, it's very similar in terms of the way

17   the compound lines up.  It's the difference between an NH

18   group on the ring or an oxygen.  Okay.  And those are called

19   isosteres.  And the testimony at trial showed that people

20   would expect isosteres to behave, in most respects, very

21   similarly.  And I think that the evidence, in fact, shows

22   that that's what happened.

23          The way that these particular compounds lined up with

24   respect to the linker link, with respect to the linker

25   attachment, with respect to substitutions on the phenyl ring,

Page 3870

1    all lined up quite nicely, I think.

2            And don't forget that when Otsuka was prosecuting the

3    '416 patent, they had their own expert in an interference

4    proceeding where Otsuka's lawyers, again from Finnegan, were

5    taking the testimony of their own witness because that's how

6    you do it in an interference proceeding.  And he said that

7    coumarins and carbostyrils were very structurally similar.

8            You know, it was interesting, too, during the trial

9    when Dr. Wise was talking about the clozapine derivatives, he

10   gave an example of clozapine as opposed to asenapine.

11           THE COURT:  Dr. Wise?

12           MR. FELDMAN:  I'm sorry, Your Honor.  Dr. Nichols.

13   I'm sorry.

14           He was talking about the clozapine and the asenapine

15   compounds, and he said those are fairly structurally similar

16   to him, even though there are a lot of different structures

17   there.  And he said really the main difference, and they were

18   isosteres, was again this NH group on the clozapine as

19   opposed to this oxygen group on asenapine.

20           So when he's talking about clozapine derivatives,

21   they're similar; but now when he's trying to distinguish

22   isosteres of carbostyrils, like the coumarin, suddenly

23   there's a great difference here.  I think that goes to the

24   credibility of what they're saying on this.

25           So now, if I can, I'd like to talk a little bit just

Page 3871

1   about justifying the starting place for both the

2   unsubstituted butoxy and also OPC-4392.

3          Ms. Holland went into some length in terms of the

4   modifications to the unsubstituted butoxy compound.  But the

5   reason why you would start there, in addition to it being

6   specifically exemplified in the Nakagawa declaration,

7   specifically claimed in the '416 patent, is that it really

8   embodied sort of the logical starting place.  As Dr. Press

9   put it, it was a perfect platform to start from.

10          Once you draw the inference, which I think the prior

11   art taught, that a butoxy template was where you wanted to go

12   to improve the potency of the carbostyril compounds, it makes

13   perfect sense to start with this unsubstituted butoxy

14   compound, and then make the sorts of substitutions that we're

15   talking about.

16          You would still take into account the teachings of

17   the other art, including OPC-4392 and Nakagawa, about the

18   types of substitutions that you might want to put on the

19   phenyl ring and where you might want to put them, for

20   example, at the 2,3 position.

21          But really, what you had in the Nakagawa declaration

22   and this unsubstituted butoxy compound was sort of a reason

23   to make sort of the next generation starting place beyond the

24   propoxy compounds.

25          You've drawn the inference that growing a propoxy

Page 3872

1    linker is going to improve the activity, but you already know

2    there's some benefits to having the other types of compounds,

3    like the OPC-4392, and its benefits in humans in terms of

4    treating negative symptoms, in terms of good toxicity

5    profile, in terms of low EPS.  You try to keep close to that,

6    but still make the types of changes that you want to make to

7    enhance the potency.

8            Now, OPC-4392 is another, I think, logical starting

9    place.  OPC-4392 was, as the evidence showed, the one

10   carbostyril compound that had been tested in humans.

11           Now, the dispute at the trial was whether this was a

12   success or a failure.  But I think if you fairly read

13   Otsuka's own reports and reports of its scientists at the

14   time, I think that they were not treating OPC-4392 as a

15   failure.  They weren't touting it as a failure in the art.

16   And I think people in the art wouldn't have viewed it as a

17   failure.

18           Can we go to ADX-28 that we used before.

19           In terms of the properties or the wish list of an

20   antipsychotic agent, Dr. Castagnoli and others explained that

21   what you really want to do is you want to be able to treat

22   the positive symptoms, treat the negative symptoms, have a

23   nontoxic compound, and have a good side effect profile.

24           The evidence showed that OPC-4392 --

25           THE COURT:  What are you citing from; today's slide?

Page 3873

1           MR. FELDMAN:  Today's slide, although there's also

2    testimony cited --

3           THE COURT:  Oh, sure.

4           MR. FELDMAN:  -- in the briefs.

5           THE COURT:  But -- yes.

6           MR. FELDMAN:  But right now I'm talking about ADX-28.

7           THE COURT:  What is ADX?

8           MR. FELDMAN:  That was a demonstrative we'd used at

9    trial.

10          THE COURT:  Okay.  It's already --

11          MR. FELDMAN:  Already --

12          THE COURT:  -- a demonstrative at trial?

13          MR. FELDMAN:  Yes.

14          THE COURT:  That's fine.

15          MR. FELDMAN:  Okay.  I'm sorry.

16          THE COURT:  ADX-28?

17          MR. FELDMAN:  Right.

18          And the underlying basis for a lot of this is the

19   Murasaki 1987 article, which was DTX-388T, and also the

20   Gerbaldo abstract, which is DTX-990.

21          And the other point that I should add is that

22   OPC-4392 was, in fact, Otsuka's starting place for developing

23   aripiprazole.  If you look at Dr. Murasaki's 2006 article, he

24   says that it all started from OPC-4392.

25          There was also testimony from Dr. Oshiro in a

1   presentation that he had given where he says that OPC-4392 is

2   the origin of the development of aripiprazole, although I

3   should say that there was a dispute during trial about the

4   translation as to whether it was the cause or the origin, a

5   dispute over a Japanese word there.

6          But I think, given what the actual evidence is and

7   even Otsuka's internal data that we'll get into a little bit

8   later, that OPC-4392 was foremost in terms of the development

9   of aripiprazole.

10          THE COURT:  It was first.  Right?

11          MR. FELDMAN:  Right.

12          Now, in terms of OPC-4392, again, as I mentioned, it

13  was almost there.  The issue of not strong was another issue

14  that came up at trial and what that meant.

15          Otsuka took the position that what that meant is that

16  it had no activity in terms of treating positive symptoms.

17          Our view was that if that was what had happened, that

18  the contemporaneous articles at the time would have said it

19  had no activity in treating positive symptoms.

20          But that's not what those articles said.  They said

21  not strong.  In other internal Otsuka materials, they said it

22  was weak.  And again, we talked about there was a Gerbaldo

23  paper that came out just a month too late to be prior art,

24  but it talked about actually treating --

25          THE COURT:  What's the author's name?

Page 3875

```
 1            MR. FELDMAN:  Gerbaldo.

 2            And it talked about treating hallucinations, which

 3       everyone agrees, I think, is a positive symptom of

 4       schizophrenia, in four out of four patients.

 5            Now, Dr. Roth, when he talked about the Gerbaldo

 6       article, obviously said there was some negativity as well

 7       there.  But the fact remains it seemed to be having some

 8       impact on these people, good or bad.  And you can't ignore

 9       the good.

10            The law, in fact, says that you take the reference

11       fairly for what it teaches.  And the fact that it had some

12       showing of the good is sufficient really to show that there's

13       a basis for starting with it.  That's the Medichem case that

14       we cite in our reply brief.

15            The other thing about the not strong is that it

16       provided a natural sort of impetus, a natural reason, a

17       natural motivation for improving this compound.

18            In other words, our concept is that -- and the

19       concept, I think, that people in the prior art would have

20       had, and I think the evidence showed that, was that you would

21       want to improve this compound.  You're not going to throw it

22       away.

23            The compound was treating negative symptoms.  The

24       testimony was that treating negative symptoms was sort of

25       special here; that other compounds, particularly the typical
```

1    antipsychotic agents, never treated the negative symptoms.

2            Having a good side effect profile was, again, a very

3    promising thing.  The typical antipsychotic agents had

4    serious side effects like EPS and hyperlactemia.

5            And so these were some real notable features of

6    OPC-4392.

7            So then the question becomes, okay.  Well, it's not

8    strong at treating the positive symptoms.  What do we do?

9    How do we make it better?

10           Well, the prior art taught how to make it better in

11   terms of improving potency.  And that's really where the

12   obviousness case comes in in terms of the motivation to make

13   the types of changes that we're talking about, the motivation

14   with respect to OPC-4392 to grow the linker length, to switch

15   the methyls to chlorines.

16           And the particular prior art that we're looking at

17   here, the Nakagawa declaration, taught the benefits of a

18   butoxy over a propoxy linked compound in terms of increasing

19   potency.  The Nakagawa declaration taught the benefits of

20   potency with respect to chlorines at the 2- and the

21   3-position.

22           THE COURT:  Are you still at Nakagawa?

23           MR. FELDMAN:  Still at Nakagawa.

24           The Wise poster also taught the benefits of the

25   butoxy linked compounds in terms of increasing the potency,

1    so that's a thing to do.

2           The Wise poster also contained data showing that a

3    chlorine at the 3-position was going to be more potent than a

4    methyl at the 3-position.  So that's another impetus to try

5    these chlorines at the 2- and the 3-position on the phenyl

6    ring and potentially swap them out with the methyls.

7           And when Dr. Castagnoli created his group of eight

8    compounds, that's exactly what he did in terms of trying the

9    methylmethyl, the methylchloro, the chloromethyl, and the

10   chloro plural compounds.  So he did systematic changes --

11          THE COURT:  Dr. Castagnoli?

12          MR. FELDMAN:  Yes, Dr. Castagnoli, yes.

13          THE COURT:  Just wanted to make sure.

14          MR. FELDMAN:  In terms of explaining what he thought

15   a person of ordinary skill in the art would do.

16          THE COURT:  All right.  Yes.  He didn't actually do

17   it.  He described it.

18          MR. FELDMAN:  He described it.  Sorry.

19          In fact, he said that he thought that a person of

20   ordinary skill in the art would be negligent if they didn't

21   make these types of changes because, again, you had the

22   teachings.  You had the target.  You knew that you needed to

23   increase the positive symptom efficacy.  And you had ways.

24   He had tools in his tool chest on how to do it.

25          The other thing that I wanted to mention is

1   homologation.   That became important at the trial in terms of

2   the systematic types of changes that a medicinal chemist

3   might make.

4           And there are some cases that I believe that Otsuka

5   cites where homologation is just all that someone has, and so

6   they'll say, Okay.  Well, it would be obvious just to make a

7   homolog.

8           We have much more than that here.  As you'll recall

9   from the Burger article that was put up on the board with Dr.

10  Castagnoli, medicinal chemists view homologs as very special

11  compounds.  In the homologous series they expect that there's

12  going to be a parabolic increase in terms of the potency.

13  And finding the peak in terms of potency is often what you're

14  looking for.

15          And I think that the Nakagawa declaration and also --

16  and even to a greater extent, the Wise poster -- the Wise

17  poster went from the ethoxy to the propoxy to the butoxy to

18  the pentoxy, so they really did the entire series.  And what

19  they found was that the butoxys were the most potent within

20  that series.  That's just another motivation to go to butoxy.

21          Now, Otsuka also spent some time talking about, well,

22  based on the Nakagawa declaration, the 5-position compound

23  with the linker was the most potent, so someone with ordinary

24  skill in the art would start there.

25          We have two main points on that.  One is, even if it

Page 3879

1    would have been obvious for someone to start with the

2    5-position linker and make changes, that's fine, but it

3    doesn't make the 7-position linked compounds less obvious.

4    There were still lots of teachings with respect to the

5    7-position compounds.

6            And in fact, there was lots more data on 7-position

7    linked compounds than what was in the Nakagawa declaration.

8    Prominently, OPC-4392, which had been a 7-linked compound,

9    you had the compounds of the Wise poster, which taught that

10   7-position was, in fact, the place to put the linker.

11           So you had more data.  You had more information about

12   it, which would have led someone, I think, to stay closer to

13   the 7-linked compound.  That's what Dr. Castagnoli testified.

14           The other testimony was that changing the linker

15   position was a big structural change.  And so as

16   Dr. Castagnoli and Dr. Press testified, at least initially

17   when they were trying to improve the potency, they wanted to

18   stay close to what's sort of known and been fairly successful

19   so far and stick with that template and make the smaller

20   changes, such as growing the linker or playing with the

21   substituents on the phenyl group.  When you change the

22   position, now you're changing the real relationship amongst

23   all the molecules.

24           But even if the 5-position option was added,

25   Dr. Castagnoli testified that the total number of obvious

Page 3880

1    compounds would only go from eight to 16, in his opinion.

2          And so, you know, even if we take into account the

3    5-position compounds, but still take into account all the

4    other teachings of the prior art, you're not dealing with a

5    particularly large universe of compounds.

6          And we can contrast that to the Merck v. Biobel

7    (phonetic) case, where there were 1,200 compounds, all of

8    which were determined to be obvious.

9          And just to drive this point home, the way the art

10   was, it almost didn't matter where you started.  There were

11   certain characteristics that were taught by the prior art

12   that a compound, in terms of optimizing potency, you were

13   going to want to have.

14         And also, not just optimizing potency, but also

15   keeping the benefits of the other compound, the OPC-4392

16   compound, in terms of treating negative symptoms, a good side

17   effect profile, low toxicity.

18         And in fact, Otsuka's journey to aripiprazole wasn't

19   much of a journey at all.  It was a matter of a couple of

20   months.  There was no "a-ha" moment.

21         All that Dr. Oshiro did in terms of arriving at

22   aripiprazole was making the same sorts of routine changes,

23   the same sorts of medicinal chemistry studies, that were

24   proven out by the Wise poster and even what was shown in the

25   Nakagawa declaration.

Page 3881

1           In other words, what did he actually do?  He screened

2    the compounds that he had already had made to see which was

3    sort of the most promising, the most potent in the Stereotypy

4    Test.

5           And then what did he do?  He studied the effects of

6    the linker length and the linker position and the

7    substituents on the phenyl ring, just like they do in the

8    Wise poster.

9           So I think that's diagnostic proof, I think, that

10   what he was doing was, in fact, ordinary, not extraordinary.

11          And I'd like to touch on, Your Honor, you know, the

12   KSR case from the Supreme Court, which is our most recent

13   direction from them.  It says that the results of ordinary

14   innovation are not the subject of exclusive rights under the

15   patent laws.  So there was some degree of innovation, some

16   degree of routine experimentation, that does not qualify for

17   a patent.

18          And our position, and I think the evidence showed, is

19   that what Otsuka did here does, in fact, fall within that

20   ordinary innovation level and is not extraordinary and is not

21   meriting a patent, particularly a second patent that's going

22   to extend their ability to exclude people from the

23   carbostyril space for another ten years.

24          THE COURT:  From when it was issued?

25          MR. FELDMAN:  Well, for another ten years from when

Page 3882

1   the '416 patent expired.

2          Otsuka spent some time talking about the clozapine

3   and the risperidone as other possible starting places.  And

4   as a general matter, maybe those could have been starting

5   places for someone's antischizophrenic drug discovery

6   program.

7          But what the statute says, 35 USC 103, on obviousness

8   is that you compare the compound that's being claimed to the

9   prior art, and you compare the differences, and you make an

10  ultimate determination as to whether the differences between

11  the compound and the prior art make that compound patentable.

12         And you don't get to exclude some of the prior art.

13  You have to deal with all the prior art, and all the prior

14  art included the carbostyril derivative compounds.

15         And as we expressed, there were obviously reasons to

16  start with the compounds that we started with.  So the fact

17  that you would have started maybe with a clozapine or

18  risperidone-derived compound, you know, in some other

19  research program doesn't really prove anything.

20         And we cite some cases to that effect that just,

21  again, because one path might be obvious doesn't make other

22  obvious paths less obvious.

23         Now, one other issue that I wanted to deal with had

24  to do with the secondary considerations.  And where the

25  secondary considerations fall is in the ultimate obviousness

1    analysis, which ultimately is a legal conclusion.

2           What you're doing is you're weighing the evidence of

3    obviousness and the evidence of nonobviousness.  Then you're

4    making an ultimate legal conclusion as to whether this

5    particular claimed invention is worthy of a patent.

6           What's significant here is the fact that the

7    aripiprazole compound was already covered by another patent.

8    And I'm not sure if that ultimately came through clearly at

9    trial in terms of the significance of that with respect to

10   commercial success and whatnot.

11          But the idea was that, you know, there's an inference

12   that needs to be drawn from these secondary considerations.

13   Okay.

14          It's not enough just to say, "Oh, we sold a lot of

15   this drug" or "Oh, they copied it" or "Oh, you know, it got

16   some awards" or something like that.  Okay.  That's not

17   enough to prove nonobviousness.  For that type of evidence to

18   establish nonobviousness, it has to support an inference of

19   nonobviousness.

20          What -- the inference that we're talking about is

21   often that, well, yeah, if someone knew that this was going

22   to be a commercial success, or if it was so obvious that you

23   knew you could make this and sell a lot of it and make a lot

24   of money, then anyone would have done it.  Okay.  And the

25   fact that no one did it means that it's not obvious.

Page 3884

1          That's really the type of inference that people are

2     seeking to draw when they're using commercial success and

3     other of those factors as an indicia of nonobviousness.

4          What we have here, though, is that no one could play

5     in this carbostyril space.  You know, Otsuka put barbed wire

6     around their sandbox here.  The carbostyril sandbox was

7     blocked.  No one could play there.  No one had an economic

8     motivation to play there because they knew that even if they

9     made the greatest carbostyril compound in the world, okay,

10    they couldn't bring it to market.

11         THE COURT:  I understand that.

12         MR. FELDMAN:  Okay.  You know, the same -- that same

13    theory underlies all the other indicia as well.  Without --

14    with some other explanation as to why people either wouldn't

15    have done aripiprazole, being this other patent, then these

16    other indicia also fall.

17         And with respect to copying, I think, as we've

18    briefed, you know, copying in an ANDA case is really sort of

19    not indicative of anything since the statute basically

20    requires generic drug manufacturers to make the same compound

21    if they want to compete.  And the statute encourages them to

22    try to do that.

23         THE COURT:  Okay.

24         MR. FELDMAN:  That's all I have, Your Honor.

25         THE COURT:  Thank you.

Page 3885

1          MR. FELDMAN:  Thank you.

2          THE COURT:  Anyone else on behalf of defendants

3    before we turn to the plaintiff?

4          MS. HOLLAND:  No, Your Honor.

5          THE COURT:  Okay.  You can have your time to reply.

6          MS. HOLLAND:  Thank you.

7          THE COURT:  Mr. Monroe, would you like to proceed or

8    take a little break?

9          MR. MONROE:  A short break would be very helpful.

10          THE COURT:  That's fine.

11          MR. MONROE:  Thank you.

12          (Recess taken.)

13          THE COURT:  Thank you, everyone.

14          Counsel.

15          MR. MONROE:  Good morning, Your Honor.

16          As I noted at the start of this trial, the issues in

17    this case are not as simple as the defendants argue, and

18    their cookbook theory of obviousness is based on nothing but

19    hindsight.

20          And it doesn't reflect the complexities of

21    antipsychotic research, as shown at trial, and the vigorous

22    effort which ultimately led to aripiprazole, nor does it do

23    justice to one of the most challenging areas in drug

24    discovery research.

25          And I think it's important for us to focus again on

Page 3886

1   some of the background and the state of the art at the time

2   of the invention to put context to the obviousness inquiry

3   and even the nonstatutory obviousness type double patenting

4   theory.

5              As we had discussed at trial, there was a lot of

6   research which led to lots of failures, and Otsuka was also

7   one of those failures.  Fortunately, Dr. Oshiro went back to

8   the drawing board following such a failure within his own

9   company, and the end result is that doctors and patients now

10  have a very unique compound that they did not have before to

11  treat one of the worst mental illnesses.

12             I noted during my opening statement several things

13  which we intended to prove at trial, and I think our

14  posttrial submission shows that we accomplished that goal.

15             I would like to focus today on what the defendants

16  did not prove because that is the issue here.  They have the

17  burden of proof.  They have the burden of establishing by

18  clear and convincing evidence that each of the asserted

19  claims is unpatentable, obvious over the prior art, or that

20  the patent itself is unenforceable.  And they have failed to

21  meet this burden.

22             I will discuss in detail the flaws in their argument,

23  but would first like to address an overarching flaw in their

24  entire analysis.  And the most important is they failed to

25  address the Federal Circuit case law which governs this sort

Page 3887

1    of case involving a pharmaceutical compound claim.

2              If we could have that first slide, PD-9101, on the

3    screen.

4              As the Federal Circuit recently stated, again, in the

5    Daiichi case, the party asserting obviousness of a claim to a

6    pharmaceutical compound must first identify a lead compound

7    in the prior art that one of ordinary skill in the art would

8    have chosen over other compounds in the prior art.

9              Defendants have not even attempted to make such a

10   showing that one of ordinary skill in the art would have

11   chosen one of their compounds over the other compounds in the

12   prior art.

13             THE COURT:  Compound or compounds?

14             MR. MONROE:  Correct, Your Honor.  Over other prior

15   art compounds.

16             THE COURT:  No.  I'm saying select a proposed lead

17   compound or compounds --

18             MR. MONROE:  Compounds.

19             THE COURT:  -- over other compounds?

20             MR. MONROE:  Correct.

21             And if we could turn to the second slide, PD-902.

22             And as the slide PD-902 shows, the defendants have

23   failed to prove that one of ordinary skill would have

24   selected their proposed lead compounds over the numerous

25   other, more promising compounds in the art, including the

1    clozapine-like compounds, the risperidone-like compounds, and

2    other carbostyril compounds, to the extent those were

3    actually relevant to an analysis of picking a lead compound

4    for antipsychotic research.

5            They have not shown why the lead compounds they have

6    chosen or even carbostyril compounds in general would have

7    been chosen over these other promising lead compounds, such

8    as clozapine-like and risperidone-like compounds.

9            Instead, they used hindsight and looked only to

10   structurally similar carbostyril compounds as the lead

11   compound.  This is an approach the Daiichi Corp. said runs

12   contrary to the Federal Circuit case law.

13           As shown by PD-903 on the screen, the Federal Circuit

14   specifically noted that it's contrary to the case law to rely

15   simply on the closest prior art as being dispositive of the

16   lead compound issue.

17           Therefore, defendants' obviousness theory fails at

18   the very first step of their analysis because they have not

19   shown that their lead compounds would be chosen over the

20   other compounds in the prior art in the subject matter area.

21           The defendants' obviousness theories are further

22   fundamentally flawed in that they were presented through

23   experts who lacked the sort of expertise necessary to render

24   this analysis or even interpret the very documents they

25   relied upon.

1           For example, Dr. Press relied heavily on certain

2    papers concerning OPC-4392, including the 1987 Murasaki

3    reference.  He candidly admitted that he did not understand

4    the statement in this paper concerning the "activating agent"

5    of OPC-4392.  He had no understanding that this indicated a

6    potentially dangerous side effect associated with 4392.

7           He similarly demonstrated a lack of understanding of

8    the key details of the documents upon which he relied.  He

9    made repeated mistakes in his testimony concerning the

10   experimental data disclosed in the Wise poster; for example,

11   incorrectly opining that the LMA Test is a test for D2

12   antagonism.  He was unaware that this is a nonspecific test

13   associated with false positives.

14          And this was Dr. Castagnoli I jumped to, Your Honor.

15   I'm sorry.  Dr. Press was the one who did not understand what

16   activated the action, and Dr. Castagnoli is the one who could

17   not testify appropriately on a lot of the pharmacological

18   tests and what they meant.

19          And all of this is laid out also in our posttrial

20   submissions to identify the lack of expertise with respect to

21   interpreting particular documents at trial.

22          And defendants have made no efforts to defend their

23   mischaracterizations or inaccurate understandings of the

24   prior art in their papers.  Multiple -- these multiple flaws

25   are fatal to defendants' position.

Page 3890

1        And I would like to now discuss in further detail the
2    evidence at trial which overwhelmingly demonstrates the
3    nonobviousness of the invention.  I'm going to begin with the
4    obviousness issue, and then address double patenting and
5    inequitable conduct.
6        THE COURT:  Okay.  Fine.
7        MR. MONROE:  It is without dispute that the first
8    place you start in an obviousness analysis is the patent
9    claims.  And in this case Otsuka is asserting three claims,
10   as we showed at court.
11       And just for recollection, I'd like to show
12   slide PD-904.
13       This shows the three claims.  One, to the chemical
14   structure of aripiprazole, is Claim 12.  The second,
15   Claim 17, is the pharmaceutical composition of that drug for
16   treating schizophrenia.  And 23 is a method of treating
17   schizophrenia wherein the carbostyril compound is
18   aripiprazole.
19       THE COURT:  Actually, 23 was added in the
20   reexamination.
21       MR. MONROE:  That's correct, Your Honor.  The patent
22   office allowed Otsuka to add additional claims after the
23   patent office had reviewed the prior art and determined the
24   patentability of aripiprazole, and also the patentability of
25   using that unique compound to treat schizophrenia.

Page 3891

1          The reason I wanted to point out the three claims --

2          THE COURT:  And actually, it had already gotten FDA

3     approval.

4          MR. MONROE:  That is correct.  And the patent office

5     was simply confirming that that product was -- that discovery

6     was patentable, for which we had FDA approval.

7          I wanted to point out the three claims because in the

8     posttrial submissions the defendants grouped those claims as

9     if they stand or fall together.  And if Claim 1 is invalid,

10    then Claim 17 and Claim 23 fall.

11         And that's incorrect.  The Court must examine each of

12    the claims, which are directed to different statutory classes

13    of subject matter, and determine whether or not each claim is

14    patentable.

15         And I'm just addressing that briefly because it is

16    important in some contexts; for example, in the double

17    patenting issue, which I will address later.  Claim 23 is

18    directed specifically to a method of treating schizophrenia.

19    And in a double patenting analysis, we look at the claims in

20    the prior patent and see if there's a claim that would have

21    rendered that claim obvious.  So it makes a distinction in

22    the double patenting analysis.

23         I would now like to discuss briefly the unique

24    properties of aripiprazole.  As discussed, Claim 12 recites

25    the chemical formula for aripiprazole.  And the defendants

Page 3892

1    concede that the prior art does not specifically disclose the

2    chemical structure of aripiprazole.

3            They further concede that there was no antipsychotic

4    in 1988, nor is there 22 years later, having the various

5    structural attributes found in aripiprazole.

6            If we could turn to the next slide.

7            For example, the defendants do not dispute that

8    aripiprazole is the only carbostyril derivative to be FDA

9    approved.  It is the only FDA-approved antipsychotic having a

10   butoxy linker.  And it's the only FDA-approved antipsychotic

11   with a 2,3-dichloro substituted phenyl ring.

12           The defendants also concede that aripiprazole

13   possesses a combination of pharmacological properties which

14   make an exceptional compound for treating patients with

15   schizophrenia and other mental disorders.

16           If we can go to the next slide.

17           The defendants do not dispute that aripiprazole is

18   the only partial dopamine agonist to receive FDA approval as

19   an antipsychotic.  It's the only FDA-approved

20   antipsychotic --

21           THE COURT:  Does partial dopamine agonist -- it

22   doesn't show it in the spec for the '528 patent; does it?

23           MR. MONROE:  The specification does not address that

24   particular property, though it is an inherent property of

25   that compound, which was unexpected, and distinguishes it

Page 3893

1    from the prior art.

2         THE COURT:  But that only shows up in the

3    pharmacology and not in the patent material?

4         MR. MONROE:  That is correct, Your Honor.

5         THE COURT:  Okay.

6         MR. MONROE:  It's also the only FDA-approved

7    antipsychotic that exhibits functional selectivity, and it's

8    the only --

9         THE COURT:  By which you mean you can agonize the

10   autoreceptor and antagonize the postsynaptic D2?  Is that

11   what you mean, or something else?

12        MR. MONROE:  In part.  You can actually -- it is

13   receptor-specific and can go to specific receptors in

14   combination, and not just to a single receptor.

15        THE COURT:  So that refers to the heat map and all

16   the different places that it goes?

17        MR. MONROE:  That's correct, Your Honor.

18        I'd like to show that.  The next slide is the heat

19   map.

20        THE COURT:  I didn't mean to interrupt you.

21        MR. MONROE:  That flows right into the point that

22   it's the only FDA-approved product which has that unique

23   combination of properties that was shown in the heat map to

24   which Dr. Roth testified.

25        As this slide demonstrates, which is PD-907 and was

Page 3894

1    PTX-406 at trial, aripiprazole exerts an amazingly complex

2    action on receptors in the brain.  These properties render it

3    distinct from any other antipsychotic drug.  And these

4    complex properties make aripiprazole such an effective drug

5    in a way that could not possibly have been predicted in

6    advance.

7           The defendants have no real response to that unique

8    aspect of aripiprazole.  The defendants also do not --

9           THE COURT:  Is this directly related to evaluating

10   obviousness?

11          MR. MONROE:  Yes, Your Honor.  It comes in the

12   context of unexpected results in the sense of secondary

13   indicia of nonobviousness.

14          And it also identifies that this compound is

15   something that didn't come before, and that no one would have

16   expected this sort of product to have the properties which it

17   has, looking at the prior art.

18          They also don't dispute that it represents a major

19   medical advance due to its ability to treat schizophrenia and

20   other mental disorders while maintaining a favorable side

21   effect for the file.

22          If we could show slide PD-908.

23          This identifies some of the clinical advantages of

24   aripiprazole, where you find -- and this was all addressed at

25   trial and is on our posttrial findings, Your Honor.  You find

1    clinical advantages like less sedation, reduced propensity to

2    cause EPS or tardive dyskinesia, which was an extremely

3    severe issue for schizophrenia patients.  Also, lower risk of

4    orthostatic hypotension and additional items mentioned in the

5    slide.

6          Nor did they dispute that as a result of its unique

7    properties, it has helped millions of patients around the

8    world and has been approved for numerous indications beyond

9    the treatment of schizophrenia.

10          If we could show the next slide, please.

11          This slide, as noted at trial -- this is PD-909 --

12    identifies all the various indications for which aripiprazole

13    has been approved as additional research has been conducted

14    on the compound to identify why it is so unique.

15          The defendants also do not dispute --

16          THE COURT:  But you can't argue any of this material

17    when you either apply for your patent or apply for your

18    reexamination, per se; can you?  Or you didn't?

19          MR. MONROE:  That's correct, Your Honor.  We didn't.

20          THE COURT:  I get it.

21          MR. MONROE:  But now it has come to have these

22    unexpected properties and these uses.

23          And under the case law, that is something that a

24    Court can look to to evaluate the uniqueness of a compound in

25    an obviousness analysis from a secondary consideration

Page 3896

1    standpoint.

2           The defendants also do not dispute that as a result

3    of its uniqueness, aripiprazole has won many prestigious

4    awards, including the Prix Galien Award, which is the most

5    prestigious in the pharmaceutical industry.

6           Nor do they dispute that it has met with tremendous

7    commercial success.  Indeed, it is that commercial success

8    which drives their interest in copying aripiprazole in the

9    first place.

10          Having made these concessions, the defendants attempt

11   to ignore them, simplistically arguing that aripiprazole's

12   unique chemical structure and accompanying unique

13   pharmacological properties would have been obvious in view of

14   Otsuka's prior own work with carbostyril compounds.

15          The defendants' efforts to establish such

16   obviousness, however, are unsupported by credible evidence.

17          Now, to evaluate the obviousness of the claim, one

18   must examine how a person of skill in the art, to which the

19   patent is directed, would have viewed the state of the art at

20   the time of the claimed invention, which in this case the

21   parties have agreed is October of 1988.

22          As for the state of the art, Otsuka established at

23   trial, and the defendants do not dispute, that the cause of

24   schizophrenia was unknown at the critical date and, in fact,

25   remains unknown today.

Page 3897

1        Nor do the defendants dispute that schizophrenia is a

2   debilitating illness that severely impairs a person's ability

3   to function.

4        Nor do they dispute, because of the seriousness of

5   this illness, the entire industry was actively seeking at the

6   critical date for new ways to treat this illness and,

7   moreover, that such research continues today.

8        Again, this focuses on the long-felt and unmet need

9   that the industry faced in trying to overcome the

10  debilitating illness.

11       We established at trial, and the defendants do not

12  dispute, several historical aspects of schizophrenia, which I

13  won't go into detail today about.

14       For example, there's no real dispute that there was a

15  first generation or typical antipsychotics, as we discussed

16  at trial, but those have serious side effects; in particular,

17  EPS.

18       The defendants also agree that the discovery of

19  clozapine in the mid-1960s provided a ray of hope that caught

20  the attention of the scientific community.  But that

21  excitement was short-lived when it was discovered that it had

22  an extremely serious side effect.

23       It was such an exciting discovery because it would

24  treat both the positive and negative symptoms of

25  schizophrenia without the same -- with the lower propensity

Page 3898

1    to treat EPS, is probably the more fair way to say it.

2              THE COURT:  With a lower propensity to cause EPS?

3              MR. MONROE:  Cause EPS, that side effect.  But that's

4    probably a fair way to address it, since there was no EPS.

5    It was just a lower propensity to cause that, and that was

6    such a significant issue.

7              Clozapine took the scientific community by storm, so

8    to speak, and that became the focus of everyone's research to

9    try to figure out a way to develop another clozapine-like

10   compound without those serious side effects, which was the --

11   agranulocytosis was the particularly bad side effect that

12   clozapine had.

13             The safety issue, as I said, began or motivated

14   researchers to try to find clozapine-like compounds, but

15   nobody knew why it worked the way it did.  And, therefore,

16   the research continued throughout the 1980s, and it was the

17   1970s and 1980s, and it was a particularly dry period for end

18   results.

19             And in fact, if we could show slide PD-190.

20             As we showed at trial, there was this period that was

21   a dry period for new research, and no new FDA-approved

22   antipsychotics came on the market during that period.

23             THE COURT:  Including not even clozapine --

24             MR. MONROE:  Correct, Your Honor.

25             THE COURT:  -- because of its very bad side effects?

Page 3899

1              MR. MONROE:  Correct, Your Honor.

2              And ultimately, the demand was so great to have

3      something that would work, the FDA approved it to be used in

4      those really extreme situations.

5              Shortly after clozapine was approved, a couple of

6      years after that, another compound called risperidone was

7      approved, which we discussed at trial.  And that was

8      chemically structurally different from clozapine, but it was

9      designed to try to mimic the properties of clozapine.

10             Otsuka also established at trial that those skilled

11     in the art, as I noted, were focusing on clozapine.  And the

12     defendants do not dispute that one skilled in the art would

13     look to clozapine as a lead compound for antipsychotic

14     research.

15             If we could turn to PD-911.

16             As Dr. Press testified at trial, clozapine is a truly

17     remarkable lead compound.  And in fact, Dr. Press also

18     testified that it was the subject of everybody's research at

19     that time.  And in fact, he himself did research with respect

20     to clozapine derivatives, and that was his background in this

21     area.

22             As I noted, there was also the discovery around this

23     time of risperidone.

24             And if we could turn to the next slide.

25             We showed this slide at trial to show some of the

Page 3900

1    abstracts that were published reporting on the discovery of

2    risperidone, and noting that risperidone treated both the

3    negative and positive symptoms of schizophrenia without the

4    negative side effect of EPS.

5            And just as a coincidence, this report for

6    risperidone can be contrasted with the report on OPC-4392 in

7    which that abstract only reported that 4392 could treat

8    negative symptoms and not the positive symptoms.  And

9    Dr. Press also admitted that these discoveries with

10   risperidone were very promising in the scientific literature.

11           If we could go to the next slide, please.

12           THE COURT:  Why did you put up 4392?

13           MR. MONROE:  That was part of the slide that we used

14   at trial, Your Honor, which contrasted what was being

15   reported about 4392, which focused solely on the negative

16   symptoms.  Whereas what was being reported at that same time

17   for risperidone was the fact that risperidone would treat

18   both positive and negative symptoms.

19           THE COURT:  Okay.

20           MR. MONROE:  Contrasting how one skilled in the art

21   would view those compounds when trying to decide what to

22   pursue in an antipsychotic drug development program.

23           And as far as what Dr. Press had to say about

24   risperidone, this is one excerpt, which is PD-913, in which

25   the question was whether or not Dr. Press, by October of

Page 3901

1    1988, agreed that risperidone appeared to have the desired

2    activity and safety profile of an atypical antipsychotic in

3    preclinical and clinical reports.  He said:

4            "I believe that risperidone was at a stage of

5    development where it was in the clinic and was showing good

6    effect."

7            Thus noting, again, that this was something in the

8    art that people were aware of as of the critical date.

9            As noted, the defendants don't really dispute

10   Otsuka's evidence at trial that the most likely lead

11   compounds one of skill in the art would have chosen would

12   have been either a clozapine-like compound or a

13   risperidone-like compound.  Instead, they argue you would

14   also look at these other lead compounds.

15           But again, the test is, why would you choose one

16   compound over what was also in the art, and how would the

17   skilled artisan look at those various compounds and make a

18   decision as to what to pursue in a drug development program?

19   That's the real Daiichi test that controls this case.

20           And as a subset of that, which I noted previously,

21   even if you assumed one skilled in the art would look to

22   carbostyril compounds, the defendants haven't shown why you

23   would choose their particular carbostyril compounds over the

24   other carbostyril compounds that were in the prior art which

25   showed better properties than their lead compounds.

Page 3902

1        Now, the hindsight analysis the defendants have

2    engaged in is -- as we noted in the opening statement at this

3    trial and also throughout trial, is the defendants start with

4    aripiprazole, work backwards, and try to find something that

5    looks like it, as close as they can, and then try to develop

6    a theory as to why one would go from that structurally

7    similar compound to aripiprazole.  And that's not an

8    appropriate analysis for obviousness.

9        THE COURT:  That may be how they work up a case as

10   lawyers.  That's not how they presented it at trial.  They

11   put it in the frame of the invented process.

12       MR. MONROE:  That's correct, Your Honor.  I think

13   that highlights the problem.  For example, on the issue

14   of whether or not one --

15       THE COURT:  And incidentally, if pressed, they might

16   say that.  But they never have to say that, and I would never

17   ask them that, and that will never be in evidence, and it may

18   not even be true.

19       MR. MONROE:  I understand completely, Your Honor.  I

20   understand completely.

21       But I think it's a good point to note, when we were

22   questioning their experts about their analysis, this theory

23   that they supposedly had developed which relied so heavily on

24   Nakagawa, they wanted to argue it would have been negligent

25   not to use Nakagawa as, you know, a teaching.

Page 3903

1          They actually didn't even know how to find that

2     declaration.  None of their experts has ever seen a

3     prosecution history, knew how to get one, knew how you would

4     find the materials in there, especially in 1988, before the

5     Internet age.  None of them had any knowledge of the entire

6     prosecution history.  Rather, they were handed this

7     declaration from the prosecution history.

8          So I think it is relevant in assessing the

9     credibility -- I think it's appropriate to focus on that for

10    purposes of analyzing the credibility of the theory that's

11    been presented.

12         THE COURT:  Okay.  Let's stick to the issues.  The

13    point is that under the law, this person of hypothetical

14    ordinary skill in the art hypothetically does have everything

15    on his desk.

16         MR. MONROE:  That's correct.  And then you go to how

17    they would interpret that.

18         THE COURT:  Right.

19         MR. MONROE:  That issue comes up in the context of

20    the publication issue, but we'll leave that with our

21    posttrial findings.

22         THE COURT:  Okay.  Go to your next slide.

23         MR. MONROE:  I'm going back to PD-903, which we

24    showed earlier, which is the Daiichi slide.  And this shows

25    that it is contrary to do this sort of reverse analysis,

Page 3904

1   which is what we believe they are doing.  They're focusing on

2   the structural similarity to overcome the failure to show any

3   evidence of why one skilled would be led to aripiprazole.

4           Again, the proper analysis is to evaluate what the

5   skilled artisan would have viewed as a lead compound over

6   other compounds, and then show that the skilled artisan would

7   have chosen that compound to move forward.

8           I'd like to go back to one thing I mentioned at the

9   beginning about the experts and qualifications.  And I don't

10  want to delve into this too much.  I just want to note the

11  different qualifications of the experts that were presented.

12          And if I could show slide PD-915.

13          This is sort of a summary of the experts that were

14  presented on certain issues.

15          We believe it is important, Your Honor, that Otsuka

16  was the only party to present an expert with clinical

17  experience, and that was Dr. Roth.  That sort of experience,

18  again, is important for interpreting these reports about

19  clinical studies, the sorts of things that I mentioned at the

20  beginning and we'll speak about later, like the Murasaki 1987

21  article, for example.

22          One of the reasons their experts didn't understand

23  what was the activating agent and know what certain terms

24  mean was because they didn't have that level of experience

25  that Dr. Roth had to interpret that term of art.

1          Otsuka also presented two antipsychotic drug

2    discovery experienced experts.  And the defendants did

3    present Dr. Press, who had 25 years ago some limited

4    experience, again, focusing on deriving something from

5    clozapine, which is our simple position of the case.

6          If we could go to PD-916.

7          Just in brief, the Court did qualify Dr. Roth as an

8    expert in schizophrenia, antipsychotic drug discovery and

9    psychopharmacology with its medicinal chemistry component

10   because his qualifications bridge all of these technologies

11   and science and put him in a position to have a better

12   understanding of what one skilled in the art would do.

13         He has an M.D., a Ph.D. in biochemistry.  He

14   practiced medicine as a psychiatrist for more than 10 years.

15   He has treated thousands of schizophrenia patients and has

16   extensive antipsychotic drug discovery.  There are lots of

17   awards, but I will skip those.

18         If we can go to the next slide, PD-917.

19         Dr. Nichols similarly was qualified in medicinal

20   chemistry and pharmacology, thus bridging the two sciences

21   and having a better understanding of how one skilled in the

22   art would interpret the prior art.  And I won't go into all

23   of his awards, either.

24         But I would like to simply note that he's actually

25   done research with aripiprazole and antipsychotic drug

Page 3906

1   discovery and actually discovered drugs in treating

2   schizophrenia which are now in clinical trials.

3          We request that the Court look at the qualifications

4   of the experts in analyzing their testimony.

5          As for the lead compound issue, to get to the merits,

6   the defendants are asking the Court to discard what the

7   entire industry was focusing on during the relevant period,

8   which was clozapine and risperidone.  The defendants argue

9   that the Court should look to Otsuka's carbostyril compounds,

10  as I noted.

11         They identified in the pretrial order two lead

12  compounds, the unsubstituted butoxy compound and 4392.  They

13  only mention the 2,3-dichloropropoxy compound in the context

14  of their bracketing theory, which was because the patent

15  disclosed both a 2,3-dichloropropoxy compound and an

16  unsubstituted butoxy compound, that would somehow teach one

17  skilled in the art to get to aripiprazole.

18         And it's noted in our posttrial submissions there was

19  no evidence presented that someone would review those two

20  compounds as a pair or bracket or associate them together to

21  come to aripiprazole.

22         THE COURT:  The 2,3 --

23         MR. MONROE:  Dichloropropoxy.

24         THE COURT:  -- dichloropropoxy, is it listed in the

25  '416?  I thought it was listed in the Swedish patent and the

1    German application, but not in the '416.  Same difference.

2              MR. MONROE:  That's correct, Your Honor, but there is

3    a reference that has both of the compounds in it.  And I'll

4    look that up to be more accurate for you.

5              THE COURT:  That's all right.  It's not necessary.

6              MR. MONROE:  But the point was they were not focusing

7    on the 2,3-dichloropropoxy compound, but rather pursuing this

8    bracketing theory, which the Federal Circuit has rejected as

9    an analysis for obviousness.

10             Again, focusing on the lead compound issue, the

11   Teva/Barr defendants originally were the only ones arguing

12   this issue and saying it was an unsubstituted butoxy compound

13   that one would pick.  They base their argument on structural

14   similarity and said that you can modify that to get to

15   aripiprazole.

16             Again, we contend, in their hindsight analysis they

17   have not identified any reason why one skilled in the art

18   would look for a lead compound, such as the unsubstituted

19   butoxy compound, and then modify it to get to aripiprazole.

20   As discussed at trial --

21             If we could put up the next slide, PD-919.

22             The '416 patent specifically refers to the

23   unsubstituted butoxy compound as an antihistamine drug.

24             If you're going to review the prior art, you have to

25   review the whole of the prior art and the whole of the

Page 3908

1    reference.  You can't just pick and choose the teaching you

2    want and then ignore the others.

3            The '416 patent specifically recites claims directed

4    to the method of producing antihistamine effect, and then

5    includes what's in the group of compounds that would produce

6    that effect the unsubstituted butoxy compound.  Therefore,

7    specifically identifying that compound as an antihistamine.

8            There was a separate set of claims that addressed CNS

9    controlling activity.  And the unsubstituted butoxy was not

10   included in that claim, even if you were to interpret that

11   claim as implicitly including schizophrenia.

12           Now, the defendants had argued that there was a list

13   at the beginning of the '416 patent which mentioned various

14   potential uses for the class of compounds.  And again, it was

15   a huge class of compounds.  Otsuka essentially discovered

16   carbostyril compounds.  For the idea that you can't --

17           THE COURT:  So it's not billions.  It's 9 trillion?

18           MR. MONROE:  Trillion.  I may be thinking of the

19   defendant claim.

20           But to get a genus, you're entitled to get a genus to

21   a large class of compounds if you have discovered a new class

22   of compounds that's not yet in the prior art.

23           The whole point of the patent system is to have

24   someone tell something to the public and add something to the

25   scientific community.

Page 3909

1        Otsuka did that by discovering that large class of

2   compounds.  That doesn't detract from their ability to then

3   get additional claims, subgenus claims in that same patent,

4   species claims in that patent, or even get a separate patent

5   in which they discover a species or subgenus of compounds

6   which have unique properties that could not have been

7   predicted from that large class, such as 9 trillion

8   compounds.

9        THE COURT:  Even if it's within the range of

10  anticipated purposes for the genus?

11       MR. MONROE:  Yes, Your Honor.  The "anticipated" word

12  bothers me a little.

13       THE COURT:  I'm so sorry.  Stated.  Stated purposes.

14       MR. MONROE:  Correct.  Correct.

15       And again, they provided no reason why someone would

16  go to the '416 patent and focus on the unsubstituted butoxy

17  as a lead compound for any psychotic research, given how it's

18  specifically characterized in the patent.

19       THE COURT:  No.  They go straight to the Nakagawa

20  declaration.

21       MR. MONROE:  And that's where I would like to go

22  next, Your Honor.  The Nakagawa declaration also doesn't

23  direct one to the unsubstituted butoxy compound.

24       Go to the next slide.

25       First, it's not prior art, but I'm leaving that for

Page 3910

1    our posttrial submissions.  I'd like to focus on the science

2    and then the technical issues.

3            As established at trial, the purpose of the

4    declaration was to compare compounds of the invention of the

5    prior art, not to provide structure activity relationship

6    information.

7            And, therefore, this suggestion that one would find

8    the Nakagawa declaration, then look at this declaration which

9    had Mouse Jumping data, and immediately say antipsychotic

10   test, and I'm going to then go to the unsubstituted butoxy

11   compound, is unfounded because if you were looking at that

12   declaration, and even if -- which we disagree -- would

13   immediately think antipsychotic, even if you did, and you

14   looked at that declaration, you would go to the most potent

15   compound.  That's the concept of looking for your best drugs,

16   and it was not the unsubstituted butoxy compound.

17           And, therefore, the defendants kind of want to ignore

18   that because they need the compound that looks just like

19   aripiprazole, but for a couple of modifications, which turn

20   out to be extremely important modifications and actually

21   result in unexpected properties.

22           Again, the declaration on its face does not say what

23   the purpose of that pharmacological test was for.  You often

24   conduct tests to compare compounds by using a test that is a

25   conventional one to look at pharmacological properties.  It

Page 3911

1   doesn't mean you're trying to establish that that compound

2   had a particular property.

3          And in this case the declaration doesn't say what

4   it's trying to prove, other than comparing a group of

5   compounds to another group of compounds.

6          Again, looking at the declaration --

7          THE COURT:  In that declaration, correct me if I'm

8   wrong, the group that we're talking about, which included

9   No. 44 and the unsubstituted butoxy, was being compared to

10  noncarbostyrils in the prior art, I think.  Is that right?

11         You know, Examples A, B, C, D, are those carbostyrils

12  or not?  I don't think so.

13         MR. MONROE:  They were not carbostyrils, Your Honor.

14  I wanted to confirm that before saying that.  And they come

15  from -- the prior art was U.S. Patent No. 4,210,753, for

16  purposes of the record.  That was the patent they were

17  comparing it to.

18         THE COURT:  Fine.

19         MR. MONROE:  In addition, if you're looking at

20  carbostyril prior art, one of the pieces of the prior art was

21  the '932 patent, which was discussed at trial.  And that

22  discloses similar Mouse Jumping data to that found in the

23  Nakagawa declaration.

24         And if you look at that patent, you would be directed

25  to 6-position isomers with all carbon linkers, which were

Page 3912

1   significantly more potent than the unsubstituted butoxy

2   compound of the Nakagawa declaration, again, leading away

3   from the compound they identified as a lead compound.

4          So sticking with the lead compound issue, you then

5   get to 4392.  And Apotex was the one who originally contended

6   that 4392 was a lead compound.

7          THE COURT:  You get 4392 because that was in the

8   literature at the critical data?

9          MR. MONROE:  That is correct.  And there is a dispute

10  regarding what the literature taught one skilled in the art

11  at that time.  The defendants focus on some preclinical

12  literature.

13         And Otsuka has pointed out that if you look at some

14  of the clinical literature which was also in the prior art as

15  of October 1988, it shows the 4392 actually was not achieving

16  antipsychotic activity.  It was not having that effect that

17  was needed for treating schizophrenia.  That's why

18  ultimately, the compound was dropped and not pursued further.

19         THE COURT:  Well, they say the phrase is "not

20  strong."  So at least it's something to like refer to --

21         MR. MONROE:  That's their position, Your Honor.

22         And I think it's important to look to how Dr. Roth

23  and Dr. Nichols, who have the expertise, and especially

24  Dr. Roth, in looking at clinical reports, to know what that

25  means -- what that language means when you're publishing it.

Page 3913

1    The concept of "not strong" means it didn't perform the goal

2    that was intended.

3              For example, if we could go to slide PD-922.

4              With respect to the Gerbaldo paper from March of

5    1988, that abstract noted that 4392 affected the negative

6    symptoms in clinical studies and did not indicate that it

7    treated positive symptoms.

8              Dr. Roth interpreted the silence on positive symptoms

9    as indicating that there was no effect because that's how

10   these sorts of reports get published.  You identify the

11   positive effect that you obtain, and they did not identify

12   one in this report.

13             Similarly, Dr. Roth interpreted the 1987 Murasaki

14   paper as indicating that there was no activity given that

15   nonstrong language that you just noted, Your Honor.

16             And Dr. Press even admitted at trial that when he

17   said in his expert reports that 4392 had strong

18   antischizophrenic activity, he had not even considered the

19   1987 Murasaki paper.  So he had formed his opinion about the

20   strength of 4392 without having looked at all of the art

21   until closer to trial.

22             Dr. Roth also noted that the reference to "strong

23   activating action" would have been a red flag for people who

24   treat schizophrenia and would have directed one away from

25   4392.

Page 3914

1          And as I noted earlier, Dr. Press did not know what

2     that term meant, did not know whether it was a good thing or

3     a bad thing.

4          Further confirming the failure of 4392 in the public

5     eye, the 1988 Murasaki indicated that 4392 would not be safe

6     in therapeutic doses.  Dr. Roth explained that that paper

7     noted that in clinical trials 4392 caused numerous serious

8     side effects and, therefore, the skilled artisan would not

9     have been encouraged to pursue 4392 or any carbostyril

10    derivative as a potential antipsychotic.

11         Again, all of this information was public knowledge

12    as of the critical date.  And to suggest that one would have

13    chosen 4392 as a lead compound in the context of this public

14    information is really contrary to what one skilled in the art

15    would do.

16         In fact, that's not what Otsuka did, as shown through

17    the testimony at trial, where Dr. Oshiro went back to earlier

18    compounds and did not start the 4392, as defendants keep

19    alleging.

20         The last lead compound is, again, the

21    2,3-dichloropropoxy.  And I've addressed the bracketing issue

22    already, Your Honor.  And if you look at it as a lead

23    compound, that theory also is baseless, based on nothing but

24    pure hindsight.

25         The defendants point to the Swedish '945 publication

Page 3915

1    and the German '105 publication, which disclosed this

2    compound amongst several hundred compounds.

3              If we can go to PD-923.

4              The Swedish '945 application is largely the same as

5    the related '416 patent.  It fails to describe the

6    2,3-dichloropropoxy compound as an antipsychotic.  It

7    provides no test data relating to antipsychotic activity.

8    And like the '416 patent, antischizophrenic activity is one

9    of ten possible therapeutic uses that are described.  It

10   doesn't identify which compounds, if any, are antipsychotics.

11             And the 2,3-dichloropropoxy compound is the 22nd of

12   86 different compounds listed in Example 134.  In other

13   words, it's one of many compounds, and the defendants have

14   not shown why one would have focused in or zeroed in on that

15   compound for purposes of a lead compound.

16             And similarly, the German '105 patent, which is a

17   counterpart to the '416 patent, doesn't even include the

18   passing reference to schizophrenia found in the Swedish

19   '945 patent.

20             In summary, with respect to the lead compound issue,

21   one skilled in the art would not have picked as a lead

22   compound for antipsychotic research any of the three

23   compounds cited by the defendants.  Instead, the skilled

24   artisan would have pointed his research in a different

25   direction.  And we presented a lot of evidence at trial to

Page 3916

1    that effect.

2              And again, that is the issue that is before the Court

3    as a threshold matter under the Daiichi case from the Federal

4    Circuit.

5              And then I think it's important to note that except

6    for Otsuka's structurally unique aripiprazole, all new

7    antipsychotics to gain FDA approval since 1975 have been

8    similar in structure to either clozapine or risperidone.

9              Go to slide PD-924, please.

10             And this was a slide we showed at trial to again

11   highlight that you had clozapine, which was a breakthrough

12   pioneer compound, and then color-coded you see the progeny,

13   what people were doing.

14             You had risperidone, which was the breakthrough

15   pioneer compound, and its progeny in blue, and then you have

16   aripiprazole, which stands alone.  And even after all these

17   years and after a lot of research, there is not yet a

18   derivative of aripiprazole.  Again, identifying how unique it

19   is and how hard it is to find a particular compound having

20   the same sort of properties.

21             As for the modifications --

22             THE COURT:  If you were to take -- and I'm not going

23   to burden this record much -- but if you were to take

24   aripiprazole and take off the two chlorines and put two CHs

25   on there --

Page 3917

1            MR. MONROE:  Methyls?

2            THE COURT:  -- methyls -- could you get a patent on

3     that today, even if it would be a good antipsychotic drug?

4            MR. MONROE:  Well, like any patent lawyer, I will say

5     I would have to look at the prior art and see if the prior

6     art actually specifically discloses that compound.  I would

7     have to assess whether that compound, if it was not

8     disclosed, actually showed some unexpected properties or

9     something that would not have been expected.

10           And you would have to analyze whether or not those

11     structural changes would have expected whatever the

12     properties you ultimately ended up with were because those

13     small changes -- we showed at trial small changes, one

14     chlorine, can completely eradicate all activity.  It just

15     depends on where you put it.

16           So I can't really answer that question without all of

17     those facts.

18           As for the modifications, I'll try to address those

19     as succinctly as I can, Your Honor.

20           THE COURT:  Where are we now?

21           MR. MONROE:  We are now --

22           THE COURT:  What's the topic?

23           MR. MONROE:  -- moving on to modifications of the

24     lead compounds.

25           THE COURT:  Oh, okay.

Page 3918

1          MR. MONROE:  Even assuming their lead compounds were

2     appropriate, what would have led one to get from those lead

3     compounds to aripiprazole other than hindsight or structural

4     similarity arguments?

5          As for the unsubstituted butoxy compound, there is no

6     suggestion in the '416 patent to add a chlorine atom at the

7     2- and 3-position of the phenyl ring to convert it from an

8     antihistamine to an antipsychotic.  To the contrary, the

9     '416 patent discloses numerous compounds, and none of those

10    compounds have such a structure.

11         And as Dr. Nichols established at trial, those

12    compounds -- sorry -- chlorination is not required for

13    antipsychotic activity.  And there was no known antipsychotic

14    as of October of 1988 with a 2,3-dichloro substituted phenyl

15    ring, and there is none today.

16         Dr. Press even admitted that he has authored papers

17    in which chlorination reduced or completely eliminated a

18    compound's potential antipsychotic activity.  Therefore, one

19    can't simply assume that you would add a chlorine and get a

20    particular result.

21         The defendants point to the Nakagawa declaration as

22    their primary teaching for modifying the unsubstituted butoxy

23    compound.

24         And if we go to PE-920, which we looked at earlier.

25         The defendants argue that the declaration includes a

Page 3919

1    propoxy linked compound with a 2-chloro substituent on the

2    phenyl ring and another compound with a 3-chloro substituent,

3    and both of these were more potent than any unsubstituted

4    propoxy compound.

5           The defendants have provided no evidence, however,

6    that a propoxy compound with both substituents would be

7    equally or even more potent than the monosubstituted

8    compounds or that such potency translates from propoxy

9    compounds to butoxy compounds.

10          Again, as a reminder, the Nakagawa declaration only

11   evaluated unsubstituted or monosubstituted compounds, as

12   shown in the slide.  It did not analyze disubstituted

13   compounds or disclose them, even.

14          And eight of the nine compounds tested in the

15   Nakagawa declaration had a propoxy linker, not a butoxy

16   linker; thus, again, teaching towards propoxy linkers if one

17   were to engage in the sort of SAR analysis the defendants

18   contend one would do.

19          Our testimony at trial established that's not what

20   you would do.  But assuming their hypothetical, you would get

21   to a different result than they have proposed, and you would

22   not be led to modify the unsubstituted butoxy compound to

23   have a 2,3-dichlorophenyl ring.  In fact, compound 44 of the

24   Nakagawa declaration was ten times more potent than the

25   unsubstituted butoxy compound.

Page 3920

1          An issue that was raised at trial and in the opening

2     is that the defendants make a lot of arguments about what

3     would happen if you did X, Y and Z, but did not present any

4     evidence through testing to establish their position, which

5     they could easily have done given their burden of proof.

6          And again, as I noted, Dr. Press admitted that

7     chlorination can have different effects and, therefore, you

8     wouldn't assume that having two of them would give you an

9     additive effect.  There's no basis for that in the literature

10    in support of that, and his testimony is contrary to that

11    conclusion.

12         Moreover, the Banno article which was discussed at

13    trial specifically reports that:

14         "The introduction of dichloro substitution at the 2-

15    and 3-positions on the phenyl ring of the 2,3-dichloropropoxy

16    compound significantly reduced activity in the Mouse Jumping

17    Test."

18         And that highlights Dr. Press' additive theory is

19    entirely unfounded.

20         The defendants also rely on the Swedish '945

21    application, but that also doesn't support their modification

22    issue for the unsubstituted butoxy.  It does disclose a

23    2,3-dichloropropoxy compound, but that's all it discloses.

24    It doesn't compare it to an unsubstituted version or provide

25    any guidance on the impact of that chlorination.  Nor is

Page 3921

1    there any data suggesting that the compound is an

2    antipsychotic.

3           The skilled artisan, therefore, wouldn't look to the

4    Swedish '945 disclosure as a way to modify the unsubstituted

5    butoxy compound.

6           And finally, with respect to the unsubstituted butoxy

7    compound, the Hiyama abstract similarly fails to support the

8    defendant's position.

9           If we could go to PD-925.

10          The Hiyama reference mentions another Otsuka

11   compound, which is OPC-4139.  It had a propoxy linker, not a

12   butoxy linker, and it was monosubstituted on the phenyl ring

13   with a single chlorine at the 3-position.  It was not

14   disubstituted.  And there was no suggestion to modify that

15   compound in any way or that you should modify any other

16   compound through the teachings of 4319 [sic].

17          Moreover, it's important to note that 4139 was shown

18   to be inactive in the Apomorphine-Induced Stereotypy Test.

19   And as Dr. Roth explained, it's devoid of any postsynaptic D2

20   antagonist activity.  And, therefore, there is no reason one

21   skilled in the art would look to that compound, which was

22   inactive in the appropriate test, as a way to modify the

23   unsubstituted butoxy compound.

24          With respect to 4392 and its status as a lead

25   compound, a lot of the same arguments apply.  But I would

Page 3922

1    like to point out a few particular points on 4392 and why one

2    skilled in the art would not be led to modify it in the way

3    suggested by the defendants.

4            THE COURT:  Are we on 4392 again?

5            MR. MONROE:  We're back to 4392 as a lead compound

6    and its modification.

7            THE COURT:  Okay.  Have you returned to a different

8    slide or --

9            MR. MONROE:  Not yet, Your Honor.  In just a moment.

10           The defendants conceded that there are multiple

11   modifications you have to make to 4392 to get to

12   aripiprazole, and those multiple modifications are simply a

13   few among thousands one could do with attempting to modify

14   4392.

15           And Dr. Castagnoli admitted at trial that all of the

16   structural features of 4392 are associated with its clinical

17   profile and side effect profile, and that the prior art did

18   not describe which changes to its structure could be made

19   without negatively impacting its side effect profile.  You

20   just don't know until you try to make modifications.

21           Dr. Castagnoli spoke in vague terms about how he

22   thought a skilled artisan would try to "tune down" the

23   autoreceptor agonist activity of 4392 or "pump up" the

24   antagonistic activity.  And today we've heard the term

25   "boost" activity.  But he could not explain how the skilled

Page 3923

1    artisan would actually go about doing such tuning and

2    pumping.

3            The defendants, therefore, point to the Wise poster,

4    which was discussed at length at trial.

5            And if we'd go to PD-926.

6            Again, that's not prior art, but we will leave that

7    with our posttrial submissions, Your Honor.  Assuming it

8    were, it would not have led one skilled in the art to modify

9    4392 in the manner that the defendants contend.

10           It concerns a class of compounds known as coumarins.

11   And one of ordinary skill in the art, as Dr. Nichols

12   testified, would not have assumed that the biological

13   properties of coumarins would translate to carbostyril

14   derivatives as an overriding general proposition.

15           Moreover, the Wise poster specifically teaches away

16   from aripiprazole.  Wise identifies its new class of

17   coumarins as dopamine autoreceptor agonists.  By October of

18   1988, however, the autoreceptor agonist theory had been

19   tested with numerous compounds, and all failed in treating

20   schizophrenia.

21           Accordingly, one looking to develop an antipsychotic

22   with D2 receptor antagonistic activity would have had no

23   reason to look for assistance from the Wise poster directed

24   to autoreceptor agonists.

25           Indeed, Dr. Castagnoli never explained why one

Page 3924

1    looking to tune down the autoreceptor activity of 4392 would

2    look to a paper whose main theme was to improve autoreceptor

3    activity.   The Wise poster does not even mention D2

4    antagonistic activity or any test used to evaluate that

5    activity.   Indeed, Dr. Roth pointed out that Dr. Castagnoli's

6    testimony that the LMA Test measures postsynaptic D2

7    antagonism was incorrect.

8           In that regard, Otsuka's posttrial submission lists

9    several other instances in which Dr. Castagnoli's testimony

10   regarding the Wise poster was in error, as shown by the

11   testimony of the defendants' other expert, Dr. Marshall.

12          In addition, the Wise poster focuses in and

13   spotlights compound 116,795, which has no substituents on its

14   phenyl ring, and specifically states in the abstract that

15   addition of chloro or methyl substituents to the phenyl

16   portion of the phenylpiperazine resulted in complete loss of

17   DA, which is dopamine, agonist activity.

18          Similarly, the heading in Table 2 of the Wise poster

19   stated that incorporation of substituents on the phenyl ring

20   resulted in loss of DA and agonist activity.

21          Finally, the summary at the end of the poster stated

22   that no substituents on the terminal phenyl ring are required

23   for DA agonist activity, which is sensitive to structural

24   modifications.

25          The defendants improperly disregard these three

Page 3925

1    explicit statements which note that substituents on the

2    phenyl ring result in a loss of DA agonist activity, which

3    was the focus of this paper, and contend contrary to these

4    statements that the skilled artisan would have interpreted

5    the 3-chloro substituted phenyl compound in that paper as

6    teaching the chlorination of the phenyl ring, which was

7    completely contrary to the whole teaching of that paper.  It

8    simply makes no sense.

9          It's further noted that the key compound which Wise

10   focused on was a propoxy linked compound, and it is

11   identified as the key and most promising compound.

12         Thus, Wise would actually have led one skilled in the

13   art to modify 4392 -- would not have led one of ordinary

14   skill in the art to modify 4392 to have a butoxy linker.

15   Rather, it confirms that one would look at a propoxy linker.

16   But again, that's assuming one would even look at coumarins,

17   which we dispute.

18         And then moving on to the '456 patent, that was also

19   discussed at trial briefly.  It discloses coumarins and

20   describes a compound with a 2,3-dichloro substituted phenyl

21   group.  No test data are provided for this compound, and

22   there's nothing in that patent which would have led anyone to

23   focus on that particular coumarin compound.

24         Moreover, the only compounds tested for potential

25   antipsychotic activity in the '456 patent were propoxy linked

1    compounds with no substituents on the phenyl ring.  And the

2    only compound claimed in the '456 patent for treating

3    psychosis was a coumarin with a propoxy linker with no

4    substituents on the phenyl ring.

5           Again, like the Wise poster, the '456 patent, even if

6    relevant for its coumarin teachings, would teach away from

7    modifying 4392 to arrive at aripiprazole.

8           As for the Nakagawa declaration and its role with

9    respect to 4392, Dr. Nichols testified that there is no

10   teaching therein that would suggest that you modify 4392 in

11   any way.

12          Indeed, there's nothing in the Nakagawa declaration

13   which would have led the skilled artisan to convert the

14   propoxy linker of 4392 to a butoxy linker and then change the

15   2,3-dimethyl substituents to 2,3-dichloro substituents.

16          First, one would not have attempted to draw any SAR

17   conclusions.  We dispute, as presented by our experts, that

18   position of the defendants.

19          Moreover, the defendants did not present any evidence

20   that the ED50 values for the butoxy linked compound and the

21   propoxy linked compounds were significant --

22          THE COURT:  Would you back up, please.

23          MR. MONROE:  Yes.

24          THE COURT:  Start that sentence over.

25          MR. MONROE:  Okay.  The defendants did not present

1   any evidence that the ED50 values for the butoxy linked

2   compounds which had a 5.5 number, and the propoxy linked

3   compound which had a 9.5 number -- 9.3 number, were

4   significantly different.  There was no evidence that those

5   two compounds were actually significantly different and,

6   therefore, wouldn't have taught anybody to choose one over

7   the other.

8           Nor was there any Mouse Jumping data in the prior art

9   with respect to 4392.  And thus, one could not compare what

10  4392 would have been in that sort of test compared to the

11  compounds in the Nakagawa declaration.

12          Therefore, one skilled in the art would not have

13  reached any particular conclusion by looking at the Nakagawa

14  declaration which would relate to modifying 4392.

15          Just as an example, Dr. Castagnoli admitted that one

16  skilled in the art would not have any reasonable expectation

17  as to what might happen if test compound 39 of Nakagawa,

18  which had the single chlorine at the 3-position, what would

19  happen if it were modified to have a second chlorine at the

20  2-position.  There's no evidence to establish how one would

21  actually combine those two aspects of the structure in

22  importing it over into 4392.

23          Finally, with the 4392 and modifications of that

24  compound, the defendants also contend that the '416 patent

25  would have suggested to the skilled artisan to make both

Page 3928

1    carbostyril and dihydrocarbostyril versions of 4392.

2            The '416 patent doesn't refer to 4392, and the

3    defendants have failed to explain why one skilled in the art

4    would pick this particular teaching out of the '416 patent

5    for purposes of modifying 4392 while ignoring all of the

6    other teachings.

7            Again, you have to look at all the teachings of a

8    piece of prior art in assessing how you would modify the

9    other pieces of the prior art.

10           The only additional comment I'll make from a

11   modification standpoint is with respect to the

12   2,3-dichloropropoxy compound.

13           And just briefly, again, there has been no teaching

14   as to why one would be led to modify the 2,3-dichloropropoxy

15   compound to get aripiprazole other than defendants' arguments

16   regarding structural similarity, which is improper.

17           In sum, the defendants resort to a routine

18   optimization argument --

19           THE COURT:  Well, they say it's a homolog.  It's just

20   the next -- you know, it's just the next -- add one -- add a

21   link.  There you are.

22           MR. MONROE:  And that is an inappropriate analysis,

23   Your Honor, under Federal Circuit case law.  Homology does

24   not result in a prima facie case of obviousness and contrary

25   to defendants' position.  And I'll address a couple of cases

Page 3929

1    on that point a little bit further.

2          The defendants point at this routine optimization as

3    a way to get around the no teaching in the actual literature

4    as to what to do.

5          THE COURT:  Okay.  They say the routine lab work to,

6    you know, move a set of experimental compounds down the line

7    isn't patentable.  So --

8          MR. MONROE:  That's their position, Your Honor.

9          THE COURT:  So they say that that's what this was.

10         MR. MONROE:  We disagree that that's what happened

11   here.  We think the evidence established that's not what

12   happened.

13         And you have to look at what one would expect to do

14   in modifying a compound and why one would be led to modify

15   that compound in a particular way because you don't know what

16   the result will be.

17         Basically, nothing would be patentable in the

18   chemical arts if you could simply argue, hook something up to

19   a computer, and get every compound you possibly can and test

20   every compound you possibly can.  That's not the standard.

21         THE COURT:  I know.  I'm still back at the 9 trillion

22   compounds.

23         MR. MONROE:  9 trillion compounds.

24         And again, if it was -- I would like to know, if it

25   was as simple as the defendants said, then Otsuka would

1    simply have immediately designed aripiprazole.  Otsuka had

2    the most experience with carbostyril compounds.

3            That's not what they did.  They had to actually go

4    through a process and try to discover something that would

5    have the properties they wanted.  And I won't go through all

6    those details again, but those details highlight that it's

7    not as simple as they want to suggest it is.

8            And in fact, if it were that simple, others would

9    have come up with derivatives of aripiprazole that are very

10   effective and promising as antipsychotics, and that hasn't

11   happened.

12           THE COURT:  I don't quite understand the little

13   argument that you make, which is, "Oh, yes, our patent '416

14   really did not block innovation by others."  But you'll get

15   there, so I'll wait.

16           MR. MONROE:  I will.  Yes, Your Honor, I'll address

17   that for you.  That comes up in the secondary considerations,

18   which I was just moving to.  We provided a lot of extensive

19   evidence about secondary considerations.  I won't go into all

20   of that.

21           THE COURT:  That's all documented.

22           MR. MONROE:  Right.  That's in the posttrial

23   submission.

24           We did show unexpected results, which is an important

25   issue in this case, and I would direct the Court to those

Page 3931

1    proposed findings.  And we showed that small changes make big

2    differences, and that structurally similar compounds can be

3    very different in their properties.  And that's the hallmark

4    of nonobviousness.  We also showed the widespread adoption of

5    the compound and its commercial success.

6         They have attempted to rebut some of the secondary

7    consideration arguments on the basis of the blocking patent

8    issue.

9         I'd like to first note that the '416 patent issued in

10   March of 1988.  And so from the standpoint of long-felt need

11   and unmet need, the blocking patent doesn't really affect

12   that analysis because of all of that long-felt unmet need

13   that occurred up until March of 1988.

14        So that evidence of long-felt unmet need, failure by

15   others to what people would do, is still relevant even under

16   their blocking patent argument, if you were to accept it.  So

17   that secondary consideration is still an important factor in

18   the Court's analysis.

19        THE COURT:  I hear the words, but I'm not sure

20   whether you have now switched over to arguing double

21   patenting or not.

22        MR. MONROE:  Not yet.  I'm still on secondary

23   considerations and blocking and whether or not the Court can

24   look to commercial success, for example, given their blocking

25   patent theory.

Page 3932

1           The simple answer to the blocking patent theory is

2    there's no evidence that anybody was stopped from getting in

3    the sandbox, as it was referred to.

4           In fact, Teva got in the sandbox.  Teva researched

5    and filed its own patent applications directed to polymorphs

6    of aripiprazole.  That is striking evidence that no one was

7    blocked from doing research in this area.

8           THE COURT:  Well, I think what they're saying is,

9    well, at some point the '416 patent went into the Orange Book

10   for aripiprazole, but that was much later.

11          MR. MONROE:  That is correct, Your Honor.

12          THE COURT:  But they're saying that once the

13   '416 patent comes out, there's not a commercial motivation to

14   do research because you're going to get such a pushback from

15   Otsuka.  You'll be accused of trying to infringe the

16   '416 patent, even if you can raise some credible arguments to

17   have a species or subgenus patent approved for yourself in

18   the wake of the '416.  I think that's what they're saying.

19          MR. MONROE:  I believe that's the theory that they

20   presented without providing any support that that is actually

21   what happened in this case.

22          And the facts of what actually happened in this case

23   show that Teva wasn't blocked, and Teva did pursue research

24   with respect to aripiprazole.

25          THE COURT:  With respect to carbostyrils and

Page 3933

1    aripiprazole?

2              MR. MONROE:  With respect to aripiprazole.  They --

3              THE COURT:  So aripiprazole, the '528 patent, isn't a

4    blocking patent to more aripiprazole research efforts, is

5    what they're saying.

6              MR. MONROE:  That's exactly -- that's what the patent

7    office has concluded.

8              THE COURT:  But they're saying that the '416 really

9    had a freezing -- not a chilling, but a freezing effect.

10             MR. MONROE:  And the argument -- our argument, Your

11   Honor, is if you look at what's really blocking, I mean, if

12   you were willing to fight against a patent specifically

13   directed to aripiprazole and do research directed to

14   aripiprazole in the sake of a patent that specifically

15   recited it, that undercuts an argument that some broad genus

16   claim prevented you from pursuing carbostyril compounds.

17   Then as a practical reality, nothing stopped you from

18   pursuing something that was specifically patented.

19             But you're arguing, on the other hand, that there's

20   this shadow of carbostyril patent.  This carbostyril patent

21   prevented you from pursuing any research.

22             THE COURT:  I think I understand your point.

23             MR. MONROE:  And as far as the double patenting --

24             THE COURT:  Have we finished 103, obviously?

25             MR. MONROE:  That's correct, Your Honor.  And I'm

Page 3934

1  done with secondary considerations, and moving into double

2  patenting --

3          THE COURT:  Okay.  Before you --

4          MR. MONROE:  -- unless you have any questions.

5          THE COURT:  No, I don't.  But before you address

6  double patenting, I really have a question for both sides.

7  And I know Ms. Holland is going to have something to say when

8  you're done.

9          But my sort of working understanding of the Federal

10  Circuit doctrine of obviousness type double patenting is a

11  judge-made doctrine.  Right?

12          MR. MONROE:  Correct.

13          THE COURT:  My understanding of it is that it does

14  not arise except where you have an original application

15  before the patent office that becomes divided through the

16  history of that application, such that all patents that

17  eventually issue derive their direct ancestry and their

18  specification from that original application.

19          That's the only context in which I have seen

20  obviousness type double patenting arise in cases that I have

21  read or decided.

22          So I need to be assured that we can really talk about

23  the concept of obviousness type double patenting, whereas

24  here, the '528 patent does not derive from the application

25  for the '416 and, in fact, the '416 patent was already fully

Page 3935

1    issued and in the public domain before the application for

2    the '528, with its own separate specification, was filed at

3    the patent office.

4            Have I made my question clear?

5            MR. MONROE:  I think your question is clear, Your

6    Honor.

7            And I believe you are correct that the cases have

8    addressed -- the case law has addressed double patenting in a

9    context of continuing applications that one can file in terms

10   of disclaimers to overcome that rejection.

11           It may be against my interests on this issue, but I

12   will note that conceptually I could see a scenario in which,

13   if one filed applications on the same day, for example, and

14   didn't say they were related to one another, but filed the

15   exact same claims, that would be a statutory double patenting

16   situation.

17           And in fact, if you filed two applications on the

18   same day with slightly different claims, then there could be

19   the potential for an obviousness type double patenting

20   rejection.

21           I am not aware of a case dealing with that.  But that

22   would be my frank answer to your question.

23           THE COURT:  Okay.  So, then, what is your answer to

24   the question that I pose, which is:  Is this a case where

25   obviousness type double patenting analysis enters in, based

Page 3936

1    upon what we know as the application history of the '416 in

2    comparison to the '528?

3            And Ms. Holland, you'll get your chance.  I'm asking

4    Mr. Monroe.

5            MS. HOLLAND:  I'm ready for it.

6            THE COURT:  I know you are.

7            MR. MONROE:  Our response, Your Honor, has been that

8    you don't even get to double patenting because the

9    '416 patent is prior art because, as you noted, it was filed

10   earlier.  It became prior art.  It was in the public domain.

11   And the double patenting is just subsumed by the obviousness

12   analysis under Section 103.

13           THE COURT:  And you're not aware of any case law that

14   would sweep this kind of situation into the double patenting

15   theory?

16           MR. MONROE:  I am not personally aware of that, but I

17   can look into that.  I'm not arguing it does not fall within

18   that.  I am just not aware of a case that would address that.

19           THE COURT:  Okay.  But still, you're going to address

20   it for argument's sake here.  Go ahead.

21           MR. MONROE:  Correct.  And for purposes of double

22   patenting, I think we need to deal with a couple of issues.

23           First, if we could have slide PD-930.

24           Contrary to defendants' position, Otsuka did not

25   patent aripiprazole twice.  Their argument suggests that we

Page  3937

1    actually specifically claimed aripiprazole in the

2    '416 patent.  That did not happen.  The '416 patent is

3    directed to a genus and discloses a number of compounds, but

4    doesn't disclose aripiprazole.

5            An Otsuka scientist discovered aripiprazole, a single

6    compound, within that huge genus.  That's allowed under the

7    law when you find something special and new that wouldn't

8    have been predicted from that big group of compounds that you

9    had originally patented.

10           THE COURT:  All right.  But while the '416 patent

11    existed, all 9 trillion compounds were covered by that

12    patent?

13           MR. MONROE:  That is correct, Your Honor.

14           THE COURT:  Whether or not they were specifically

15    listed in the disclosures of the patent?

16           MR. MONROE:  Right.  All 9 trillion compounds were

17    species within that genus of 9 trillion compounds.

18           And the question is, how would one have -- under a

19    double patent analysis, you look at the claims of the

20    '416 patent and then evaluate how would one of ordinary skill

21    in the art been modified to modify what's in that claim to

22    come to the claim in the patent-at-issue.

23           And that's how you get to some of the same arguments

24    that we've heard under the 103 obviousness case.

25           And just to give you some case support, Your Honor,

Page 3938

1    turn to the next slide, which is PD-931.

2           In re Baird is a Federal Circuit case which

3    specifically notes that the fact that a claimed compound may

4    be encompassed by a disclosed generic formula does not by

5    itself render the compound obvious.

6           THE COURT:  I'm sure that's true, or the patent

7    office wouldn't be issuing species patents.

8           MR. MONROE:  That's exactly right, Your Honor.

9           And it's also important to note with respect to,

10   like, the structural similarity arguments that came up in the

11   context of the Hirose declaration, Mr. Van Horn's submission

12   to the patent office did not admit that there was a prima

13   facie case of obviousness based on structural similarity.

14          Rather, he noted that it's possible that one may

15   argue that, which he debated and throughout the prosecution

16   contended against and said that was not fair.  But for

17   purposes of resolving that issue, Otsuka presented evidence

18   of unexpected results.

19          So I just wanted to address the issue that defendants

20   had made that he had somehow admitted that there was a prima

21   facie case, which is not correct.

22          Then if I could have the next slide.

23          Again, courts have repeatedly found chemical

24   compounds' nonobviousness over prior art genus.  And I think

25   the Eli Lilly case is particularly informative in this case

Page 3939

1    because it -- a couple of things happened.

2            First, in that case, a claim to the antipsychotic

3    drug olanzapine was held nonobvious in light of Lilly's prior

4    art, the '574 patent, that claimed a genus encompassing

5    olanzapine.  Olanzapine was also found to be not obvious in

6    light of the next adjacent homolog specifically disclosed in

7    the '574 patent.  Again, this concept that homolog is not

8    enough to render unpatentable a compound.

9            The Court also rejected the defendants' bracket

10   theory as simply characterizing structural similarity, which

11   is not what controls this sort of analysis.

12           And then finally, the Federal Circuit did not

13   specifically address, but did affirm the case ultimately.

14   And at the district court level, the district court had held

15   that double patenting was subsumed by the obviousness.

16           If I could go to the next slide.

17           Similarly, I'd like to identify the Sanofi case

18   against Apotex in which a claim to a pharmaceutical compound

19   was held nonobvious in light of a generic disclosure in

20   claims in Sanofi's prior '596 patent.  And again, in that

21   case the district court had held that the obviousness inquiry

22   was subsumed by obviousness inquiry.

23           THE COURT:  That the double patent was subsumed by

24   the obviousness.

25           MR. MONROE:  Yeah.  Sorry.  I misspoke.

Page 3940

1          And finally, with Takeda, in that case the Federal

2   Circuit found that a claim to a diabetic drug was not obvious

3   over Takeda's prior art patent that included generic claims

4   the company had for this compound.

5          Again, I wanted to bring those to the Court's

6   attention for purposes of addressing the defendants'

7   contention that there's somehow something wrong with getting

8   a species claim or a subgenus claim in the face of a prior

9   genus claim.

10          I'd like to quickly address now the --

11          THE COURT:  I don't think they really say that.  I

12   just think they say that this wasn't novel; that inventively,

13   you could take what you had in the prior art and get to

14   aripiprazole without a lot of effort.  So it's not

15   patentable.  It's obvious.

16          MR. MONROE:  Well, I think it's the --

17          THE COURT:  I don't think they're saying you couldn't

18   get a species patent after the '416.  But thank you for the

19   case.

20          MR. MONROE:  I hope you're correct that they're not

21   saying that, Your Honor.

22          With respect to enforceability, I'll just briefly

23   touch upon the four issues that Ms. Holland identified.

24          As far as the allegedly inconsistent stereotypy data,

25   this argument was not in the pretrial order and shouldn't be

Page 3941

1    addressed.  But even so, the defendants have failed to

2    establish the existence of any inconsistent data.

3            During cross-examination Dr. Oshiro was asked about

4    some internal data regarding the testing of aripiprazole and

5    the 2,3-dichloropropoxy compound in an Anti-Apomorphine

6    Stereotypy Test back in 1987.  This data indicated that

7    aripiprazole was six times more potent than the

8    2,3-dichloropropoxy compound in that particular testing.

9            And the defendants contend that this is inconsistent

10   with the data in the Hirose declaration showing a 23-fold

11   difference.

12           There is no evidence, however, concerning the test

13   conditions underlying the internal test data back in 1987 and

14   whether the resulting data may be validly compared to the

15   Hirose data.

16           Rather than them presenting any evidence on that

17   issue, the defendants mischaracterized the testimony of

18   Dr. Oshiro, as we explained in our posttrial submission.

19           We contend he did not make that sort of admission

20   that as a general proposition, all six-fold increases are not

21   surprising.  Rather, he was in context talking about whether

22   or not he found something that was as surprising as what he

23   found when he found the 15-fold increase in his research

24   which led to his lead compound, 14542.

25           And moreover, there is no evidence that any

Page 3942

1   individual knowingly withheld this information.  Dr. Oshiro

2   admitted that he likely saw something -- a version of

3   something that was submitted to the patent office during the

4   reexamination, but he didn't recall what it was.

5        And there's no evidence that he specifically edited

6   the final declaration that was submitted.

7        THE COURT:  Well, they couldn't get that anyway.

8   Right?  Wouldn't that be privileged?

9        They say the privilege log says he's sitting around

10  and had 300 contacts with this process.  That's about the

11  limit of the discovery they can get.

12       But go ahead.

13       MR. MONROE:  I agree.  And they made no efforts to go

14  further, Your Honor.

15       I mean, Dr. Oshiro admits he was at certain meeting.

16  But also, as noted, he testified he doesn't know what's

17  happening at most of those meetings because he can't hear

18  what's being said.

19       So to conclude that because he was in the room, he

20  was aware of something, in this particular case is not

21  appropriate.

22       As far as being on the privilege log, Dr. Oshiro did

23  test --

24       THE COURT:  I guess he does say, though, that he had

25  various drafts of the -- what do you call it -- the

Page 3943

1    successive submissions to the PTO during the reexamination,

2    and he probably saw the test results that were submitted in

3    the reexamination.  I think he was asked that.

4         MR. MONROE:  He wasn't asked the very specific

5    question I think you're going to, Your Honor.  He was asked

6    about what he would have seen.  He couldn't recall seeing

7    that particular declaration.  He did say he saw something and

8    had provided comments.

9         As he testified, his role as an advisor was to look

10   at scientific issues and answer scientific questions.

11   There's no evidence that he was involved in the actual

12   formulation of that declaration and its content, and so I

13   don't think they've shown that he had that knowledge.

14        Moreover, the defendants didn't ask him at trial,

15   "Were you aware of this data back in 1987?"  They didn't

16   delve into a lot of questions about that data and what that

17   data meant and what he knew about it.

18        THE COURT:  You mean, were you thinking of it in

19   2008 --

20        MR. MONROE:  '5.

21        THE COURT:  -- '5 when it sat in your binder since

22   1987?

23        It was his binder.  Right?

24        MR. MONROE:  It was produced from one of his lab

25   notebooks, which are stored not with him.

Page 3944

1          But they could have asked him a lot of questions.

2   They could have asked Dr. Hirose a lot of questions to try to

3   dig into this issue rather than just asking for an inference.

4          They fault Otsuka for not asking the questions they

5   didn't ask or -- and that they didn't even ask at his

6   deposition.  They could have gone into some of this at his

7   deposition, and they didn't.

8          THE COURT:  Did they bring up the six-time difference

9   at Oshiro's deposition?

10         MR. MONROE:  No, Your Honor.

11         THE COURT:  Okay.

12         MR. MONROE:  And so there's been no evidence that

13  anybody acted with deceptive intent and specifically withheld

14  that data and what that data actually meant.

15         As far as the second issue that Ms. Holland

16  identified, she talked about allegedly false descriptions of

17  testing procedures.  The particular phrase they focus on in

18  Dr. Hirose's declaration was "an observer blind to the

19  treatment received by the mice."  And there was a lot of

20  discussion about that at trial.

21         And Otsuka's position is that it's clear that

22  Dr. Hirose acted with good faith, that those are the sorts of

23  tests he always conducted, and that that statement is

24  accurate.  And the defendants' experts a couple of times

25  admitted that the protocol had a blinding with respect to the

1   dose.

2          So that sentence was not inaccurate.  It said there

3   was a blind to the treatment.  And the dispute is, what does

4   "treatment" mean?  And defendants want to argue that term as

5   meaning something different than what Dr. Hirose meant when

6   he used that term.

7          In addition, they want to argue that there was

8   only -- that the sentence suggests there was only one person,

9   when there were actually two.  If you look at the face of the

10  protocol, there's two individuals involved.

11         And the testimony at trial from the experts

12  established that one skilled in the art and someone at the

13  patent office would assume by looking at the protocol that

14  have the two individuals listed, that two people were

15  involved.

16         And what they would interpret that sentence to mean

17  is that one individual would analyze one particular mouse,

18  which is exactly what happened.  There were two individuals

19  who looked at their individual mice.

20         So this is completely accurate.  There's no evidence

21  of any intent to mislead the patent office regarding how the

22  test protocol was conducted.

23         Moreover, there's no evidence that that test protocol

24  led to any errors in the data or any problems.  Everything is

25  this inference or suggestion that this data must somehow be

Page 3946

1    wrong.  But again, the defense could have conducted their own

2    tests and established that it was wrong if it truly was.

3    They didn't.  Rather, they just want to argue an inference.

4         And Dr. Thisted, our statistician, looked at the

5    data; crunched the numbers; could not find any evidence of

6    the sorts of things which they suggested might -- and they

7    were very careful in saying "might."  They didn't actually

8    argue that there was any error in the data.

9         As far as the Nakagawa declaration and its alleged

10   withholding, there's no evidence that anyone involved in the

11   prosecution of the '528 patent was actually aware of the

12   '928 patent.  Again, everything is this -- one must have

13   known.

14         THE COURT:  Was actually aware of the Nakagawa

15   declaration?

16         MR. MONROE:  Correct.

17         THE COURT:  I think you may have misspoken.

18         MR. MONROE:  Oh, I'm sorry.  Of the Nakagawa

19   declaration.  There's no evidence that anyone was aware of

20   the Nakagawa declaration during the reexamination of the

21   '528 patent.

22         THE REPORTER:  Yes.  That's different than what you

23   said so, please,restate that again for me.

24         MR. MONROE:  There is no evidence that anyone

25   involved in the prosecution or reexamination of the

Page 3947

1    '528 patent was aware of the Nakagawa declaration.

2              THE COURT:  At least consciously aware?

3              MR. MONROE:  Or ever aware.

4              Dr. Oshiro was named as an inventor on that patent,

5    but there was no evidence presented that he ever looked at

6    the prosecution history of that patent or that he was ever

7    involved in the preparation of the Nakagawa declaration.  The

8    most the defendants can point to is testimony from

9    Dr. Nakagawa that he was a coworker.

10             THE COURT:  Nakagawa was deposed but did not come to

11   trial.

12             MR. MONROE:  Correct.

13             THE COURT:  But his deposition is in evidence, I

14   guess.

15             MR. MONROE:  Correct.

16             THE COURT:  Okay.

17             MR. MONROE:  And Dr. Nakagawa simply said he might

18   have because he was my coworker, but there was no evidence he

19   actually was involved.  And Dr. Oshiro does not recall this

20   declaration in any way.

21             Moreover, when you look at the declaration, the

22   defendants focus on Mouse Jumping data and argue what that

23   Mouse Jumping data means and say there is some correlation

24   between that data that would lead one skilled in the art to

25   modify the compounds, thus making it material.

Page 3948

1          We argue vigorously against this suggestion that it

2   was material and don't believe the defendants provided

3   sufficient evidence on that point.

4          As far as the knowledge, Dr. Oshiro did testify he

5   was aware of Mouse Jumping data, but not that data.  He

6   testified he did not recall ever seeing that declaration.

7   And other contemporaneous evidence back during that time

8   period shows Dr. Oshiro was aware of different mouse data

9   than what was in the declaration.

10         For example, his testimony about the Banno article

11  which he authored showed -- the Banno article reports

12  different data.  Banno reports a 9.5 figure for the

13  unsubstituted butoxy compound, which is different than that

14  reported in the Nakagawa declaration, which was 5.5.

15         So Dr. Oshiro admits he was aware of Mouse Jumping

16  data, but what he was aware of he put in the Banno article,

17  which was a different figure.  As far as -- I think that

18  shows his lack of knowledge of that particular data the

19  defendants are pointing to.

20         Finally, they argue there are allegedly false

21  arguments during reexamination.  The defendants have failed

22  to establish that there was anything false about the

23  statement during reexamination about the five compounds.

24         In context, the full section in which that statement

25  appears makes it clear that this statement was referring to

Page 3949

1    the particular references addressing -- that were being

2    addressed and whether those references established

3    antipsychotic activity and discuss that property in general.

4    As such, that statement was accurate.

5            And finally, the defendants try to argue a lot of

6    inference regarding who did or did not come to trial.

7            With respect to Charlie Van Horn, who is the attorney

8    that was involved in the reexamination of the '528 patent, he

9    was identified to defendants as someone available to attend

10   trial, and Otsuka had identified him as a potential witness.

11   And we made it clear to the defendants that he might not

12   appear even during trial because of a death in his family.

13           And based on the evidence presented, there was no

14   reason to present him.  However --

15           THE COURT:  Could he have been deposed by the other

16   side?

17           MR. MONROE:  He was, in fact, deposed, Your Honor.

18           THE COURT:  He was deposed?

19           MR. MONROE:  And that was one of the potential

20   issues, is whether or not deposition testimony would be

21   needed or not.  The defendants graciously offered that if we

22   thought we needed to call him and we couldn't because of his

23   situation, we could try to do deposition designations to have

24   him appear.

25           It is noted he was someone we said would be

Page 3950

1   available, just like Dr. Oshiro and Dr. Hirose.  The

2   defendants specifically requested -- demanded that Dr. Oshiro

3   and Dr. Hirose come to trial, and they were originally going

4   to call them in their case.  They never indicated that

5   Charlie Van Horn had to be there.  So I don't think the

6   inference is fair.

7           And as far as the prosecution history, there's no

8   evidence that Charlie Van Horn actually ever reviewed the

9   '416 patent prosecution history.  During the reexamination he

10  was discussing the teachings of the patent itself, and

11  there's no evidence he looked at that prosecution, and that's

12  all speculation.

13          He also wasn't involved in the prosecution of the

14  '416 patent because he wasn't even at Finnegan at the time it

15  was prosecuted.

16          Finally, I tried to highlight certain issues.  And

17  there were several comments that defendants made in their

18  openings.  But I went on sort of long, Your Honor.  And if I

19  could have a moment just to address a few points.

20          THE COURT:  You know, why don't we take a brief

21  recess right now, and you can decide whether you want to say

22  anything else or not.  And then I'll hear the last word from

23  you and something else from the other side.

24          MR. MONROE:  Thank you, Your Honor.

25          THE COURT:  Okay.

1          (Recess taken.)

2          THE COURT:  Mr. Monroe.

3          MR. MONROE:  Thank you, Your Honor.

4          The defendants stated that what Dr. Oshiro did was

5     just ordinary research.  And I would like to contrast that

6     with the fact that the majority of the case, the defendants

7     argued that the test that Dr. Oshiro used, the Stereotypy

8     Test, was a wrong test and not a good test for establishing

9     antipsychotic efficacy and, in fact, at one point had an

10    inequitable conduct argument based on the fact that that test

11    was used.

12         THE COURT:  You mean in the history of the case, not

13    at trial?

14         MR. MONROE:  Correct.  It's only at trial that

15    suddenly the Stereotypy Test became an ordinary test that

16    anybody would do.

17         The second point is with respect to the properties

18    and how those properties of the compounds that we discover

19    later might be relevant to the obviousness analysis.

20         I would just draw the Court's attention to In re

21    Papesch, 315 F.2d 381 81.  And in that case, the Court noted:

22         "From the standpoint of patent law, a compound and

23    all of its properties are inseparable.  They are one and the

24    same."

25         And that has been a bedrock principle since 1963 in

Page 3952

1    looking at these sorts of issues.

2         As far as the double patenting issue, I would like to

3    note, despite all of the arguments the defendants make

4    regarding how a double patenting situation exists here, the

5    patent office never contended that there was double patenting

6    in view of the '416 patent, even though the patent office

7    examined the '528 patent twice during the original

8    prosecution and reexamination.  And the patent office was

9    vividly aware of the '416 patent during that prosecution and

10   had that opportunity.

11        THE COURT:  This is not a statutory theory.

12        MR. MONROE:  That is correct, Your Honor.

13        THE COURT:  It's a judge-made theory.

14        Does the patent office invoke obviousness type double

15   patenting, to your knowledge?

16        MR. MONROE:  Yes, Your Honor, it does.

17        THE COURT:  And I take it that if I go back to

18   refresh my memory, the arguments of the

19   applicant-turned-patentee are not framed in double patenting

20   terms.  Right?

21        MR. MONROE:  That is correct, Your Honor.  The patent

22   office did not frame the issues in that way.

23        THE COURT:  Okay.

24        MR. MONROE:  And on that front, I also note with

25   respect to the P&G case which the defendants cited at the

Page 3953

1   beginning of their presentation, it's important to note that

2   in that case there is the language they identified, but the

3   Court's actual analysis and decision reflects that the court

4   actually followed the analysis that we proposed.

5         The Court found that the invention in that case was

6   not obvious under 35 USC 103, and in reaching that conclusion

7   considered secondary considerations, and then when it got to

8   double patenting said, We don't have to deal with this issue.

9   We get to the same result that we did under 103.

10        So it didn't actually hit head-on the issue that the

11  defendants would suggest, despite that it was in the

12  decision.

13        THE COURT:  If we do use a double patenting analysis,

14  it is, I think, agreed between both sides that under that

15  type of analysis you look at the state of the art as of the

16  date, in this case, the '528 patent, or not?

17        MR. MONROE:  You do, Your Honor.

18        THE COURT:  You're only comparing the claims of the

19  '528 and the '416, but you're looking at the state of the

20  art?

21        MR. MONROE:  Yes.  Plus, the state of the art in the

22  context of this case is the '416 patent itself.  So you can

23  use the specification of the '416 patent and other claims in

24  that patent to interpret the claim in the '416 patent in

25  which they focus because that patent actually is in the prior

Page 3954

1    art and becomes part of that prior art.

2              THE COURT:  True.  But would something like the --

3    those -- something like the Banno article be in the prior art

4    for the '528 patent?

5              I'm not sure I want the Banno article.  Let's use the

6    ones you have immediately handy.  You know, the 1977 and

7    early '78 literature and the Wise poster would be in the

8    prior art because if it is prior art at all, it's 1987.

9    Right?

10             MR. MONROE:  Correct.

11             THE COURT:  So obviousness type double patenting, you

12   still look at the state of the art as of the application date

13   for the later patent, the '528 patent.  You don't confine it

14   to the state of the art as of maybe when the '416 was

15   applied?

16             MR. MONROE:  That's correct.  I understand.  Yes,

17   Your Honor, that's correct.  You go to the date of the filing

18   of the application of the claim which is being reviewed for

19   patentability.  That's correct.

20             Two more points.  With respect to Charlie Van Horn,

21   we would also like to note he was deposed, as discussed, and

22   during his deposition the defendants did not ask the

23   questions regarding the Nakagawa declaration.  We did not

24   even provide him with a copy of that during his deposition.

25             So as a practical matter, with respect to the

Page 3955

1    inference, the defendants never pursued that issue with

2    Mr. Van Horn prior to trial.

3            Finally, there were a lot of statements by counsel

4    that lots of things were unrebutted.  And we would just ask

5    that the Court look to the proposed findings to see if any of

6    those things were rebutted.

7            They may say the same thing about my comments about

8    things that are not in dispute, but I think it's important to

9    take at face value what's being said.

10           And I would like to correct one issue.  Your Honor,

11   you asked about the compound D and E in the Nakagawa

12   declaration, whether or not those --

13           THE COURT:  All the lettered compounds in that one

14   test that we're focusing on.

15           MR. MONROE:  I do not have with me my cheat sheet,

16   and I answered incorrectly.  They were carbostyrils, Your

17   Honor.

18           That's all.  Thank you, Your Honor.

19           THE COURT:  Ms. Holland.

20           MS. HOLLAND:  I want to first address the issue --

21   the question that you posed about whether this is a case

22   where the double patenting voucher can apply.  And the answer

23   is absolutely yes.

24           And just sitting in my chair, I thought of three

25   cases in which the patents-at-issue, the double patenting

Page 3956

1    references, were completely separate patent families.

2              THE COURT:  And they're cited in your papers anyway?

3              MS. HOLLAND:  The cases are cited, but I want to make

4    sure that Your Honor is looking at them in that context.

5              THE COURT:  Okay.

6              MS. HOLLAND:  The Proctor & Gamble case that I had up

7    on the screen this morning, the Federal Circuit 2009

8    decision, that was a case where the patents were from

9    separate families.

10             The Sun vs. Lilly case, which is a 2010 Federal

11   Circuit case, the patent and the double patenting reference

12   were from completely separate patent families.

13             And then there's the In re Berg case which is cited

14   in our posttrial papers.  And there is a -- there's a

15   footnote in that case that makes it clear where it says that

16   the applications that are being discussed there are not

17   related as by continuation, in part or divisional, and

18   neither references the other.

19             And all those cases are cited in our brief.  I'm not

20   sure they're cited for that point, but they're all found in

21   the briefing.

22             THE COURT:  Thank you.

23             MS. HOLLAND:  I think Mr. Monroe started -- or at

24   least it was near the beginning of his presentation when he

25   said that Otsuka had to go back to the drawing board.  That's

Page 3957

1  simply not the case, and I think it's an important issue here

2  because it impacts inequitable conduct in addition to

3  obviousness.

4       When Otsuka decided that it was going to look at

5  something next generation to OPC-4392, one of the first

6  things it did was test the 2,3-dichloropropoxy.

7       If you recall, Your Honor, Dr. Oshiro testified at

8  trial that his idea was they wanted to get a compound whose

9  activity in the Anti-Apomorphine Stereotypy Test was better

10 than chlorpromazine.  That was the goal.

11      And the evidence at trial showed that they tested the

12 2,3-dichloropropoxy compound, and it was better than

13 chlorpromazine.  It fit the profile Otsuka was looking for to

14 commercialize an antischizophrenic drug.

15      Why didn't they put a 2,3-dichloropropoxy on the

16 market?  That question was also answered by Dr. Oshiro.

17 There is an e-mail that's in evidence from Dr. Oshiro to

18 Dr. Hirose where he states that the patent term on an

19 OPC-4392 series compound, in other words,

20 2,3-dichloropropoxy, which was part of that series, was

21 insufficient.

22      And Dr. Oshiro also testified that there was a policy

23 at Otsuka at the time that they would not commercialize

24 anything unless they could get sufficient patent protection

25 on it.

1          So the 2,3-dichloropropoxy, not only did Dr. Oshiro

2     know that it tested better than it tested in the Hirose

3     declaration; it was a compound that actually fit the profile

4     that Dr. Oshiro was looking for.

5          And that was off the bat, Your Honor.  They could

6     have gone to market with that compound.  They didn't want to

7     because they couldn't get another patent on it.

8          Mr. Monroe also made a point of saying that the three

9     asserted claims at issue in this case have to be analyzed

10    separately.  And in fact, Dr. Press did analyze each of those

11    three claims separately.

12         If we can look at page 141 to 142 of the trial

13    transcript.  Can we blow up from line 11 on page 141, or

14    highlight -- circle that.  Thanks.

15         As you can see, Dr. Press was specifically asked not

16    only about Claim 12, but about Claim 17.

17         And if we can go to the next page.

18         He was also asked about Claim 23, starting from the

19    middle of that page.  And Dr. Press explained why all three

20    of the asserted claims at issue in this case are obvious

21    variants of the unsubstituted butoxy.

22         Can we go back, and starting from line 15 on

23    page 142.

24         This is from Dr. Press' testimony.  Common sense,

25    Your Honor.  It's obvious.  If you know that aripiprazole has

Page 3959

1    antipsychotic activity and that it was going to be formulated

2    into a dose that could be used to treat schizophrenia, of

3    course you would want to use that agent to treat

4    schizophrenia in a patient.

5              That's Claim 23 of the '528 patent, the asserted

6    claim that talks about the method of treatment.

7              Dr. Press' testimony was that you would know

8    aripiprazole would be an improved antipsychotic agent, so of

9    course you would want to use that drug to treat patients.

10   That's the whole point of the research.

11             Just staying on the topic of Dr. Press for one

12   second.  Mr. Monroe was talking about Dr. Press' credentials.

13   And I just want to remind the Court of Dr. Press' testimony

14   at trial, that he was the only expert in this case who was

15   actually sitting in a lab trying to develop antischizophrenic

16   agents at the relevant time frame.

17             Mr. Monroe disparaged that by saying it was 25 years

18   ago, but that's the right time frame in this case.  He was

19   actually in the lab doing his work at the right time frame.

20             Not only was he in the lab trying to develop an

21   antischizophrenic agent; he actually did come up with one.

22   He testified at trial that while he was at Lederle Labs, he

23   had synthesized the compound olanzapine that's currently

24   being marketed by Eli Lilly.

25             The issue there, as Dr. Press testified, was that he

Page 3960

1    at Lederle and Eli Lilly were working on it at the same time,

2    unbeknownst to each other, and that there was an

3    interference, and ultimately, Eli Lilly prevailed.

4            But Dr. Press actually did develop an

5    antischizophrenic agent that is currently being marketed

6    today.

7            Mr. Monroe made the point that chlorination is not

8    required for a compound to have antischizophrenic activity.

9    And of course that's the case, Your Honor.  Defendants are

10   not saying that in every case you would need a chlorine in a

11   molecule in order to have antischizophrenic activity.

12           What we're looking at here are not generalizations.

13   We're looking at a very specific reference, the Nakagawa

14   declaration, that has very specific teachings about chlorine

15   and how they would affect the unsubstituted butoxy.  It says

16   put chlorine at the 2-position.  Put chlorine at the

17   3-position.  Don't put chlorine at the 4-position.

18           So although you may not generally need -- or chlorine

19   may not always be required, in this particular case the prior

20   art is very clear that chlorine at the 2- and the 3-position

21   will improve antipsychotic activity.

22           Mr. Monroe also brought up the fact that defendants

23   didn't actually -- or Dr. Press didn't actually test any of

24   the compounds in the prior art to see how they would actually

25   perform.

Page 3961

1          But of course, that is not the analysis that you're

2    supposed to do on obviousness or on double patenting.  You're

3    supposed to only be looking at what the person of ordinary

4    skill in the art would know from the public literature at the

5    time.

6          Any testing that any expert would do in 2010 would be

7    completely irrelevant to what the person of ordinary skill in

8    the art would know based on the publicly available literature

9    as of the right date.

10          That's all I have, Your Honor, but I think

11    Mr. Feldman has something to say.

12          THE COURT:  That's fine.

13          MR. FELDMAN:  Just very briefly, Mr. Monroe discussed

14    Dr. Roth's testimony about certain red flags that he saw with

15    OPC-4392, including the notion that it was an activating

16    agent.

17          Our point on this, as brought out in the briefs, is

18    that Mr. Monroe and Dr. Roth weren't fairly really treating

19    those articles in terms of what they were actually teaching.

20    In other words, Dr. Roth's conclusions weren't really

21    consistent with what Otsuka and Dr. Murasaki were saying at

22    the time.

23          For example, they point to a 1988 Murasaki article.

24    Although it's dated 1988, which makes it seem later, it's

25    actually in English, and I think it's talking about an

1   earlier Phase I study.  Dr. Roth said that's a red flag.

2           And if you recall on cross-examination, the actual

3   conclusion of that particular paper, which is PTX-545 at

4   802 -- and the transcript page is at 1405, starting at

5   line 9 -- what they actually concluded was that, in fact,

6   this compound was safe enough and should progress.

7           And in fact, it did.  OPC-4392 progressed from

8   Phase I to Phase II and ultimately to Phase III clinical

9   trials.

10          So Dr. Roth's interpretation of OPC-4392 really is

11  not consistent with what the literature says or taught about

12  it.

13          The plaintiffs also brought up several sort of

14  after-developed or after-appreciated features of

15  aripiprazole.

16          Our point on that is that it doesn't really

17  distinguish the prior art carbostyril compounds because

18  there's nothing to show that the prior art carbostyril

19  compounds didn't also have those sorts of properties.

20          And in fact, in some cases there were instances where

21  there was literature teaching that the carbostyrils in the

22  prior art did have those features.

23          For example, they talked about having presynaptic

24  agonism and postsynaptic antagonism behavior.  There was

25  literature that we discussed at trial and is in our briefs,

Page 3963

1    DTX-104, for example, that shows that, in fact, OPC-4392 was

2    characterized as having those same sorts of properties.

3           And I'll also remind the Court that in the

4    '416 patent specification, again, there was a whole host of

5    CNS activities that were discussed in there.

6           And so the fact that Otsuka then decided to test and

7    get FDA approval on various other CNS-like indications is

8    really consistent with what the '416 patent was already

9    teaching in terms of the types of activities that these

10   carbostyril compounds would be expected to have.

11          And finally, Your Honor, again, they've brought up

12   the heat map and this notion of antihistamines with respect

13   to the '416 patent.

14          And the trial testimony, I believe, and again, this

15   is highlighted in our briefs, showed that just because

16   something had some antihistaminic activity did not preclude

17   it from being an antischizophrenic drug.

18          And in fact, just the opposite, as Dr. Press

19   testified, I believe.  Many antischizophrenic drugs, in fact,

20   show some activity at that receptor.

21          And I believe that's corroborated by Dr. Roth's heat

22   map that show that a lot of the marketed antischizophrenic

23   drugs, in fact, were active at that particular receptor.

24          And one final point, Your Honor.  The Banno article

25   that they keep referring to was not prior art, so it doesn't

Page 3964

1    really count in terms of analysis.

2              Thank you, Your Honor.

3              THE COURT:  That's why I took back that --

4              MR. FELDMAN:  Great.  Understood.

5              THE COURT:  All right.  We will get you a decision as

6    soon as we possibly can.  We appreciate very much all the

7    work that's reflected in the posttrial submissions and also

8    your very, I think, well-organized presentations today, both

9    sides.

10             There's 600 pages of posttrial briefing, something

11   like that.  And I will take the liberty of referring to

12   chunks of the record by referring to inclusive pages of your

13   posttrial submissions just in order to get an opinion out.

14             But when you see us do that, that will signify to you

15   that you have all of your arguments full text available to

16   take with you as this case progresses through the Courts, and

17   that we've considered them, and that we're referring to the

18   whole body of whatever the portion is to which we're

19   referring in making our evaluation.

20             And we will call you up before we release anything.

21   You will know.  And we'll figure out a timetable for

22   releasing it.  We'll figure that out with you.

23             And some of your materials have been "filed under

24   seal."  Some of them haven't made it onto the docket in any

25   form at all, these posttrial submissions as of yesterday,

Page 3965

1   which is fine.  I have them in chambers.  If you want to

2   actually get them filed, you have to get them filed under

3   seal.  And the magistrate judge can do the order for you to

4   get that much of it done.

5        And then probably our opinion will be initially filed

6   under seal so that we can get it to you.  We may e-mail it to

7   you first so that you can decide whether you want it filed

8   under seal or not.  All of these are options.  But I assure

9   you that we will not put an opinion on the docket without

10  consulting you first.  Okay?

11       MS. HOLLAND:  Just one more thing that I want to put

12  on the record, Your Honor.  We're going to be submitting our

13  deposition designations formally today.  I just wanted to

14  have that on the record before the record is closed.

15       THE COURT:  Fine.  Do you need us to be in session to

16  do that?

17       MS. HOLLAND:  I don't believe so.  I just wanted it

18  to be put on the record that we were putting that in before

19  the close of this.

20       THE COURT:  Is that agreeable to both sides?

21       MR. MONROE:  Yes.  We're doing the same.

22       THE COURT:  Yes.  And so are you going to submit a

23  copy to chambers?

24       MS. HOLLAND:  Yes.  Would you like a copy, Your

25  Honor?  However Your Honor prefers.

Page 3966

1          THE COURT:  Well, for us to have our bench documents

2     complete, it would be good if we get something.

3               Now, the designations may just designate pages and

4     lines, right, or will they actually show the text of the

5     testimony?

6          MS. HOLLAND:  We can do it whatever way will be

7     easier for the Court.  I think currently we have page and

8     line, but we can --

9          MR. MONROE:  I thought we were doing excerpts.

10         THE COURT:  So it will be readable?

11         MS. HOLLAND:  Yes, yes.

12         THE COURT:  Okay.  That's fine.

13         MR. FELDMAN:  Also, I believe -- are there any

14    exhibits that go with the depositions?  There may be a couple

15    of additional exhibits that are supported by the

16    designations, and we'd like to move those into evidence as

17    necessary.

18         THE COURT:  You can attach them to the deposition

19    designation.  That would make it the easiest way to refer to

20    them when reading.

21         MR. MONROE:  I guess we would like an opportunity to

22    know which ones in case we have an objection.

23         MR. FELDMAN:  Right.  Understood.

24         THE COURT:  Okay.  And if you have any problems, of

25    course, we're available.  Otherwise, if you don't, you can

Page 3967

1   just submit these as part of the record.  Let the court

2   reporter know how you're marking this so the transcript can

3   reflect that it's been received into evidence.

4           All right.  Anything else?

5           Do we stand adjourned?

6           Thank you very much.

7           (Proceedings adjourned at 1:33 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 3968

1                        CERTIFICATE

2        STATE OF NEW JERSEY )

3                           ) ss:

4        COUNTY OF MERCER    )

5              I, JOMANNA DeROSA, a Certified Shorthand

6    Reporter and Notary Public within and for the States of

7    New York, New Jersey, California and Arizona, do hereby

8    certify that within is a true and accurate transcript of the

9    proceedings held on October 21, 2010.

10             I further certify that I am not related to any

11   of the parties to this action by blood or marriage, and that

12   I am in no way interested in the outcome of this matter.

13             In witness whereof, I have hereunto set my

14   hand this 21st day of October, 2010.

15

16             _____

                 s/ JOMANNA DeROSA

17

18

19

20

21

22

23

24

25

Page 3969

1                          I N D E X

2

3                                                    PAGE

4    Appearances                                     3827

5

6    Closing Argument - Ms. Holland                  3831

7    Closing Argument - Mr. Feldman                  3860

8    Closing Argument - Mr. Monroe                   3885

9    Closing Rebuttal Argument - Ms. Holland         3955

10   Closing Rebuttal Argument - Mr. Feldman         3961

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25